

U.S. Department of Justice

United States Attorney
Eastern District of New York

JJD:EMR/MEF/PP
F. #2023R00737

610 Federal Plaza
Central Islip, New York 11722

October 22, 2024

By ECF and E-Mail

The Honorable Nusrat J. Choudhury
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

The Honorable Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

    Re: United States v. Michael S. Jeffries, et al
      Criminal Docket No. 24-423 (NJC)(SLT)

Dear Judges Choudhury and Tiscione:

  On October 17, 2024, a grand jury sitting in the Eastern District of New York returned the above-captioned indictment charging the defendants with one count of sex trafficking, in violation of 18 U.S.C. § 1591, and 15 counts of interstate prostitution, in violation of 18 U.S.C. § 2422(a) (the "Indictment"). Earlier today, the defendants were arrested by agents from the Federal Bureau of Investigation ("FBI") and New York City Police Department. Later this afternoon, the defendants will make their initial appearances in the Southern District of Florida and the District of Minnesota, pending removal to the Eastern District of New York.

  The government respectfully submits this letter in advance of the defendants' forthcoming arraignment before a magistrate judge in the Eastern District of New York, at a date to be determined, in support of its motion for the Court to detain the defendant Matthew C. Smith ("Smith") pending trial, and to impose significant, secured bonds and appropriate conditions of release to reasonably assure the appearance of defendants Michael S. Jeffries ("Jeffries") and James T. Jacobson, also known as "Jim Jake," "Mrs. Cook" and "Todd" ("Jacobson"), in court and to ensure the safety of the community.

I. <u>Background</u>

The government proffers the following facts regarding certain of the charged crimes.[1]

A. <u>Overview</u>

From approximately 1992 to 2014, Jeffries was the CEO of Abercrombie & Fitch Co. ("Abercrombie"), a fashion clothing retailer that owned and operated retail stores around the world. Matthew Smith was Jeffries' life partner. Jacobson was employed by Jeffries and Smith to recruit, interview and hire men to perform commercial sex acts for and at the direction of Jeffries and Smith.

As specified in the allegations in the Indictment, from approximately 2008 to 2015, Jeffries, Smith and Jacobson, together with others, operated an international sex trafficking and prostitution business. During this period, Jeffries and Smith relied on their vast financial resources, Jeffries' power as the CEO of Abercrombie, and numerous people, including Jacobson and a network of employees, contractors and security professionals, to run a business that was dedicated to fulfilling their sexual desires and ensuring that their international sex trafficking and prostitution business was kept secret, thereby maintaining Jeffries' powerful reputation.

As part of this international sex trafficking and prostitution business, Jeffries and Smith paid for dozens of men to travel within the United States and internationally to meet Jeffries and Smith in various locations, including in the Hamptons and New York City, as well as in hotels in such places as England, France, Italy, Morrocco and Saint Barthélémy, and a luxury international cruise ship, for the purpose of engaging in commercial sex acts with Jeffries, Smith and others (the "Sex Events"). Jacobson traveled throughout the United States and internationally to recruit and interview men for the Sex Events. During "tryouts" of potential candidates, Jacobson typically required that the men first engage in commercial sex acts with him.

Jeffries and Smith spent millions of dollars to create a massive infrastructure that supported this operation. In addition to paying hundreds of thousands of dollars in cash to men for commercial sex, they also spent prolific amounts on a secret staff to run Sex Events, domestic and international travel and hotel rooms, Jacobson's salary, and a full-service security company that oversaw non-disclosure agreements, conducted background checks and surveilled witnesses, among other things. Importantly, these non-disclosure agreements were intended to, and in fact did, stop victims and witnesses not only from disclosing information about the Sex Events, but also from seeking assistance for themselves where needed.

Indeed, Jeffries, Smith and Jacobson knew that their conduct was illegal and conspired to maintain the secrecy of their sprawling operation. For example, in addition to the

---

[1] The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

non-disclosure agreements, Jeffries and Smith directed the purchase and use of pre-paid cellular devices to facilitate communications with Jacobson, including those between Jacobson and their staff, to reduce the risk that they would be exposed. And on occasions when witnesses threatened to expose or sue them, Jeffries and Smith relied on the services of a security company to surveil and intimidate those individuals, thereby securing their silence.

  B. <u>The Defendants Used Coercive, Fraudulent and Deceptive Tactics to Coordinate a Sprawling, International Sex Trafficking and Prostitution Operation</u>

 The evidence shows that the process by which Jeffries, Smith, and Jacobson recruited, hired, transported, maintained and compensated men for commercial sex was highly coercive, as was the atmosphere at the actual Sex Events. For example, Jeffries, Smith, and Jacobson, and others acting at their direction:

- employed a referral system and interview process that failed to inform men of the details of the Sex Events before they attended, including the full extent and nature of the sexual activity that would be required of the men at the Sex Events, including, among other things, anal intercourse; the insertion of large sex toys into the anus; and high-pressured enemas administered by inserting a hose into the anus;

- caused men to believe that attending the Sex Events could yield modeling opportunities with Abercrombie or otherwise benefit their careers;

- physically groomed men prior to the Sex Events, including at times shaving men's genitals without advance notice;

- required men to relinquish their personal items, including clothing, wallets and cellular phones, and store them in an inaccessible location during the Sex Events;

- required men to sign non-disclosure agreements;

- intentionally recruited heterosexual men, certain of whom were unwilling to engage in particular sex acts, including anal sex, and insisted that men who previously stated they were unwilling to engage in particular sex acts, including anal sex, nonetheless engage in such acts during the Sex Events; and

- pressured men to consume alcohol, Viagra, and muscle relaxants known as "poppers," during the Sex Events.

 Against the background of this deceptive and coercive environment, Jeffries, Smith and Jacobson used force, fraud and coercion to compel certain victims to engage in sex acts at the Sex Events.

 Jeffries and Smith engaged in sex acts, or caused men to engage in sex acts, to which the men did not or were unable to consent. At least two men disclosed to the FBI that, on

3

their first trips to Jeffries' Hamptons home, Jeffries subjected them to anal sex without their consent. Jeffries and Smith also subjected certain men to other kinds of anal penetration – including painful, high-pressure water enemas – without their consent. Numerous other witnesses said that Jeffries subjected them to escalating demands for anal sex and other sex acts, even after they said no, or persisted in sex acts after they requested that he stop. Other witnesses disclosed that Smith also engaged in aggressive sexual behavior. And notwithstanding the fact that Smith personally witnessed Jeffries' aggressive sexual behavior on numerous occasions, and therefore knew the physical risk Jeffries posed to attendees, Smith not only continued to participate in the Sex Events for his and Jeffries' sexual pleasure, but also to facilitate Jeffries ever more outlandish conduct.

Jeffries and Smith also pressured men to consume alcohol and poppers during these Sex Events. Multiple men have disclosed that Jeffries would hold their heads to force them to inhale poppers before sex acts. Jeffries and Smith also directed others to inject or personally injected men in their penises with a prescription-grade erection-inducing substance for the purpose of causing the men to engage in sex acts in which they were otherwise physically incapable or unwilling. Notwithstanding the fact that these injections were not medically indicated and often caused the men to suffer painful physical reactions that lasted for several hours, Jeffries and Smith employed their use to fulfill their own sexual desires by causing men to submit to them. Several men have disclosed that they suffered a significant medical reaction to the injection and were never offered medical attention; at least one individual disclosed that he was required to engage in sex acts even as he was still suffering the effects of the injection.

Many of the victims, at least one of whom was as young as 19 years old, were financially vulnerable and aspired to become models in the fashion industry, a notoriously cut-throat world. Indeed, some of the men they recruited had previously worked at Abercrombie stores or modeled for Abercrombie. Jeffries, Smith and Jacobson took advantage of certain men and tricked them into believing that they were meeting Jeffries and Smith for the purpose of receiving a modeling opportunity with Abercrombie. Some men also were led to believe that refusing to engage in sexual interactions could stifle their careers, a premise that was easily accepted in such a dysfunctional industry. In fact, numerous men told the FBI that Jacobson misled them about the purpose of meeting and engaging in sexual activity with Jeffries and Smith.

For these serious crimes, the defendants face significant terms of imprisonment. If convicted of the sex trafficking charge, the defendants face a maximum sentence of life imprisonment and mandatory minimum sentence of 15 years' imprisonment. If convicted of the interstate prostitution charges, the defendants face a maximum sentence of 20 years' imprisonment on each count.

II. <u>Legal Standard</u>

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." <u>United States v. Friedman</u>, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice." <u>Id.</u> (citation omitted). "Once this determination has been made, the

court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

The government may proceed by proffer to establish facts relevant to a detention determination. United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. This is because bail hearings are typically informal affairs, not substitutes for trial or discovery. Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004) (internal citations and quotation marks omitted).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "the person's character"; and (4) the nature and seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). In evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Moreover, the sex trafficking charge based on the defendants' conduct – Count One – carries with it a presumption of detention. See 18 U.S.C. § 3142(e)(3)(D) ("Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense under chapter 77 of this title for which a maximum term of imprisonment of 20 years or more is prescribed.").

   III. Argument

      A. The Defendants Pose a Significant Risk of Flight and a Danger to the Community

Based on the defendants' serious and years-long abuse, the penalties they face upon conviction, the strong evidence of their guilt, and their ability and incentives to flee, the government respectfully submits that Jeffries and Jacobson should be released only upon the issuance of a substantial secured bond, in the amount of $10 million for Jeffries and $500,000 for Jacobson, along with the imposition of appropriate conditions to ensure that they do not flee or endanger the community. For the same reasons, in addition to the fact that Smith is not a United States citizen and maintains meaningful contact with the United Kingdom, of which he is a national and citizen, Smith should be detained.

5

First, as set forth above, the offenses are serious, the conduct involves extraordinary abuse, and the defendants face severe penalties if convicted at trial. "The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence." United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022). Here, if the defendants are convicted at trial, they face a mandatory minimum sentence of 15 years' and up to life imprisonment. 18 U.S.C. § 1591.

Second, the evidence of the defendants' guilt is strong. The Indictment comes at the end of a long-term investigation conducted by the FBI, and includes the anticipated testimony of dozens of witnesses, as well as voluminous documentary evidence including emails, travel records, non-disclosure agreements, financial records and other documents. Where the weight of the evidence is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." Zhang, 55 F.4th at 151; United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee.").

Third, the history and characteristics weigh in favor of imposing stringent conditions of release for Jeffries and Jacobson, and detention for Smith. While the defendants have no known prior criminal history, the evidence shows that their conduct was not aberrational or a one-time mistake; the defendants employed dozens of people and spent millions of dollars on their illegal enterprise. Their crimes were meticulously planned to take advantage of men for their own sexual pleasure, which included forcible sex without consent. Importantly, the defendants were deeply committed to maintaining the secrecy of their operation, including by using legal agreements and money to leverage their power over witnesses and guarantee their silence regarding their sprawling illegal conduct.

Fourth, the defendants have the means to flee if they choose to do so. See Sabhnani, 493 F.3d at 76 ("a second factor strengthens the case for detention: defendants' ample means to finance flight"). Based on information obtained during the investigation, the government understands that Jeffries and Smith, in particular, have access to substantial wealth. As the CEO of Abercrombie, Jeffries often earned tens of millions of dollars per year. Jeffries and Smith also have substantial international ties, including having lived in South Africa for several years after Jeffries left Abercrombie.

Given these factors and the likelihood that a conviction on the sex trafficking charge will result in an effective life sentence for the defendants given their respective ages, the defendants are all a risk of flight. Indeed, the Second Circuit has held that the possibility of a severe sentence is an important factor in assessing flight risk. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."). Moreover, the possibility of a substantial sentence here presents a uniquely different risk to the defendants than the mere monetary

damages associated with a civil lawsuit, and thus, any claim that Smith and Jeffries have not yet fled, notwithstanding the existence of a pending civil suit against them in the Southern District of New York, which relates to some of the same conduct as that which underlies the charges in the Indictment, is unpersuasive.

### B. Smith Poses the Most Substantial Risk of Flight and Should Be Detained

This is especially true for Smith, who is a citizen of the United Kingdom and continues to have strong continuing ties to his home country, which profoundly affects his ability to flee. See, e.g., United States v. Zarrab, 15-CR-867 (RMB), 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (citing the defendant's extensive international travel as one factor supporting detention); United States v. Seif, 01-CR-0977 (PHX), 2001 WL 1415034, at *2-3 (D. Arizona Nov. 8, 2001) (denying bail for a defendant who was a foreign national, had no family ties to United States, and was an experienced international traveler with substantial connections in countries that did not have extradition treaties with the United States). While the United States and the United Kingdom have an extradition treaty, extradition proceedings in the United Kingdom often take years to complete when the defendant contests his extradition. Moreover, Smith also has the means to flee to a country where it is difficult for U.S. law enforcement to locate him or that does not extradite individuals to the United States.

Given Smith's foreign citizenship, a bond that requires only home detention and the use of an ankle monitor is not sufficient to rebut the presumption of detention. Moreover, the fact that Smith has access to substantial financial resources should not override that risk. See United States v. Boustani, 932 F.3d 79 (2d Cir. 2019 (holding that Bail Reform Act does not permit two-tiered bail systems where wealthy defendants are effectively released to self-funded private jails); United States v. Dono, 275 F. App'x 35, 36 (2d Cir. 2008) (rejecting conditions that included, among others, home detention and electronic monitoring, and requirement that defendant's father – a retired police officer – take "personal responsibility" for defendant).

Additionally, as some courts have observed, "home detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start." United States v. Zarger, No. 00-CR-773 (JG), 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000); see also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal citation and quotation marks omitted). Indeed, similarly situated defendants have been known to evade the strictures of pre-trial detention and orchestrate a flight from justice. Less than two weeks ago, a German national charged in this district who was under home detention on a $5 million bond guaranteed by his domestic partner and children tampered with his ankle bracelet monitor and absconded. See United States v. Horst Jicha, 23-CR-342 (OEM) (E.D.N.Y. 2024); see also United States v. Rufai, 18-CR-201 (DLC) (S.D.N.Y.) (defendant, who was convicted of fraud, sentenced and due to surrender in 12 days, removed his ankle bracelet and fled the United States). There is thus a significant risk that, if Smith fled, he would never face justice.

For these reasons, the Court should find that there are no conditions that would enable Smith to overcome the presumption of detention, and thus he should be detained pending trial.

      C.   Significant, Secured Bonds and Appropriate Conditions Are Required for Jeffries and Jacobson

In light of the above, the government submits that the Court release Jeffries and Jacobson only if each defendant satisfies appropriate conditions, including:

1) Home detention with GPS location monitoring;

2) A bond of $10 million for Jeffries secured by property, and a bond of $500,000 for Jacobson secured by property, signed by at least two sureties with significant moral suasion over the relevant defendant;

3) Restrictions limiting travel to their home district and, as required for court appearances, the Eastern District of New York, see 18 U.S.C. § 3142(c)(1)(B)(iv);

4) No contact, outside the presence of their attorneys, with known co-conspirators, known potential witnesses, or any known alleged victims of the offenses charged in the Indictment. In the event there is confusion regarding whether someone the defendants interact with fall into any of the above categories, the defendants shall seek permission from the Pretrial Services Officer to have contact with that individual. See 18 U.S.C. § 3142(c)(1)(B)(v);[2] and

5) The surrender of all firearms and weapons.[3]

The government has consulted with counsel for Jeffries and Jacobson who consent to the proposed conditions.

## IV. Conclusion

For the reasons set forth above, the government respectfully submits that the Court should detain Smith pending trial, and only release Jeffries and Jacobson upon the execution of a substantial, secured bond, with stringent conditions of release, including home

---

[2] Because Jeffries and Smith are life partners, the government is not seeking to forbid contact between them but only to prohibit contact between them and Jacobson, and to prohibit the defendants from discussing the case among themselves outside the presence of counsel.

[3] This condition is particularly applicable to Jacobson, who is known to possess multiple firearms, albeit for recreational purposes.

8

detention.  Such terms are necessary to ensure that the defendants neither flee nor engage in further criminal activity harmful to the community.

                              Respectfully submitted,

                              BREON PEACE
                              United States Attorney

                    By:    /s/_____
                              Erin Reid
                              Megan E. Farrell
                              Philip Pilmar
                              Assistant U.S. Attorneys
                              (718) 254-7000

cc:    Clerk of the Court (NJC) (by ECF)
        Clerk of the Court (SLT) (by ECF)
        Counsel of Record (by ECF)