**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| United States of America,<br><br>-v-<br><br>Michael S. Jeffries,<br>Defendant. | 2:24-cr-00423 (NJC) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

Defendant Michael S. Jeffries is an 82-year-old man who formerly served as the Chief Executive Officer of fashion clothing retailer Abercrombie & Fitch Co. from around 1992 to 2014. Jeffries faces a sixteen count Indictment charging him with sex trafficking in violation of 18 U.S.C. § 1591(a), (b)(1), interstate prostitution in violation of 18 U.S.C. § 2422(a), and aiding and abetting these offenses under 18 U.S.C. § 2. (ECF No. 1.) His trial is scheduled to begin with jury selection on October 26, 2026. On May 2, 2025, following the submission of expert evidence, this Court found by a preponderance of the evidence that Jeffries was suffering from a mental disease or defect rendering him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. (ECF No. 63.) Jeffries was committed to the Federal Medical Center at Butner ("FMC Butner" or "Butner") pursuant to 18 U.S.C. § 4241(d) for competency restoration procedures, and evaluators at the facility ultimately deemed Jeffries' competency restored. (ECF No. 73-1 at 2.) Jeffries was subsequently reevaluated by the parties' experts, and this Court held a four-day competency hearing in March 2026.

Before the Court are the parties' post-hearing submissions addressing whether Jeffries' competency has been restored since the Court's issuance of the May 2, 2025 Order. The Court has carefully evaluated a voluminous record, which includes the testimony and written reports of three defense expert witnesses (Dr. Jacqueline Valdes, Dr. Alexander Bardey, and Dr. Miranda Rosenberg) and three prosecution expert witnesses (Dr. Cassondra Morris, Dr. Tracy O'Connor Pennuto, and Dr. Cheryl Paradis), Jeffries' medical records, and records concerning his four-month custodial hospitalization at Butner from July 21 through November 21, 2025. The Court also listened to more than 21 hours of audio recordings of the 109 telephone calls made by Jeffries to people other than his counsel while detained at Butner, as well as all available audio recordings of a two-day evaluation of Jeffries conducted jointly by Dr. Bardey, Dr. Rosenberg, and Dr. Paradis in January 2026.

In *Dusky v. United States*, 362 U.S. 402 (1960), the U.S. Supreme Court established that a criminal defendant is competent to proceed where (1) the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and (2) the defendant "has a rational as well as factual understanding of the proceedings against him." Here, there is ample evidence—far more than a preponderance of the evidence—to show that that Jeffries is competent to proceed to trial on the sex trafficking and interstate prostitution charges against him for five overarching reasons.

First, Jeffries clearly possesses a rational and factual understanding of the proceedings to adjudicate his criminal charges. His presentation and responses in evaluations following his commitment to Butner and his phone calls show that he understands the structure of the criminal legal system, courtroom procedures, the functions of the various participants, the nature and purpose of the proceedings, and key legal concepts, including but not limited to the concepts of

innocence, guilt, a guilty plea, attorney-client confidentiality, a bench versus jury trial, and the considerations made by a defendant when choosing whether or not to testify. Although Jeffries made a conscious choice not to engage with the charges and allegations against him either before or during much of his custodial hospitalization in Butner, Jeffries has learned and retained adequate information about the interstate prostitution and sex trafficking charges and the prosecution's allegations.

Second, Jeffries is a reasonably intelligent person and skilled communicator who possesses a more than sufficient ability to consult with his lawyers with a reasonable degree of rational understanding. Despite the decline in certain areas of his cognitive functioning, Jeffries' responses in evaluations, whether at Butner or following his release, and his phone calls with Matthew C. Smith, his romantic partner and co-Defendant, illustrate his abilities to ask pertinent questions, engage in critical thinking, follow and participate in a conversation, express himself, learn information and recall it days later, understand and suggest defense strategies, and advocate for his interests. All of these skills enable him to work with his counsel to meaningfully engage in his defense.

Third, in reaching these conclusions, the Court grants the most significant weight to the opinions and testimony of Dr. Paradis, Dr. Morris, and Dr. Pennuto, all of whom testified credibly before this Court. Dr. Paradis has conducted more than one thousand neuropsychological assessments and competency evaluations and has more than ten years of experience working in rehabilitation medicine with people suffering from brain damage. Her opinion that, as of 2026, Jeffries is competent to proceed is amply supported and based on the objective application of reliable principles and methods to the data before her. It is significant to the Court that based on the information available in February 2025, Dr. Paradis agreed with

defense experts Dr. Bardey and Dr. Rosenberg that Jeffries was *not* competent to proceed at that time, but that she changed her opinion only after reviewing new, concrete, and voluminous evidence concerning Jeffries' functional abilities, including but not limited to Jeffries' 109 phone calls from Butner, her direct observations of him during the January 2026 joint evaluation, and the observations of Dr. Morris and Dr. Pennuto.

Although Dr. Morris has relatively less experience in conducting competency evaluations than Dr. Paradis, she nevertheless has sufficient experience having conducted between 100 to 150 competency evaluations. Moreover, her opinion that Jeffries is competent to proceed merits significant weight because it is based in part on her direct observation of Jeffries in around 30 to 35 formal and informal interactions during his four-month custodial hospitalization in Butner. Additionally, Dr. Morris' testimony about how she reached her conclusions as to Jeffries' competency was credible, reliable, and persuasive. Finally, Dr. Pennuto is a qualified forensic neuropsychologist, also testified credibly, and reached reliable and well-supported opinions regarding Jeffries' neurocognitive functioning based on both her administration of neuropsychological tests as well as her assessment of Jeffries over both formal and informal contacts during his detention at Butner.

Fourth, the Court finds the audio recordings of the Butner calls and the 2026 joint evaluation of Jeffries to be particularly illuminating. On the calls, Jeffries is a fluent conversational partner and shows that he has the ability to learn new information auditorily and to retrieve it days or weeks later, particularly where the subject is important to him. Thus, Jeffries learned and remembered information about the competency restoration and evaluation process at Butner and updates about friends and family. He also demonstrated a recognition of the seriousness of the charges and allegations against him, expressing significant and rational

concerns about being found competent to proceed and identifying questions for his counsel relating to the formulation of defense strategies. Similarly, during the 2026 evaluation, Jeffries showed not only that he understands the nature and consequences of the proceedings and the charges and allegations against him, but also that he can learn and recall information that is meaningful to him.

Fifth, Jeffries relies heavily on certain opinions reached by defense experts Dr. Bardey and Dr. Rosenberg to which this Court does not give weight because they are unsupported or otherwise do not comport with this Court's careful review of the record, including the Butner calls and the 2026 joint evaluation of Jeffries. Indeed, Dr. Bardey only listened to some of the calls. The opinions of Dr. Bardey and Dr. Rosenberg that Jeffries has only a superficial understanding of the charges and allegations and no comprehension of the seriousness of the proceedings is belied by the record. Similarly, their opinions that Jeffries is incapable of assisting counsel due to memory deficits, a failure to formulate any reality-based defense strategies, and a tendency to "confabulate"—to fabricate information to compensate for memory loss—lack support. By contrast, both the Butner calls and Jeffries' performance in evaluations with Dr. Morris and in the 2026 joint evaluation show that Jeffries has intact memories from the time period at issue in the charges against him and that he has a sufficient ability to learn new information and recall it when he cares to do so.

Similarly, although the Court takes into account defense expert Dr. Valdes' assessment of the strengths and weaknesses in Jeffries' cognitive functioning through various rounds of neuropsychological tests from 2023 through 2026, Jeffries' results on those tests do not, in and of themselves, resolve the question of his competency. The parties' experts agree that neuropsychological test results are just one piece of information considered along with evidence

of Jeffries' functional abilities. Dr. Valdes did not adequately consider Jeffries' functional abilities as shown by more than four months of phone calls from Butner, and her ultimate opinion that he suffers from major neurocognitive disorder rather than mild neurocognitive disorder does not establish that Jeffries lacks the competence to proceed to trial. Moreover, the Court places weight on the opinions of Dr. Paradis and Dr. Pennuto that Dr. Valdes administered the 2026 tests in a manner that likely caused Jeffries fatigue, thereby impairing his performance and overstating his cognitive deficits.

Jeffries' remaining arguments in support of his position are unpersuasive. First, as a threshold matter, his contention that the burden of proof must be placed on the prosecution is immaterial because the record provides ample evidence of his competence. Second, Jeffries' emphasis on the fact that his experts diagnosed him with Alzheimer's Disease and Lewy Body Dementia, misses the point. Although the prosecution experts disagree, even if Jeffries suffers from these conditions, there is significant evidence that he has sufficient cognitive functioning in areas relevant to competence—including, but not limited to, intelligence, verbal and reading comprehension, verbal abstract reasoning, verbal learning of structured and unstructured material, and working memory. Jeffries is significantly more intelligent and functions at a far higher level than other defendants who have been found competent across the country. Third, Jeffries' contention that his cognitive deficiencies cause him to be "disinhibited" such that he does not grasp the seriousness of the charges and may engage in inappropriate courtroom behavior is contradicted by the Butner calls, his presentation in evaluations by Dr. Morris and in the 2026 joint evaluation, and his demeanor at the four-day competency hearing. Rather, the incidents that Jeffries attributes to "disinhibition" are more reflective of personality traits. Fourth, Jeffries' argument that he is unable to understand defense strategies is premised on an incorrect

reading of the Indictment and is belied by the record, which shows that he has conceptualized at least three different rational avenues for cross-examining witnesses at trial. Fifth, Jeffries' contention that his competency may be "fleeting" is unsupported by the record, which shows that his condition has remained largely stable since 2023 despite some improvements in some areas and declines in others.

For all of these reasons, as explained in detail below, Jeffries easily meets both prongs of the *Dusky* standard. Accordingly, this Court has no hesitation in concluding that Jeffries is competent to proceed to trial.

Nevertheless, in order to aid Jeffries and in light of his age and documented cognitive impairments, the Court will institute certain accommodations to facilitate his ability to fully participate in trial. Specifically, this Court will hold trial from 1:00 pm to 5:00 pm Monday through Friday of each trial week in order to ensure that each morning, Jeffries may review transcripts and discuss with counsel the testimony and other events of the previous trial day. The Court will also ensure that there are at least two or three 15-minute breaks during each afternoon of trial. The Court will further require the parties to jointly order the transcript for each trial day with a 24-hour return so that the Jeffries may review the transcripts promptly as trial proceeds to aid his comprehension.

To be clear, Jeffries is competent to proceed regardless of these accommodations. Nevertheless, the Court adopts these measures in order to facilitate Jeffries' participation in its broad discretion to account for the needs of each defendant in a criminal proceeding.

## PROCEDURAL HISTORY

On October 17, 2024, a grand jury indicted Jeffries, Smith, and James T. Jacobson on one count of sex trafficking in violation of 18 U.S.C. § 1591(a), (b)(1), interstate prostitution in violation of 18 U.S.C. § 2422(a), and aiding and abetting these offenses under 18 U.S.C. § 2.

(ECF No. 1.) On October 22, 2024, Jeffries was arrested in the Southern District of Florida. (Elec. Order, Oct. 22, 2024.) On October 25, 2024, Jeffries appeared in the Eastern District of New York before Magistrate Judge Steven Tiscione, who released Jeffries on a substantial monetary bond subject to additional conditions. (ECF Nos. 16, 18.)

On December 9, 2024, Jeffries filed an unopposed motion to determine his competency to stand trial. (ECF No. 50.) Jeffries sought an order requiring (1) that he "submit to psychiatric and/or psychological examinations" by defense experts, Dr. Bardey and Dr. Rosenberg, and prosecution expert Dr. Paradis; (2) "the production of reports addressing the findings of the evaluations to be filed with the Court under seal"; and (3) a hearing before this Court to determine Jeffries' competency to stand trial. (*Id*. at 1.) In support, Jeffries filed under seal a 2023 report and 2024 addendum from his treating physician, Dr. Jacqueline Valdes ("2023 Valdes Report" and "2024 Valdes Addendum"), describing an evaluation and the results of neuropsychological tests conducted in October 2023. In these submissions, Dr. Valdes opines that Jeffries was likely suffering from a major neurocognitive disorder. (*See id*.)

On December 10, 2024, the Court scheduled a hearing pursuant to 18 U.S.C. § 4241(a) to determine Jeffries' competency to stand trial. (*See* Elec. Order, Dec. 10, 2024.) The Court further ordered Dr. Bardey and Dr. Paradis to evaluate Jeffries' competency and prepare reports addressing his history and symptoms, the psychiatric, psychological, and medical tests administered and their results, their findings, and their opinions as to diagnosis, prognosis, and whether Jeffries is "suffering from a mental disease or defect" to render him incompetent to stand trial. (*Id*.)

Jeffries filed under seal a joint report by Dr. Bardey and Dr. Rosenberg on February 5, 2025 ("2025 Bardey/Rosenberg Report"). (ECF No. 54-1.) The prosecution filed under seal Dr.

Paradis' report on March 18, 2025 ("2025 Paradis Report"). (ECF No. 56-1.)

Following review of the 2023 Valdes Report, 2024 Valdes Addendum, 2025 Bardey/Rosenberg Report, and 2025 Paradis Report, on May 2, 2025, the Court found by a preponderance of the evidence that Jeffries was "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." (ECF No. 63 at 1.) Pursuant to 18 U.S.C § 4241(d), the Court ordered Jeffries to "be committed to the custody of the Attorney General for a period not to exceed four (4) months to determine whether his competency may be restored." (*Id.* at 2.) The Court directed the Bureau of Prisons to "determine a suitable facility" for Jeffries "to be evaluated by a forensic psychologist or psychiatrist in an effort to restore his competency to proceed." (*Id.*)

At the designation of the Attorney General, Jeffries commenced his custodial hospitalization at the Federal Medical Facility in Butner, North Carolina on July 21, 2025. (GX-2A at 1, ECF No. 74-1; Def. Br. at 5, ECF No. 102.) He was detained for four months and was released from Butner on November 21, 2025. (*Id.*)

**FINDINGS OF FACT**

The Court has closely reviewed an extensive evidentiary record in making findings of fact related to the determination of whether Jeffries is competent to stand trial. The record includes, but is not limited to:

- the testimony of three defense expert witnesses (Dr. Valdes, Dr. Bardey, and Dr. Rosenberg) and three prosecution expert witnesses (Dr. Morris, Dr. Pennuto, and Dr. Paradis) at a four-day competency hearing held from March 24 through 27, 2026;

- all expert reports by Dr. Valdes, Dr. Bardey, Dr. Rosenberg, Dr. Morris, Dr. Pennuto, and Dr. Paradis, and attachments to those reports;

- medical records relating to Jeffries;

- records concerning his commitment at Butner;
- Dr. Morris' notes from her 2025 evaluation of Jeffries;
- Dr. Morris' notes from a November 19, 2025 call with defense counsel and the prosecution;
- the audio recordings and written transcripts of all 109 telephone calls made by Jeffries to persons other than counsel while detained at Butner;
- the audio recordings of portions of an evaluation of Jeffries conducted jointly by Dr. Bardey, Dr. Rosenberg, and Dr. Paradis on January 12 and 13, 2026;
- Dr. Paradis' notes from the 2026 joint evaluation of Jeffries;
- Dr. Rosenberg's notes from her evaluations of Jeffries in 2024 and in 2026, and
- a January 3, 2026 *New York Times* opinion article.[1]

---

[1] Jeffries has moved separately for an order to seal the audio recordings of portions of the 2026 joint evaluation by Dr. Bardey, Dr. Rosenberg, and Dr. Paradis, and the audio recordings and transcripts of the 109 non-counsel calls placed by Jeffries from Butner. (ECF No. 106.) The prosecution has opposed only the sealing of the audio recordings and transcripts of the Butner calls. (ECF No. 107.)

All portions of these recordings and transcripts that the Court specifically references in this Opinion and Order are unsealed and subject to public view. This Opinion and Order is a judicial document, and the Second Circuit has made clear that the redaction of information from a judicial document may be supported only by specific on-the-record findings as to why the redactions are narrowly tailored to promote a higher interest. *Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019). Here, the specific portions of the audio recordings and transcripts relied upon by this Court to determine Jeffries' competency to stand trial are integral to the Court's resolution of this important legal question. *See Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 142 (2d Cir. 2016) ("[W]here documents 'directly affect an adjudication,' or are used to determine litigants' substantive legal rights, the presumption of access is at its zenith . . . and thus can be overcome only by 'extraordinary circumstances.'"). Jeffries has offered no persuasive reason why the specific portions of the materials referenced in this Opinion and Order as the basis for this Court's ruling would, if publicly disclosed, unfairly prejudice Jeffries.

However, any portions of the 2026 joint evaluation and Butner calls on which this Opinion and Order do not rely remain subject to Jeffries' pending motion to seal, which the Court will resolve in a separate, forthcoming order.

(*See* ECF No. 96 (Def. Exhibit List); ECF No. 98 (Gov't Exhibit List).)

Below is a summary of the Court's factual findings relating to the issue of Jeffries' competency. Additional findings are also addressed in the Conclusions of Law below.[2]

## I. Jeffries' 2018 Injury & Hospitalization

On August 4, 2018, Jeffries fell while hiking with Smith in Cape Town, South Africa and sustained a traumatic brain injury ("TBI"). (DX-F at 5–6.) A face and head CT scan conducted on the day of the fall reveals that he sustained "facial fractures," "bleeding between the skull and the outer brain covering in the front part of the head," "bruising of the brain in the front and around the eye socket," and "widespread bleeding in the space surrounding the brain in the front and side regions." (*Id.*) Jeffries was admitted to the Mediclinic Cape Town for treatment from August 4, 2018 to August 14, 2018. (*Id.* at 6.)

On August 31, 2018, Jeffries was readmitted to the Mediclinic for further examination after he reportedly ran onto a beach carrying a large knife. (DX-B at 4.) According to Smith, during the incident, Jeffries appeared to be delusional and believed that Smith was trying to kill him. (*Id.*)

On September 18, 2018, an MRI of Jeffries' brain showed atrophy as well as the TBI and subsequent healing. (*Id.*) Physicians treating Jeffries after the accident informed him that the "size of his brain was noted to be smaller than normal" as shown in the MRI. (DX-A at 2.) Smith reported to Jeffries' treating physicians at the time that a prior MRI conducted in 2013 had not shown such significant atrophy in the brain. (DX-F at 8.)

[2] In light of the volume of evidence in the record, the Court has integrated the testimony of expert witnesses during the competency hearing regarding their observations, findings, and conclusions related to Jeffries into the description of the experts' written submissions in order to reduce repetition.

According to Smith, Jeffries experienced episodes of confusion, delusional thinking, psychotic symptoms, and marked cognitive decline after the fall. (DX-A at 8–9.) Smith described to Dr. Valdes, who later became Jeffries' treating neuropsychologist, incidents that he perceived to reflect impaired judgment and orientation. (*Id.*) These included incidents in which Jeffries dressed for work and waited at a bus stop even though he had been retired for years, when Jeffries entered the wrong hotel room and insisted it was his, and when Jeffries was found lying in a neighbor's flowerbed, wearing only his underwear. (*Id.* at 9.)

According to records from Jeffries' treating physicians, Jeffries demonstrated an improvement in behavior after a change in his medication. (DX-B at 5.) He was later weaned off of a majority of his psychiatric medication in 2020. (GX-2A at 9.)

Dr. Valdes found that the MRI, conducted shortly after his fall in August 2018, demonstrated significant brain atrophy and that the fall likely "unmasked an evolving neurodegenerative process" rather than serving as the sole cause of Jeffries' cognitive decline. (DX-A at 40–41.) Similarly, Jeffries' experts, Dr. Bardey and Dr. Rosenberg opined that "cognitive decline appears to have begun around 2018, though earlier, more subtle symptoms may have been present." (DX-G at 19.) Dr. Pennuto, who evaluated Jeffries at Butner, observed that, following Jeffries' head injury, "[c]ognitive, psychiatric, and physical deficits were noteworthy, but have generally resolved, but for some residual physical pain/weakness." (GX-2A at 28.)

## II. Pre-Commitment Reports from Dr. Valdes, Dr. Bardey, Dr. Rosenberg, and Dr. Paradis

### A. Dr. Valdes' 2023 Evaluation and 2024 Report

Dr. Jacqueline C. Valdes is a clinical neuropsychologist who has been licensed to practice since 1993. (Hr'g Tr. 18:7–8, 20–21.) She conducted an initial examination of Jeffries

across three days on October 4, 5, and 11, 2023, at her office in Florida. (Hr'g Tr. 20:22–23, 186:19–20; DX-A at 1, 8.) Dr. Valdes met with Jeffries for five and a half hours on the first day, four and a half hours on the second day, and two and a half hours on the third day, with several short coffee and restroom breaks on each day. (DX-A at 17.)[3] Dr. Valdes also interviewed Smith by telephone on October 26, 2023. (*Id*. at 8.)

Dr. Valdes produced an initial 2023 report summarizing her findings. (2023 Valdes Report, DX-A, ECF No. 90-1 at 1–53.) Around one year later, on October 2, 2024, Dr. Valdes issued an addendum report, which reflected her review of additional medical records and test results relating to Jeffries. (2024 Valdes Addendum, DX-B, ECF No. 90-1 at 54–72.)

***i. 2023 Evaluation and Report***

*1. General Observations & Neuropsychological Test Results*

In October 2023, Dr. Valdes administered neuropsychological tests to evaluate Jeffries' "intellectual abilities; his language functioning, his academics, his visuospatial, motor, learning, memory, and . . . executive functioning," which includes "problem solving, managing more complex information, being able to switch gears," "[b]eing flexible," and "[b]eing able to keep track of feedback and information at a quick pace." (Hr'g Tr. 23:16–25; *see generally* DX-A at 15–33.) Based on her examination and the results of Jeffries' neuropsychological tests, Dr. Valdes concluded that Jeffries had "probable" Lewy Body Dementia. (DX-A at 42; Hr'g Tr. 26:4–5.)

Dr. Valdes observed that Jeffries was "interactive with the examiner and was socially appropriate," was "able to engage in casual conversation," "evidenced good eye contact," and

[3] Dr. Valdes noted that the second day only lasted four and a half hours because Mr. Jeffries "became emotionally distraught and also very frustrated with some of the task demands related to memory." (DX-A at 17.)

was "able to appreciate humor." (DX-A at 17.) She found that Jeffries exhibited "difficulty providing his own history and background information," "requir[ed] assistance" with providing additional details, faced "significant difficulty following more complex instructions," and approached tasks at a speed that ranged from "appropriate to very slow," depending on the task. (*Id*. at 15–16.) Jeffries scored 18/30 on the Montreal Cognitive Assessment ("MoCA"),[4] which Dr. Valdes found to show "moderate cognitive impairment." (*Id*. at 17.)

Dr. Valdes found that Jeffries "obtained a Full Scale IQ just within low average at the 9th percentile," and that "[h]is General Ability Index was slightly stronger and just within average at the 27th percentile." (*Id*. at 22.) According to Dr. Valdes, measures of premorbid intellectual functioning suggested that Jeffries had previously functioned in the "high average" to "superior" range intellectually. (DX-A at 21.) She noted a significant difference between Jeffries' estimated premorbid intellectual functioning and his level of functioning in October 2023. (*Id*. at 39.)

Dr. Valdes concluded that there was "clear evidence in 2023 of cognitive impairments in multiple domains." (Hr'g Tr. 24:3–6.) She found that Jeffries demonstrated "clearly impaired learning and memory abilities" and "clearly impaired executive functioning." (*Id*. 24:11–13.) She also found that Jeffries had "problems with problem solving," "problems with his processing speed," and "difficulty when he had to be flexible or shift gears or keep track of more than one thing at the same time." (*Id*. 24:13–16.)

Jeffries' "poorest performances" on the 2023 neuropsychological tests "were related to executive functioning, visual spatial skills, learning and memory abilities." (DX-A at 40.) Dr.

---

[4] Dr. Valdes described the MoCA assessment as "a mental status screening frequently used by neurologists and neuropsychologists to get a first glimpse of how somebody is doing," which "looks at . . . visual spatial abilities, executive functioning, attention, learning, memory, reasoning, orientation . . . ." (Hr'g Tr. 79:9–80:2.)

Valdes observed that Jeffries' verbal learning and memory abilities were "impaired to borderline impaired," and that his visual learning and memory abilities were "impaired." (*Id.*) According to Dr. Valdes, Jeffries benefited from "repetition and cues," but "required a high level of repetition to retain information and even with repetition with larger amounts of information evidenced limited recall of only 25-27% of information learned." (*Id.*) She remarked that there were "clear difficulties when task demands became more complex and required flexibility of thought, shifting cognitive task set or managing more complex information." (*Id.*) Specifically, Dr. Valdes observed that "[w]hen engaged in more complex problem solving, [Jeffries] forgot task rules and evidenced confusion and difficulty using planning or strategy for even simpler task items" and that he "had difficulty adapting to novel task demands and would lose track of task demands on tasks of processing speed and problem solving." (*Id.*)

*2. Conclusions & Recommendations*

Dr. Valdes concluded that Jeffries had probable Lewy Body Dementia. (DX-A at 42.) She also provided recommendations to "maximize" Jeffries' cognitive abilities, including the use of "external organizers, cues, a daily to-do list, providing himself with electronic reminders through his phone or a watch, using a calendar, alarms, and other external reminders," breaking down complex tasks "into their simpler components," and providing new information when Jeffries is alert. (*Id.* at 44–46.) However, Dr. Valdes acknowledged that she "never made a statement regarding [Jeffries'] competency," and that competency evaluations have "never been an area that [she has] practiced in." (Hr'g Tr. 182:19–183:7.)

***ii. 2024 Addendum***

Dr. Valdes issued an addendum to her 2023 report on October 2, 2024 after reviewing medical records relating to Jeffries' 2018 TBI and recent neuropsychological testing and imaging studies. (Hr'g Tr. 42:16–43:10; DX-B at 1.) Dr. Valdes concluded that Jeffries was likely

suffering from (1) "Dementia with Behavioral Disturbance" of mixed etiology, which is also referred to as "Major Neurocognitive Disorder" in the DSM-5; (2) "probable" late-onset Alzheimer's disease, and (3) "possibly concurrent[]" Lewy Body Dementia. (DX-B at 18; Hr'g Tr. 45:4–6, 46:3–5.) As in her 2023 report, Dr. Valdes found that Jeffries lacked the ability to independently manage his affairs and required ongoing supervision and assistance. (DX-B at 18.)

Dr. Valdes concluded that Jeffries' "slow progressive decline coupled with his generalized cognitive impairments and findings on diagnostic studies," including a PET scan disclosing amyloid plaques, "are most consistent with a neurodegenerative process of moderate severity," specifically "moderate stage Alzheimer's disease." (*Id*. at 17.) Additionally, she noted that Jeffries' "abnormalities of gait and balance, and hallucinations . . . would also fit characteristics of Lewy Body Dementia (LBD)." (*Id*. at 17) She explained that "Jeffries presents with likely multiple factors impacting his cognition." (*Id*. at 17–18.)

According to Dr. Valdes, Jeffries was suffering from a "major neurocognitive disorder," which meant that his cognitive deficits impaired his ability "to carry out . . . instrumental activities of daily living," such as "[d]riving, managing finances, managing their own medications, making decisions regarding safety, health, welfare . . . ." (Hr'g Tr. 45:13–47:5.)

Dr. Valdes attributed her revised conclusions to the fact that the updated medical records relating to the 2018 TBI demonstrated "significant bleeding in the brain," "multiple facial fractures as a result of the fall," and an extended period of post-traumatic amnesia. (DX-B at 15; Hr'g. Tr. 43:14–19.) Dr. Valdes characterized Jeffries' condition as an "irreversible" "neurodegenerative disease" that "will continue to decline over time." (DX-B at 18.) She also observed that the 2023 results—including Jeffries' exhibition of symptoms that seemed indicative of Parkinson's disease—could have been attributed, in part, to his alcohol use and

medication management. (Hr'g Tr. 184:16–23; DX-B at 15.)

### B. Dr. Bardey and Dr. Rosenberg's 2024 Evaluation and 2025 Report

Dr. Alexander "Sasha" Bardey is a forensic psychiatrist who has been licensed to practice since 1994. (Hr'g Tr. 252:7–10.) Dr. Miranda Rosenberg is a licensed clinical psychologist who has been licensed to practice since 2020. (Hr'g Tr. 407:19–23.) At the request of Jeffries' counsel, both experts conducted a six-hour evaluation of Jeffries on December 5 and 6, 2024. (DX-F at 1.) The first day of the evaluation was conducted at the Florida office of Jeffries' counsel, Brian Bieber, and the second day was conducted at Jeffries' Florida home. (Hr'g Tr. 409:3–6.)

Prior to conducting their evaluation, Dr. Bardey and Dr. Rosenberg reviewed records relating to Jeffries' 2018 TBI and Dr. Valdes' 2023 Report and 2024 Addendum. (*Id*. 254:25–255:7; *see also* DX-F at 5–16.) The Bardey/Rosenberg evaluation consisted of a "comprehensive clinical interview" of Jeffries regarding his background and the administration of neuropsychological assessments and a test known as the Evaluation of Competency to Stand Trial – Revised ("ECST-R"). (Hr'g Tr. 409:9–410:1.) Dr. Bardey and Dr. Rosenberg also interviewed Smith and Jeffries' wife, Susan Jeffries. (*Id*. 413:15–16.)

Dr. Bardey and Dr. Rosenberg memorialized their preliminary findings in a December 9, 2024 letter. ("2024 Preliminary Bardey/Rosenberg Report," DX-E, ECF No. 90-1 at 187–93; *see also* Hr'g Tr. 417:16–23.) They subsequently issued a full Forensic Psychiatric and Neuropsychological Evaluation Report on February 5, 2025 ("2025 Bardey/Rosenberg Report," DX-F, ECF No. 90-1 at 194–222).

#### ***i. 2024 Preliminary Report***

In their preliminary report, Dr. Bardey and Dr. Rosenberg concluded that Jeffries "meets the diagnostic criteria for major neurocognitive disorder due to multiple etiologies, including

Alzheimer's disease, Lewy Bodies disease, and the residual effects of a traumatic brain injury." (DX-E at 3.) They found this diagnosis supported by clinical evaluations, the results of neuropsychological testing, neuroimaging studies, and a documented history of Jeffries' progressive cognitive decline. (*Id*. at 3–4.) They further concluded that Alzheimer's disease appeared to be the most significant factor causing Jeffries' deteriorating cognitive functioning. (*Id*. at 4.)

Dr. Bardey and Dr. Rosenberg further opined that Jeffries was not competent to proceed under the *Dusky* standard and could not be restored to competency. (*Id*. at 4–6.) They reasoned that he suffered from profound memory, learning, and comprehension impairments such that "for Mr. Jeffries, each interaction is experienced as entirely new." (*Id*. at 5.) They wrote:

> Neuropsychological testing has objectively demonstrated significant difficulties in acquiring and retaining new information, as well as recalling previously learned material. These memory impairments are accompanied by deficits in reasoning, problem-solving, and other executive functions.

(*Id*. at 4.) Dr. Bardey and Dr. Rosenberg concluded that Jeffries' inability to adequately encode and retrieve information prevented him from "recalling case-specific details, retaining legal advice, or engaging in informed discussions regarding his defense," thereby fundamentally impairing his ability to assist his counsel. (DX-E at 5.)

Dr. Bardey and Dr. Rosenberg found no evidence that Jeffries was exaggerating or overstating his symptoms. (*Id*.) They concluded that his impairments were genuine and consistent with "severe neurocognitive deficits." (*Id*.)

***ii. 2025 Report***

In the 2025 Bardey/Rosenberg Report, Dr. Bardey and Dr. Rosenberg reiterated their opinion that Jeffries "meets the diagnostic criteria for major neurocognitive disorder due to multiple etiologies, including Alzheimer's disease, Lewy Bodies disease, and the residual effects

of a traumatic brain injury." (*Id*. at 25.) They also opined, again, that Jeffries did not meet the legal criteria for competency to proceed under federal standards. (*Id*. at 26–27.)

*1. General Observations & Neuropsychological Test Results*

Dr. Bardey and Rosenberg noted that, during their interview with Jeffries, "[s]ignificant cognitive deficits" were "evident." (*Id*. at 19.) Dr. Bardey observed that Jeffries "had significant gaps in his biographical narrative" and demonstrated "difficulty with the temporal chronology of things" by, for example, providing the same year—1962—when asked when he graduated high school, when he graduated college, and when he graduated from the London School of Economics. (Hr'g Tr. 266:14–267:1.) He also noticed "evidence of [Jeffries] being confused, of his not having proper memory for things," and "of him not being able to process information." (*Id*. 267:5–7.) Similarly, Dr. Rosenberg characterized Jeffries as "confused, disoriented, inattentive, ha[ving] significant difficulty processing and following the course of a conversation and provid[ing] historical information about himself that was either vague or clearly inaccurate." (*Id*. 411:2–5.) Both experts remarked that Jeffries demonstrated a "limited" attention span and "difficulty sustaining focus" during conversation. (DX-F at 19.) They observed that "[a]t times, Mr. Jeffries was engaged, witty, and gregarious," but that "as the evaluation progressed and he was questioned on topics that he was unable to recall, he became disinhibited and irritable." (*Id*. at 18–19.) They further noted that he "demonstrated a tendency to confabulate," that is, to provide "fabricated or distorted memories." (*Id*. at 19.) During the second day of evaluation, Jeffries could not remember having met Dr. Bardey or Dr. Rosenberg the previous day. (*Id*.)

According to Dr. Bardey and Dr. Rosenberg, the results of neuropsychological testing similarly revealed Jeffries' substantial cognitive deficits. (*Id*.) They found that Jeffries exhibited "rapid fatigue" and "decreased stamina" throughout the testing process, although he nevertheless "demonstrated adequate effort." (*Id*.) On the Dementia Rating Scale–Second Edition ("DRS-

2”),[5] Jeffries scored 83, which is “significantly lower” than the established cutoff score of 123 used to distinguish healthy individuals from those with neurocognitive disorders. (DX-F at 20.) Dr. Bardey and Dr. Rosenberg characterized Jeffries’ performance as falling within the “Exceptionally Low” range and consistent with dementia-level impairment. (*Id*. at 20.)

Dr. Bardey and Dr. Rosenberg observed the most significant deficits in Jeffries’ learning and memory. (*Id*. at 22.) They found that Jeffries demonstrated “[s]evere memory dysfunction,” with his performances varying from the “Exceptionally Low” range to the “Extremely Low” and “Below Average” ranges. (*Id*.) Additionally, they found that Jeffries’ executive functioning demonstrated “impairments in initiation, abstract reasoning, and planning and organizational abilities.” (*Id*. at 21.) Jeffries’ performance on the executive functioning components of tests fell within the “Extremely Low” and “Below Average” ranges. (*Id*.)

*2. Competency Assessment*

To assess Jeffries’ competency to proceed to trial, Dr. Bardey and Dr. Rosenberg administered the ECST-R across two consecutive sessions. (DX-F at 23–24.) The ECST-R is a “standardized assessment tool designed to evaluate a defendant’s ability to understand and participate in legal proceedings” consistent with the standards set forth in *Dusky*. (*Id*. at 24.) On the second day of evaluation, Jeffries could not recall the discussions that he had with Dr. Bardey and Dr. Rosenberg the previous day, which the evaluators found to show profound impairments in memory retention and recall. (*Id*. at 23.)

Dr. Bardey characterized Jeffries’ understanding of the legal process as “rudimentary” and “superficial.” (Hr’g Tr. 267:10–15.) He observed that Jeffries “was not able to describe the

[5] Dr. Rosenberg described the Dementia Rating Scale as a “global screener that measures different cognitive domains that are typically imperative to individuals who are suffering dementia.” (Hr’g Tr. 411:22–25.)

nature of his charges, the different types of charges he was facing," and found that Jeffries "could not evidence an understanding of the proceedings . . . beyond a superficial knowing" and did not "appreciate[] the severity of his charges." (*Id*. 267:23–268:3.) Dr. Bardey described Jeffries' demeanor throughout the evaluation as follows:

> [H]is manner throughout the evaluation . . . was one of – almost like we were having lunch at his country club. There was no . . . sense of gravity. There was no sense of alarm or distress. He was joking. He was oftentimes inappropriate.
>
> …
> He called Dr. Rosenberg a bitch. At one point, he commented on my suit, thought I needed a new tailor. He made inappropriate comments in the midst of a very, very serious evaluation about something that would have a tremendous impact on his life.

(*Id*. 268:10–21.)

In recognition of "the potential for secondary gain in the context of [the] evaluation and its implications for the outcome of [] Jeffries' legal case," Dr. Bardey and Dr. Rosenberg "considered and carefully assessed" the possibility of malingering through empirical testing. (DX-F at 27.) The testing "revealed no indications of exaggeration or intentional misrepresentation." (*Id*; *see also* Hr'g Tr. 275:1–276:2.)

Drs. Bardey and Rosenberg found that Jeffries' scores evaluating his "Factual Understanding of Courtroom Proceedings" and "Rational Understanding of Courtroom Proceedings" fell "within the normal range," which suggested "intact basic comprehension of courtroom procedures." (DX-F at 24.) They found that he "demonstrated a basic factual understanding of certain courtroom roles and functions," though his comprehension was "inconsistent and incomplete" in certain areas, such as the meaning of a plea deal and the neutrality of a jury. (*Id*.) However, they also found that Jeffries showed a "markedly impaired" understanding of his charges. (*Id*.) They noted that Jeffries could not recall "the specific charges against him, the number of charges, the time frame of the alleged conduct, or whether the

charges were classified as misdemeanors or felonies," without providing any examples of Jeffries' responses to support these findings. (*See* DX-F.) Nevertheless, Dr. Bardey and Dr. Rosenberg concluded that Jeffries exhibited substantial impairment in rational understanding and legal decision-making as follows:

> While he expressed an intention to follow his attorney's recommendations, including testifying if advised, he demonstrated a fundamental lack of awareness regarding the potential consequences of his legal case. He did not acknowledge the possibility of a guilty verdict or the associated penalties. When asked about the best and most likely legal outcome, he rigidly reiterated that he would demonstrate that his charges were not serious but was unable to explain how this would be achieved. His reasoning was inflexible, and he did not demonstrate the ability to consider alternative legal strategies or potential adverse outcomes.

(*Id*. at 25.) Dr. Bardey and Dr. Rosenberg noted that they had made efforts to educate Jeffries "about his charges, the allegations, the criminal justice system, and the legal options available to him," but that he "exhibited marked confusion throughout these discussions and was unable to engage in a focused, sustained conversation on these topics." (*Id*.)

Dr. Bardey and Dr. Rosenberg also found that Jeffries scored within the "severely impaired" range on the ECST-R "Ability to Consult with Counsel" assessment. (DX-F at 24.) They found that Jeffries "did not demonstrate an understanding of what potential disagreements [with counsel] might entail and exhibited rigid and perseverative reasoning." (*Id*.) They also concluded that Jeffries "did not appear to comprehend alternative legal strategies, potential challenges in his case, or the broader implications of his charges." (*Id*.)

### 3. *Conclusions*

Consistent with their 2024 Preliminary Report, Dr. Bardey and Dr. Rosenberg concluded that Jeffries' deficits led to his inability to assist counsel in a rational and factual manner. (DX-F at 27.) They restated their opinion that Jeffries was not competent to stand trial within the meaning set forth in *Dusky v. United States*, concluding:

> Although Mr. Jeffries demonstrates a general understanding of the structure of the legal system and can identify that he currently has criminal charges against him, he does not understand the specific details of the charges or their implications. He is unable to retain or integrate information necessary to comprehend the factual basis of the charges or to grasp the potential consequences of the proceedings. His inability to evaluate realistic outcomes or make informed decisions further limits his ability to meaningfully engage with the legal process.

(*Id.*)

Finally, Dr. Bardey and Dr. Rosenberg opined that Jeffries' "significant deficits in memory, reasoning, executive functioning, and judgment render him unable to make informed decisions regarding his healthcare, legal matters, or financial responsibilities." (*Id*. at 28.)

### C. Dr. Paradis' 2025 Evaluation and Report

Dr. Cheryl Paradis is a licensed forensic psychologist who has been practicing for forty years. (Hr'g Tr. 902:4–6.) She conducted a two-hour evaluation of Jeffries on February 20, 2025, in a law firm conference room in New York. (GX-1 at 1; Hr'g Tr. 906:8–10.) Dr. Paradis summarized her findings in a March 18, 2025 report ("2025 Paradis Report," GX-1, ECF No. 57).

#### *i. General Observations & Neuropsychological Test Results*

Dr. Paradis conducted a psychological examination and psychosocial assessment and administered neuropsychological tests. (GX-1 at 2.) Before the evaluation, she reviewed Jeffries' medical records relating to his 2018 TBI, the 2023 Valdes Report, the 2024 Addendum, the 2024 Bardey/Rosenberg Preliminary Report, and the 2025 Bardey/Rosenberg Report. (Hr'g Tr. 908:11–909:20; GX-1 at 5–11.) She also spoke with Jeffries' counsel, Brian Bieber. (Hr'g Tr. 910:9–23.)

Dr. Paradis observed Jeffries' presentation to be "similar to what was described by Dr. Bardey and Dr. Rosenberg." (*Id*. 911:4–5.) She agreed that Jeffries "appeared more confused than a very competent defendant would look in terms of discussing his case" and that his

cognitive abilities were "significantly impaired," although she also noted that Jeffries was "alert and cooperative" during the evaluation. (*Id*. 911:7–8, 918:12–15; GX-1 at 12.) Dr. Paradis observed that Jeffries "had difficulty providing reliable biographical information" and "demonstrated superficial understanding of his cognitive limitations." (GX-1 at 12–13.)

She also found that Jeffries appeared "disinhibited" at times because he made comments referring to her as a "tough bitch" and a "cunning bitch." (Hr'g Tr. 911:9–912:21.) Dr. Paradis interpreted these comments to be "teasing" and recognized that they could be "consistent with a personality style." (*Id*. 911:11–912:12.) Ultimately, however, she concluded that Jeffries' comments "went too far" and were "consistent with frontal lobe damage for someone to be disinhibited." (*Id*.)

Dr. Paradis found that Jeffries' neuropsychological test scores "were in the impaired range." (*Id*. 917:20–25.) She remarked in her report that "[h]is ability to learn and retain information was poor, almost certainly decreased compared to his premorbid abilities." (GX-1 at 13.) Dr. Paradis also administered the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"), which assesses "attention, language, visuospatial/constructional abilities, and immediate and delayed memory." (*Id*. at 14.) Jeffries scored a 61, which is below the average score of 100 and is "in the severely impaired range." (*Id*.) Dr. Paradis noted that his testing performance "was consistent with his functioning as measured by Dr. Valdes and Dr. Rosenberg." (*Id*. at 16.) Dr. Paradis found that Jeffries was not malingering. (Hr'g Tr. 918:16–919:14.)

#### ***ii. Competency Assessment***

Dr. Paradis found that "[d]ue to the severity of his cognitive impairment, Mr. Jeffries was unable to discuss his legal case in a meaningful manner." (GX-1 at 17.) She found that "[h]e retained well-learned information and understood the roles of court personnel," as well as "the

nature and seriousness of the charges against him." (*Id.*) Jeffries described his charges as "assault, essentially rape," that the allegations pertained to events from more than 10 years ago, and that the complainants were "young men." (*Id.* at 17.) Jeffries also "understood that he could resolve a criminal case by going to trial or accepting a guilty plea." (*Id.* at 18.)

Dr. Paradis remarked that Jeffries "did not appear to appreciate the risk of a trial" when she raised the possibility that he may be found guilty. (*Id.*) Jeffries responded, "Anything is possible – but it's highly unlikely." (*Id.*) However, she found that Jeffries "did become visibly anxious when [she] pressed him to discuss the possibility of being found guilty" and he responded, "This is getting very uncomfortable." (GX-1 at 18.)

During the evaluation, Jeffries correctly identified his partner, Smith, as another defendant in this case, although he did not initially recall that Jacobson was also charged in the Indictment. (*Id.* at 17.) When questioned further, Jeffries recalled a "Jim somebody." (*Id.*) Dr. Paradis observed that Jeffries "had difficulty providing" "his understanding of the details of the instant offense charges"—for example, he could not approximate how many complainants were involved in this action—and expressed concern that "[h]is impaired memory functioning would interfere with his ability to learn and recall legal information his attorney provided in the past or would provide in the future." (*Id.* at 17–18.)

***iii. Conclusions***

Dr. Paradis agreed with Dr. Valdes, Dr. Bardey, and Dr. Rosenberg that Jeffries was suffering from a "major neurocognitive disorder." (Hr'g Tr. 940:24–941:1.) She further concluded that "[h]is cognitive impairment is severe enough to qualify for a more commonly used diagnostic term – dementia," and that the results of the neuropsychological testing she conducted supported these findings. (GX-1 at 19.) Dr. Paradis further concluded:

> In my opinion Mr. Jeffries is suffering from a mental disease or defect which renders him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him and to properly assist in his defense.
> . . .
> [H]is inappropriate behavior, which is a symptom of his dementia, could further interfere with his ability to maintain proper courtroom demeanor and/or take the stand in his own defense. He may blurt out self-incriminating statements or engage in erratic behavior, which would undermine his credibility and risk prejudicing the judge or the jury against him. Given these cognitive limitations and behavioral symptoms, he is incapable of meaningfully participating in his defense.

(GX-1 at 19.)

## III. Jeffries' 2025 Custodial Hospitalization at FMC Butner

On April 10, 2025, Jeffries moved the Court for an order requiring his custodial hospitalization in the custody of the Attorney General for up to four months for competency restoration and evaluation procedures consistent with 18 U.S.C. § 4241(d). (ECF No. 59.) In support, he offered the following stipulation by the parties:

> (1) Mr. Jeffries is "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense;" and (2) that a competency hearing is unnecessary, because the Bardey and Paradis Competency Evaluation Reports contain definitive grounds for the Court to find, by a preponderance of the evidence, that Mr. Jeffries is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense. 18 U.S.C. § 4241(d).

(*Id*. at 3.) The prosecution did not oppose the motion. (*Id*. at 4.)

On May 2, 2025, upon review of Jeffries' motion and the experts' reports and supporting records, this Court ordered the commitment of Jeffries "to the custody of the Attorney General for a period not to exceed four (4) months to determine whether his competency may be restored." (Order, ECF No. 63.)

Jeffries was committed to the Federal Medical Facility in Butner, North Carolina on July 21, 2025. (GX-2A at 1; Def. Br. at 13.) He was released on November 21, 2025. (*Id.*) While at Butner, Jeffries was evaluated by Dr. Pennuto and Dr. Morris.

### A. <u>Dr. Pennuto's 2025 Evaluation</u>

Dr. Tracy O'Connor Pennuto is a licensed forensic neuropsychologist at Butner, where she has practiced for almost sixteen years. (Hr'g Tr. 565:7–24.) Her primary responsibilities involve "completing comprehensive neuropsychological assessments" and "assessing defendants' cognitive strengths and weaknesses." (*Id*. 566:1–3.) Prior to evaluating Jeffries, Dr. Pennuto reviewed Jeffries' medical records, the 2023 Valdes Report and 2024 Valdes Addendum, the 2024 Bardey/Rosenberg Preliminary Report, the 2025 Bardey/Rosenberg Report, and the 2025 Paradis Report. (*See* GX-2A at 21–23.)

Dr. Pennuto evaluated Jeffries on October 23, 2025 and November 13, 2025 in a private testing room at Butner. (GX-2A at 23.) The first session lasted around two hours and fifteen minutes and the second session lasted around one and a half hours. (*Id.*) Dr. Pennuto conducted a clinical interview and administered "psychological tests to assess [Jeffries'] cognitive functioning." (*Id.*) Her findings were consolidated into a report with Dr. Morris' findings ("2025 Morris/Pennuto Report," GX-2A, ECF No. 74).

#### *i. General Observations & Neuropsychological Test Results*

Dr. Pennuto described Jeffries' demeanor as "calm," "pleasant," "jovial at times," "fairly charismatic," "cooperative," and "generally appropriate," but also noted that Jeffries cursed at times and "sometimes call[ed her] a bitch" when she administered "a difficult test." (Hr'g Tr. 578:3–579:10.) At one point, Jeffries was "laughing and joking about how much fun he was having with the testing" and told Dr. Pennuto, "We can be married. I'm gay, but that doesn't matter." (*Id*. 579:11–13.) Dr. Pennuto observed that Jeffries "appeared to be purposely testing

the limits and enjoying the interaction" because he "became more and more informal" during the course of the evaluation. (GX-2A at 23 n.1; Hr.'g Tr. 580:15–16.) She characterized Jeffries as testing the limits "in a manipulative way, not in a childlike way." (Hr'g Tr. 658:13–17.) However, Dr. Pennuto found that Jeffries was responsive to redirection, "understood what [she] was telling him," and "was able to appropriately comport his behavior." (*Id*. 581:5–11.) In contrast to Dr. Bardey and Dr. Rosenberg, she found that Jeffries' informal behavior was "volitional" and did not suggest "disinhibition" because Jeffries responded to her redirection. (*Id*. 586:11– 587:2.)

Dr. Pennuto found Jeffries' communication skills to be "sensical and logical." (*Id*. 581:17–21.) She did not find any evidence of malingering, although she observed "potential suboptimal engagement at times" and noted that "some [of Jeffries'] performances may underestimate his true abilities somewhat." (*Id*. 592:1–11; GX-2A at 25.) Specifically, she observed that Jeffries "became frustrated with tasks he found difficult and required significant encouragement for him to complete the tasks." (GX-2A at 24.) In her view, Jeffries "was sometimes quick to give up, stating 'That's it,' before the time limit had elapsed, without providing full thought or effort to complete the task." (*Id*.)

Dr. Pennuto summarized Jeffries' neuropsychological test results as follows:

> Mr. Jeffries demonstrated primarily average to low average range performances, including aspects of executive functioning . . . most aspects of learning and memory . . . language tasks . . . and visuospatial skills . . . . He demonstrated weaker performances, in the borderline to impaired range, primarily on tests assessing aspects of executive functioning, including cognitive flexibility, conceptualization and problem solving in response to feedback, and some tests of processing speed . . . .

(*Id*. at 28.) She further observed that "[i]n comparison to his previous evaluations, including review of raw psychological test data, Mr. Jeffries' current performances are generally improved, and in some cases significantly so." (*Id*.) Dr. Pennuto opined that:

> The reason for his cognitive improvement across assessments is unclear, but may be related to abstinence from alcohol, improved physical health, and better medication management. The potential for practice effects must be considered given the numerous cognitive assessments Mr. Jeffries has previously completed, though with any improvement due to this effect reflecting Mr. Jeffries' intact memory of the previously administered tests.

(*Id.*)

Dr. Pennuto also had multiple informal contacts with Jeffries "on [his] unit or in passing" while he was at Butner. (Hr'g Tr. 576:18–19.) One such interaction occurred several days after her October 23, 2025 testing session with Jeffries. (*Id.* 576:20–23.) She was walking past Jeffries in a hallway, when he greeted her and said, "Hey, when are we going to meet again? I had so much fun with you. When are we going to meet?" (*Id.* 576:24–577:3.) Dr. Pennuto found it remarkable that Jeffries "remembered not only me, but the purpose of our meeting and the fact that we were planning to meet again." (*Id.* 577:6–7.)

***ii. Conclusions***

Dr. Pennuto diagnosed Jeffries with "mild neurocognitive disorder due to multiple etiologies." (*Id.* 573:20–22.) She carefully considered whether Jeffries suffered from a "major" neurocognitive disorder, but ultimately ruled out this diagnosis because, while Jeffries "did have some cognitive skills that did show significant decline," Jeffries was able to "effectively utilize" accommodations and strategies such that he retained "functional abilities" for daily living. (*Id.* 634:24–635:22.) Dr. Pennuto noted that Jeffries had "present[ed] much differently" at the time of his diagnosis with major neurocognitive disorder. (GX-2A at 30.) At that time, he showed "confusion, disorientation, disorganization, and significant cognitive impairments," whereas at the time of her evaluation, he was "presenting quite well," "alert and oriented and thinking clearly without confusion." (*Id.*)

Dr. Pennuto concluded that Jeffries' diagnosis "falls somewhere in between" a "major" and "mild" neurocognitive disorder, and that his condition reflected something "more than a modest decline of a mild neurocognitive disorder, but not quite the significant decline for a major neurocognitive disorder." (Hr'g Tr. 635:16–:22.) She found his current cognitive abilities to be "relatively intact" and in the "average to low average" range. (GX-2A at 30.) Dr. Pennuto concluded that Jeffries' cognitive presentation was not consistent with Alzheimer's disease because he did not demonstrate "memory deficits" that were "more amnesic over time," but rather, showed memory improvement over time and performed in the average and low average ranges on memory tests. (Hr'g Tr. 628:10–18.) She ultimately concluded that "[t]here was nothing in [her] findings that would preclude Mr. Jeffries' competency." (*Id*. 574:7–13.)

**B. Dr. Morris' 2025 Report**

Dr. Cassondra Morris is a forensic psychologist at Butner, who has worked at the facility since 2022. (Hr'g Tr. 707:4–9, 708:9–11.) She interacted with Jeffries at Butner on around 30 to 35 occasions, which included fifteen formal contacts as well as additional informal contacts in the hallways and throughout the facility. (*Id*. 726:6–11.) She documented these interactions, her evaluation, and her findings concerning Jeffries in a report dated December 10, 2025. (2025 Morris/Pennuto Report, GX-2A, ECF No. 74-1.)

***i. Interactions with Jeffries at Butner***

Dr. Morris conducted a psychological intake of Jeffries on July 21, 2025 in order to determine, among other things, where Jeffries should be housed within Butner. (Hr'g Tr. 714:7–22.) When Jeffries first arrived at the facility, Dr. Morris determined that he should be placed in the "semi-secure unit, which . . . provides more support for individuals," including "additional medical staff." (*Id*. 714:14–18.) Individuals housed in the semi-secure unit are designated into one of four categories with varying degrees of freedom to move about the facility. (*See id*.

716:1–12.) Upon conducting the intake, she did not observe that Jeffries "display[ed] any significant issues that [she] thought would preclude him from going to a general population unit," but nevertheless placed him in the semi-secure unit in light of his medical records and prior evaluations. (*Id.* 715:4–16.) Dr. Morris provided Jeffries level four permissions, which meant that he was permitted "to leave the unit without being escorted by other staff members" for activities within the facility, including dining, recreation, and education. (*Id.* at 717:2–8; 719:5–7.) However, several days later on July 24, 2025, Dr. Morris downgraded Jeffries' access to "level two" after he was found in an unauthorized area of the facility, because he was either lost or exploring. (*Id.* 719:5–20:1; *see also* DX-AJ at 6.) With level two permissions, Jeffries was not allowed to leave his housing unit without an escort. (Hr'g Tr. 717:24–718:7.) Upon his request, on September 3, 2025, Dr. Morris increased Jeffries to level three permissions after he had demonstrated "appropriate" behavior and "had not engaged in any additional rule breaking behavior." (Hr'g Tr. 721:12–18; DX-AJ at 13.) On September 22, 2025, Dr. Morris increased his permissions to level four. (GX-2A at 15.) Jeffries did not have any other disciplinary issues during his time at Butner and "appeared to be able to follow the rules." (Hr'g Tr. 722:2–724:17, 725:15–20.) On October 9, 2025, Dr. Morris moved Jeffries from a semi-secure housing unit to a general population unit in which individuals were locked in their cells for shorter time periods each day. (*Id.* 724:19–725:6; GX-2A at 16.)

When Jeffries' permissions were being upgraded to level three, Dr. Morris escorted him on his route from his housing unit to the cafeteria three times to ensure he was familiar with it. (Hr'g Tr. 723:1–25.) She observed that Jeffries was able to "notic[e] cues" such as hallway signage and that by the third lap, Jeffries was able to direct himself on the route "without any

support." (*Id.*) Dr. Morris found that this incident showed that Jeffries is able to "utiliz[e] a strategy for himself to remember where he needed to go." (*Id.* 724:5–10.)

On another occasion, Jeffries expressed to Dr. Morris his concern for his safety upon learning that Butner staff "were talking about Mr. Jeffries having a relationship with [Jeffrey] Epstein." (Hr'g Tr. 737:19–21.) According to Dr. Morris, Jeffries "demanded that [Dr. Morris] . . . get his attorneys to pick him up." (*Id.* 739:8–9.) She denied the request and told Jeffries that his options were to be placed in a more secure housing unit or to remain in the general population and to inform staff if there was any reason for additional concern. (*Id.* 738:15–24.)

Dr. Morris found that she was "effectively able to communicate with Mr. Jeffries" and that he "was able to understand the questions that [she] was asking" and "was able to respond in a relevant and efficient way." (*Id.* 735:18–23.) Indeed, she found his communication skills in their formal sessions to be sufficiently strong such that she was "unable to keep up with what Mr. Jeffries was saying because [she] could not type as fast as he was talking." (*Id.* 742:7–10.)

Dr. Morris found that Jeffries made "comments" to staff, such as comments about their physical appearance, which were "inappropriate . . . specifically for the prison setting . . . ." (Hr'g Tr. 739:20–25.) She also observed that he "ma[de] jokes" and "[tried] to make me laugh." (*Id.* 789:12–13.) Dr. Morris noted that Jeffries required "some redirection and adjustment in that area." (*Id.* 739:25–740:1.) However, like Dr. Pennuto, she found that Jeffries' jokes and comments did not demonstrate disinhibition, but rather showed that he was "trying to get [her] on his side to make [her] like him, to have a positive view of him in order to get [her] on his side." (*Id.* 789:9–20.) Dr. Morris also found Jeffries' behavior to "some cognitive abilities that do relate to competency" because:

> in order to act in that manner to get somebody on your side or to attempt to try to get somebody on your side, you . . . have to hold information and intentionally modify your

> behavior in order to get them on your side. So he's potentially holding . . . two pieces of information in his brain at the same time, right?

(*Id*. 789:25–790:10.)

Dr. Morris testified that Butner staff who led group sessions in which Jeffries participated told her that Jeffries "appear[ed] to be paying attention and tracking the information that's being discussed," and that he "actively participated and responded appropriately to questions asked." (*Id*. 822:17–823:8.) Butner staff also reported to Dr. Morris that Jeffries was "not having any difficulties" beyond the one incident in which he was found in an unauthorized wing of Butner. (Hr'g Tr. 883:8–10.) Dr. Morris also spoke with Butner medical staff, officers in Jeffries' housing unit, and the mental health lieutenant who had "frequent contact" with people in Butner for competency evaluation or restoration procedures, and "other psychologists that had interactions with Mr. Jeffries." (*Id*. 882:16–25.)

***ii. Competency Assessment***

On November 18, 2025, Dr. Morris administered to Jeffries the Revised Competency Assessment Instrument ("R-CAI"), a tool to "help guide and structure the interview process" to elicit information about the following fourteen competency-related areas:

- Understanding of Charge
- Appreciation of Penalties
- Appraisal of Available Defenses
- Appraisal of Functions of Courtroom Participants
- Understanding the Court Procedures
- Motivation to Help Self in the Legal Process
- Appraisal of Likely Outcome
- Planning of Legal Strategies
- Ability to Cooperate Rationally with Counsel
- Capacity to Disclose Pertinent Information to Counsel
- Capacity to Testify
- Capacity to Challenge Prosecution Witnesses
- Ability to Manifest Appropriate Courtroom Behavior
- Capacity to Cope with the Stress of Incarceration Awaiting Trial

(GX-2A at 31; *see also* Hr'g Tr. 743:4–12.) Dr. Morris conducted the competency evaluation over the course of two days and, on the second day, tested Jeffries' retention of information provided on the first day. (Hr'g Tr. 756:18–21.)[6] She described the R-CAI as a "flexible instrument" and did not ask all of the questions on the assessment, but determined which questions to ask based on the facts of Jeffries' case and his responses. (*Id.* 888:24–891:11.)

Dr. Morris observed that Jeffries "demonstrated a good factual understanding of the nature and consequences of court proceedings." (GX-2A at 31.) When asked about his charges, he responded, "I guess the charges are Interstate Prostitution, which is interesting, 15 of them." (*Id.*) He also noted, "There is a 16th which I am not sure what it is." (*Id.*) After Dr. Morris educated Jeffries about the sex trafficking count, Jeffries "demonstrated some difficulty" describing the allegations. (*Id.*) In response to Dr. Morris' questions about the potential penalties associated with a guilty verdict, Jeffries recognized that "if found guilty, someone may face financial consequences and be sentenced to a period of incarceration." (*Id.* at 32.) Jeffries also described three possible plea options that he could enter in court: guilty ("That you did it"), innocent ("That you didn't do it"), and "innocent by way of insanity" ("That your thoughts aren't based on reality"). (*Id.*)

Jeffries responded to questions about the various players in a criminal proceeding as follows:

> Mr. Jeffries defined a defendant as "the accused" and correctly identified himself as the defendant in his case. He described the job of the defense attorney as "to protect the client" by "arguing their case effectively." Mr. Jeffries further identified him[self] as the client to his defense attorney. He indicated the job of the prosecutor is "to prove that the person is guilty." Mr. Jeffries stated the judge "determine[s] . . . whether the person is innocent or guilty and then . . . work[s] out the penalty." Mr. Jeffries correctly stated that when a jury is present, they "determine guilt or innocence of the accused." He indicated the jury is comprised of "12" individuals. Mr. Jeffries understood the difference between

[6] The record does not reflect how much time Dr. Morris spent evaluating Jeffries.

> a bench trial and a jury trial (i.e., "bench is performed in front of the judge and a jury in front of a jury"). He further indicated a judge decides the verdict in a bench trial and a jury decides the verdict in a jury trial. Mr. Jeffries incorrectly stated the jury decides sentencing in a jury trial, and he received education. After a time delay, Mr. Jeffries remembered this information. Mr. Jeffries stated a witness "would experience or viewed the . . . crime." When asked specifically about the role of a witness in the courtroom, he stated, "Testifying to that which he or she had seen."

(GX-2A at 32.) In response to questions about legal strategies, Jeffries responded as follows:

> Mr. Jeffries indicated a defendant can testify in their own cases but that it is not required. He stated, "As a matter of fact, I would advise not to because it could prove their [sic] guilty." He noted if a defendant does choose to testify, they would have to answer the questions asked and tell the truth. He indicated, "They could be perjured" if a witness lied on the stand, and that perjury is "a crime," specifically a "felony." . . . Mr. Jeffries acknowledged the prosecutor would ask the defendant questions in cross-examination in an attempt to "show that the defendant is guilty."

(*Id.*) Dr. Morris found that "[w]hen asked, Mr. Jeffries demonstrated the ability to reason through the pros and cons of testifying as the defendant." (*Id.*) Specifically, Jeffries "indicated the defendant can choose to testify to 'present his point of view' and identified this as a positive aspect of testifying." (*Id.*) He "further identified a negative aspect of testifying as the defendant could in turn 'do a [b]ad job' and could 'open the road for prosecution to strengthen the prosecution's case.'" (*Id.*) Regarding other witnesses, Jeffries acknowledged that he can "'tell [his] attorney' if a witness was to lie about him in the courtroom." (*Id.*) When Dr. Morris "asked if there is anybody who is likely to lie about him, Mr. Jeffries stated, 'The accusers.'" (GX-2A at 32.)

Dr. Morris also asked Jeffries questions about his counsel. Jeffries "indicated he has never disagreed with how his attorney has handled his case thus far but suggested if he were to disagree in the future, he would 'tell him' about the disagreement and would possibly retain a new attorney." (*Id.* at 33.) Jeffries also stated that "he can help his attorney by 'telling the truth about everything . . . not fabricating and making up stories.'" (*Id.*) He further explained that he

understood the concept of "confidentiality" between him and his attorney to mean "[t]hat what I talk to him about is privileged," which means, "it is between us." (*Id.*)

Dr. Morris found that Jeffries "benefited from prompting" when answering questions, but was also capable of "remembering information for a significant period of time after it was provided to him." (Hr'g Tr. 858:18–24.) She observed, "Mr. Jeffries does better when he's asked information that's contextualized and he can relate to and he has some connection to." (*Id.* 860:22–24.) Dr. Morris further found that Jeffries required "minimal to moderate" amounts of prompting, but acknowledged that "[t]here are no specific standards" that establish what amount of prompting is "minimal" as opposed to "moderate" or "significant." (*Id.* 891:12–893:14.)

Dr. Morris acknowledged that Jeffries required education about certain topics, including about which counsel would first question a defendant who chose to testify and what accepting a plea bargain entails. (GX-2A at 32–33.) Jeffries could not recall the specific names of the criminal charges against him, even though they had been provided several days earlier, but correctly identified that there were sixteen counts. (*Id.* at 34.) He also retained other information that Dr. Morris had provided to him several days before the evaluation. (*Id.* at 32–34.) Jeffries accurately described the allegations (*e.g.*, "transporting people for prostitution"), including the allegation that he had coerced individuals to engage in sexual acts in exchange for "the ability to be Abercrombie models." (*Id.*)

Dr. Morris found that, during his time at Butner, "Jeffries was able to adequately adjust, he was able to learn new information, he was able to remember information from situation to situation interview to interview." (Hr'g Tr. 873:9–15.) She recognized that these findings were inconsistent with the findings of others who had evaluated Jeffries before his arrival at Butner. (*Id.*)

***iii. Conclusions***

Ultimately, Dr. Morris concluded that "although [Jeffries] does have a severe mental defect, it is not of the severity that would preclude him from being competent to stand trial." (*Id.* 780:25–781:2.) In support, she noted the following findings:

- While Jeffries "at times needed education" regarding legal concepts or procedures, he "was amenable to the education and demonstrated the ability to remember and apply the novel information to both hypothetical scenarios and his own legal situation." (GX-2A at 34.)

- "Although he at times needs prompting to arrive at the most accurate and inclusive response, when prompting was provided, Mr. Jeffries demonstrated the ability to recall and discuss information accurately" and "demonstrated the ability to appreciate the seriousness of the charges against him." (*Id.* at 35.)

- "Although [Jeffries] expressed an ideal defense strategy," i.e., the strategy of being found incompetent to stand trial, "and was unwilling to discuss alternative strategies, . . . this was not due to an inability but rather an unwillingness to take a different approach to his case." (*Id.*)

- "Mr. Jeffries evidenced the ability to participate and remained engaged in interviews, even when the interview lasted for longer than one hour." (*Id.*)

Accordingly, Dr. Morris formed the opinion that Jeffries' "measured and observed deficits are not significantly impairing his cognitive processes at this time" and that he "is competent to stand trial and can be returned to resolve his legal situation." (*Id.* at 35–36.)

**C. <u>Jeffries' Personal Phone Calls from Butner</u>**

The Court has reviewed audio recordings and written transcripts of all phone calls between Jeffries and individuals other than his counsel during the four-month period in which Jeffries was committed to Butner. There are a total of 109 calls, or 21 hours and 16 minutes of audio. Each recording commences with Jeffries placing the call and an automated message informing him that the phone call would "be recorded and subject to monitoring at any time." (*See, e.g.*, 300T at 2.) All of the calls are between Jeffries and his partner and co-defendant Smith

(*see* GX-300 through GX-408), with the exception of one call between Jeffries and his son Andrew Jeffries (also known as "AJ") and daughter-in law, Annabel Jeffries. (*See* GX-364.) While at Butner, Jeffries called Smith multiple times each week and occasionally multiple times in the same day, for up to fifteen minutes per call, as permitted by Butner. (*See* GX-300 though GX-408.)

#### *i. Jeffries' Focus on the Competency Evaluation Process and Likely Result*

The calls reveal that over the course of his four-month hospitalization at Butner, Jeffries carefully tracked the logistics of the competency evaluation and restoration process. Shortly after his arrival at Butner, Jeffries told Smith during an August 4, 2025 call that he believed Butner's "mission" was to "prove that [he] had Alzheimer's" and Lewy Body Dementia. (GX-317T at 4.) However, the following week, on August 12, 2025, Jeffries reported to Smith about a conversation he had with a Butner staff member: "All he said was that this is a transition place. Uhm, to get me; to get the people to trial. So . . . You should pass that onto Brian, too." (GX-329T at 4.) The calls reflect that throughout his custodial hospitalization, Jeffries was increasingly concerned about the length of his commitment at Butner and the possibility that he would be found competent to stand trial.

For example, on August 1, 2025, when Jeffries realized that he may be on a long list of people at Butner waiting for evaluation, he asked Smith, "The question is, is there anything we can do about that? . . . [Bieber] didn't research it well enough to know that this was going on . . . If he'd researched it, he'd know there's no chance of getting [off] the waiting list . . . ." (GX-309T at 5.) On October 29, 2025, Jeffries expressed concern about being detained for a competency evaluation before being convicted of a crime:

> I don't know what happened to the concept of innocent until proven guilty. I haven't been proven guilty. . . . I have not been convicted of anything. Isn't there a concept in American jurisprudence that you're innocent until proven guilty?

(GX-382T at 5.)

Jeffries spent a considerable amount of time on his calls with Smith speculating about the length of his custodial hospitalization and strategizing about how to obtain more information about the evaluators, the evaluation process, and the likely outcome. For example:

- On July 30, 2025, Jeffries asked Smith for the spelling of Dr. Morris' name. (GX-305T at 9.)

- On August 1, 2025, Jeffries speculated about who would conduct his evaluation and the timing: "They're just saying that she's backed up . . . She kind of runs this place." (GX-309T at 4–5.) Later that same day, Jeffries speculated that Dr. Morris was involved in the evaluation process and commented, "Oooh, that's a bad idea because she hates me." (GX-312T at 2.) He added, "She's not a . . . technician or a specialist. So, I assume it's gonna go first to this girl, lady, and then to the other person. But is that a good assumption?" (*Id*. at 5.)

- On August 2, 2025, the following day, Jeffries reiterated to Smith that "We don't know [the] name" of the person who would conduct the evaluation. (GX-314T at 3.)

- On August 20, 2025, Jeffries told Smith, "I think, um, you need to check with Brian to find out who said that it could possibly be sooner than four months," referring to guidance he had received from counsel about the expected duration of his time at Butner. (GX-340T at 2.)

Jeffries explained to Smith his evolving understanding about the purpose and logistics of the competency evaluation and restoration process and the possibility that he could be found competent to proceed to trial. For example:

- On August 12, 2025, Jeffries remarked: "I think the biggest issue is it's all prison. There's no end. I'm finally figuring out what goes on here, which is very complicated. . . . [I]t is all prison; that there is no medical and that scares me to death in terms of what's going to happen. The guy came to visit me today from the prison, from the mental health department was saying that this is just a transition place; the whole place [is] for people to go to trial, which is also scary. That's all that I think you should pass on to Dave, but also that we need a, I need a spokesperson here." (GX-330T at 3.)

- On August 14, 2025, Jeffries told Smith:
  - "[Doctors at Butner will] review the information about the testing that I've had and determine whether it was good or not. . . . I don't know that they'll say it is the be all and end all, but they'll make the recommendation that a judge will at that point say, uhm, well, it's, it's valid or it's not." (GX-333T at 2.)
  - "The Judge would, they're going to make the recommendation that they think it is or is not good. And then the judge will make the decision." (*Id*. at 3.)
- On August 20, 2025, Jeffries observed: "It seems to me that everyone here is on a four-month deal, that's the level, that's what everyone is in for here. Everybody. And, there are like 3,000 people here." (GX-339T at 3.)
- On September 19, 2025, Jeffries asked Smith to have Bieber calculate 120 days from the date of his arrival at Butner, apparently realizing that he, like others at Butner, are normally hospitalized for 120 days. (*See* GX-358T at 4–5.)
- On October 23, 2025, Jeffries and Smith had the following exchange:

  > Jeffries: [T]he woman who does the testing got to me today, and I had a testing session.
  >
  > Smith: Yes. Great news. Was this Cassie, who's doing the testing?
  >
  > Jeffries: No, no, no. She's separate. . . . The testing lady is just the testing. . . . Her results go to . . . Morris then for Morris's final report.

  (GX-378T at 4.)
- On October 30, 2025, Jeffries told Smith: "I had a session this morning with Dr. Morris. . . . And she . . . gave me a document that read out all of our charges, which I have not paid any attention to." (GX-383T at 2.)
- On November 14, 2025, Jeffries noted to Smith: Dr. Morris "is writing a report. . . . Next week that will go to the judge, the prosecutor and our lawyer. . . . And it will state either I am incompetent or competent." (GX-402T at 2.)

In a number of calls, Jeffries demonstrated an understanding of the potential consequences stemming from a determination that he is competent to proceed and expressed concern about going to trial, even during the early days of his custodial hospitalization. For example, on August 6, 2025, Jeffries recounted, "David said that, uhm, this place, the

. . . hospital or whatever . . . is supposedly here to, um, get people into, in shape to go on trial. Now, if that's the case for us, we're in big trouble. As you know." (GX-318T at 2.) He reiterated, "That the organization [Butner] is charged with getting the, the patients to the state that they can go on trial. I am saying if we go to that state we're, we're screwed. So we have to figure this out." (*Id.* at 3.) Jeffries repeated these concerns again: "But if we do go on trial, we're in real trouble." (*Id.*) On October 30, 2025, during the same call in which Jeffries reported to Smith that Dr. Morris had given him a document laying out his charges, he acknowledged: "But as important, the remedy if, if we're guilty of these charges is really onerous. They'll take all our money away." (GX-383T at 2.)

Jeffries also demonstrated an understanding that even if he were found to be incompetent, Smith might have to proceed to trial. During an October 30, 2025 call, Smith told Jeffries, "You won't stand trial," to which Jeffries responded: "Right. But you will." (*Id.*)

Near the end of his custodial hospitalization at Butner, on November 14, 2025, Jeffries shared with Smith his concern that Dr. Morris would conclude that he is competent to proceed:

> Smith: I mean [the report] has to say that you're, uhm you're not competent to stand trial[.]
>
> Jeffries: It doesn't have to say that, that's what bothers me.
> . . .
>
> Smith: It has to, darling. Don't worry about that.
> . . .
>
> Jeffries: I am, I really am. Because I don't know what I went through other than the Alzheimer's to indicate that I'm incompetent.

(GX-402T at 4.) Later in the conversation, Jeffries stated, "I think they're looking for a way to forget about this, uhm, Alzheimer's or Lewy whatever it is, and, and, and declare me competent. I think that's their goal, and I think that's terrible. We can't make that happen." (*Id.* at 6.) Jeffries

also expressed concern regarding the impact of his competency finding on Smith's case. (*See id*. at 3–5.) In response to Smith's efforts to assuage his concerns, Jeffries raised incisive questions about the basis for a competency determination:

> Jeffries: What . . . have they done to say that I am incompetent other than the Lewy Body or the Alzheimer's[?]
>
> Smith: But that is it. That would make you . . . [incompetent] . . . that's the point.
>
> Jeffries: How do . . . how do they reinforce that? All they . . . Look at our, our evaluations. That's not independent, that's not being independent. We could have made those up.
>
> Smith: [Laughing] No, they were done by . . . so many doctors, that's the point.

(*Id*. at 7.)

A few days later, on November 18, 2025, Jeffries reiterated his intuition that Dr. Morris would find him competent:

> Morris has been coming on to me over and over again. She is very committed to coming up with a report that I am competent, which, as you know, is a disaster, will be a disaster for us in terms of time, effort, money, every way you can say it. So I think you need to get to Brian and say: "Brian, this is what's happening. Are you prepared to counter that when that, she comes up with that conclusion?" Does that make sense?

(GX-405T at 2.) When Smith asked Jeffries about the basis for his conclusion, Jeffries responded:

> Everything she's saying and how she's saying it. . . . [A]m I 100% about this? No. But the downside is so huge, Matty. So huge! That I just want us to be paranoid about it. I want you to be par-. Me to be par-. Brian to be paranoid. And I think challenging Brian . . . he's smart. He can come up with a strategy that can fight it. God knows, maybe we're not going to need to, if it comes back as incompetent, but I think that it is a longshot given what's going on.

(*Id*. at 3.)

#### ***ii. Jeffries' Ability to Rely on Counsel to Assist in his Defense and Discussion of Defense Strategies***

Throughout the Butner phone calls, Jeffries frequently urged Smith to speak with Bieber (Jeffries' attorney) in order to ensure that Bieber is working diligently to fight the charges

against Jeffries. Jeffries made these requests to Smith starting in the early days of his custodial hospitalization at Butner, which began on July 21, 2025, and continued to make them throughout the duration of his commitment. Indeed, Jeffries began many calls to Smith by asking for an update about whether Smith heard from Bieber and what Bieber said. (*See, e.g.*, GX-308T at 2 ("Did you get to Brian?"); GX-328T at 2 ("Were you able to get to Brian?"); GX-350T at 2 ("Did you speak to, Brian?"); GX-352T at 3 ("Any word from, uh, Brian?"); GX-356T at 2 ("Did you get a chance to talk to Brian?").)

The following are illustrative examples of how Jeffries directed Smith to reach out to Bieber and followed up to see if those instructions were followed:

- On July 28, 2025, Jeffries instructed Smith: "Keep pressuring Brian, by the way . . . I don't trust what's going on there at all. I don't, I don't think anything is going well." (GX-302T at 8.)

- On August 1, 2025, Jeffries told Smith, "But I think the question is, what does Brian think? Is he gonna have a chance to work this out? . . . I would put him in the corner. I really would. Does he feel responsible somehow for this, um, disaster?" (GX-312T at 6.)

- On August 3, 2025, Jeffries questioned Smith, "Well, what were your conversations with Brian?" . . . "He's got to figure out who [the evaluator] is so he can, he can get somebody on that." (GX-315T at 2–3.) Jeffries also implored Smith to speak with counsel to make sure they were "doing everything [they] should be doing":

  > You gotta be creative, get in there and dig and figure out . . . And where the angle is, there is always an angle, but you've got to know what's going on before you get there. . . . Isn't that what you should be forcing them to do? . . . And I don't think it would be harmful for you to indicate to them that we're not very happy with where we are. Do you?

  (GX-315T at 8–9.) Jeffries then instructed Smith, "So go fight, please. Fight hard. It wouldn't hurt to be nasty with them. Put them on notice. They think we're easy marks, they really do. I'd tell them that. Okay? Did you hear me? Matty?" (*Id.* at 9.)

- The day after the August 3, 2025 call, Jeffries called Smith to follow up on his instructions from the previous day. (*See* GX-317T.) After Smith recounted his conversations with counsel, Jeffries responded with pertinent questions:

- Smith: I told Brian . . . their job is to try and see if they can improve you . . .

  Jeffries: Why do they think they need to improve me? (GX-317T at 4–5.)

- Jeffries: Joe wasn't on the call?

  Smith: Well, neither . . . they were separate calls. So I had one with Brian and one with Dave.
  . . .

  Jeffries: Why didn't you speak to Joe? (*Id.*)

- Smith: What he disagrees with . . . is that necessarily um, therefore it's going to take the four months.

  Jeffries: Why does he disagree with that? (*Id*. at 5.)

- Jeffries: [W]hy would it take so long for them to figure out if I have these two diseases? (*Id*. at 6.)

- Several months into his custodial hospitalization, on October 29, 2025, Jeffries instructed Smith to coordinate with counsel about setting up a privileged phone call with "Mr. Moll":

  > But, I think you have to really be tough with him. Say we got to make this call happen. . . . Mr. Moll said, "Well, I haven't heard from him," so I called Brian, said, "Brian, please get to him." He said, very surly way, "Well, okay, I'm going to call him right now once I hang up." Obviously that didn't happen. (GX-382T at 3.)

During a number of calls, Jeffries shared with Smith ideas about defense strategies:

- On September 21, 2025, Jeffries told Smith, "A law was passed this week" that "calls for reducing all sentences by half. Immediately." He asked Smith, "I don't know whether this applies to us at all, but it's certainly worth checking. Don't you think?" (GX-360T at 2.)

- On October 19, 2025, Jeffries told Smith about two "key points" that he had shared on a call with Bieber for his consideration. The first was for Bieber to review the book, *Is it Alzheimer's?* by Peter V. Rabins. Jeffries explained:

  > [O]n page 11, he talks to the fact that the average . . . age of survival, the length of time of survival is ten years. And I've said to . . . Brian, that huh, it's clear that I've had this. It's been diagnosed for ten years. So, and, and, as a matter of fact, what I think he should be pushing for is . . . that point[.]

(GX-375T at 2.) Jeffries' second point for Bieber was that "I've been classified as a . . . model prisoner" by Dr. Morris. (*Id*. at 3.)

- After Dr. Morris reviewed the charges in the Indictment with Jeffries, on October 31, 2025, he remarked to Smith that the list "sparked in me, a comment that . . . Judge Judy had . . . made, which was, 'These, these people were adults, and, there was no force involved,' which I think is kind of key, isn't it? To our suit?" (GX-385T at 3.)

- On November 2, 2025, Jeffries reviewed his list of issues for discussion with counsel, including: (1) "What are the charges?" (2) "What are your arguments against each of them?" (3) "What are . . . your prognosis for each of them?" (4) "[I]s this going to be a trial or is it going to be [] judge decided?" (5) "How much will all this cost?" (6) "[W]hen will this case be finally finished?" (GX-389T at 6–7.)

On November 13, 2025, Jeffries instructed Smith to ensure that Bieber would make sure the entire defense team was "on go" for a "very important" meeting that would occur on November 22, 2025, for which Jeffries had a list of discussion items that he did not disclose on the call. (GX-400T at 3.) Smith confirmed that everyone was "on standby." (*Id*.) Several days later, on November 19, 2025, Jeffries again discussed preparations for his release from Butner and identified pertinent questions to discuss during the meeting with counsel:

> And that's why, and that's gotta be our conversation with the boys. What are the charges? What's your prognosis? How long's it going to take? All that stuff . . . .

(GX-406T at 6.) In another call later that same day, Jeffries shared additional thoughts for discussion with counsel:

> I think we need a time and action. When, when do we really get free? What are the dates with the judge . . .? And this is something for Brian. Are we being aggressive enough about presenting our case that she's going to let it go at that point? And there's two things. One is you and then me.

(GX-408T at 7.)

Jeffries further directed Smith to instruct Bieber to stay on top of the logistics for Jeffries' departure from Butner. For example, on October 16, 2025, he reminded Smith: "I'd really make sure that Brian is, is checking as well as he might how smoothly this departure might be? . . .

Because I'm hearing from people here that it takes two weeks to, to process . . . time to get out." (GX-371T at 4.)

### *iii. Jeffries' Demonstrated Capabilities Over Managing his Affairs*

During the Butner calls, Jeffries frequently gave Smith instructions about the couple's financial planning and directed him to coordinate with "Gavin," their financial manager,[7] showing that Jeffries was involved in the management of his finances and affairs, at least at a high level. The following are illustrative examples.

- During a July 28, 2025 call, Jeffries told Smith, "I think you should get out the cash flow and go over it, and then go over the assumptions that we made in terms of how many different . . . cities and all that. And look at . . . the numbers to make sure that they're coming out." (GX-301T at 7.)

- During an August 10, 2025 call, Jeffries informed Smith that he may live to be 95 years old and that, as a result, "I think our model needs updating. And I think you and Gavin need to work on it pretty quickly." (GX-323T at 2–3; *see also* GX-332T *generally*, GX-333T at 4–6.)

- On September 5, 2025, Jeffries expressed to Smith an interest in incorporating his son Andrew into their financial assumptions and planning: "[L]et's not talk him into not working. I just think he should know that that safety valve exists if he doesn't want to." (GX-349T at 6; *see also* GX-333T at 5.)

- On September 11, 2025, Jeffries asked Smith, "[H]ow are you doing on the cash flows? Are those all working out?" (GX-353T at 5.)

- On September 16, 2025, Jeffries told Smith, "I was thinking you, you thought that we shouldn't find out what AJ was making. But, I think we should know, because we have to make sure that he's got enough to live on, between what we're giving him and what that is." (GX-356T at 3.)

- On September 22, 2025, after Andrew received a job offer, Jeffries suggested to Smith that Gavin should "look at what the offer is, and make sure we've made up enough difference that he can live well, that's all." (GX-362T at 6.)

[7] Jeffries identified "Gavin" as a manager who oversees his finances, including bill payments and estate management. (DX-F at 5.)

- On October 1, 2025, Smith consulted Jeffries about their financial affairs: "We would like to put Susan's apartment, start getting it ready to go on the market. You don't have a problem with that, do you?" (GX-366T at 4.)

Furthermore, in anticipation of his departure from Butner, Jeffries provided granular instructions to Smith about tasks to undertake in preparation and appointments he wanted to have in place. For example:

- During an October 20, 2025 call, Jeffries requested, "Botox . . . I look like, 100 years old," and cortisone treatment akin to what he received after his 2018 fall in South Africa. (GX-377T at 3–4.) He also instructed: "I need dark glasses. If we could just take the lens I have now and put dark glasses in them in addition to what I have, that would be fine." (*Id*. at 4.)

- On October 30, 2025, Jeffries repeated his request for Botox and requested a haircut, discussed the medication with which he would be released from Butner, and asked when "Peter and Minka" would come to visit him at home following his return. (GX-384T at 3–4.)

- On November 2, 2025, Jeffries asked Smith to procure a "razor," "shaving cream," "eye repair," "hair gel," "Listerine," "nasty videos," "Caverject," and "Viagra," as well as clothing items. (GX-388T at 3–4.)

- On November 13, 2025, Jeffries instructed Smith to allocate the remainder of his commissary funds to four of his peers detained at Butner and provided Smith the names and ID numbers of each individual as well as the exact amount that they should receive. (*See* GX-399T.)

#### *iv. Jeffries' Love of Reading and Recall of Information Previously Read*

Jeffries spent much of his time at Butner reading books and newspapers. Early during his hospitalization, on an August 8, 2025 call with Smith, Jeffries referenced having read a book "three times over" out of boredom. (GX-320T at 8; *see also* GX-328T at 2 (Aug. 11, 2025) ("I just got a good book that might see me through a few days.").) On numerous occasions, Jeffries asked Smith to send him more books because he had "[run] out of things to read." (GX-335T at 3 (Aug. 17, 2025).) For example:

- On August 18, 2025, Jeffries asked Smith when he was sending more books and told him, "I'm dying for books." (GX-338T at 8.)

- On August 20 and 23, 2025, Smith and Jeffries discussed which books Smith should send to Jeffries. (GX-340T at 6; GX-341T at 3.)
- On September 11, 2025, Jeffries asked for additional books written by Suzanne Brockmann and noted, "I'm almost out of the Donna Leon[] [books] that you sent . . . it wouldn't hurt to send a few more of those if you have any more." (GX-353T at 3–4.)
- The following day, on September 12, 2025, Jeffries again asked Smith for more books and noted, "I'm down to only four books that I have not read." (GX-354T at 3–4.)
- On September 19, 2025, Jeffries asked Smith, "[A]ny more books on the way to me?" (GX-358T at 7.)
- On October 2, 2025, Jeffries asked when books being sent by Smith would arrive and explained that he was "keeping [the old books] 'cause I'm re-reading them all," and that he's "[r]e-reading Donna Leon now." (GX-367T at 3.)
- On October 16, 2025, Jeffries told Smith, "I would love some more Jeffrey Archer, by the way," and lamented, "I'm out of good reading stuff." (GX-371T at 3–4.)

Jeffries even commented on his ability to remember what he was reading while at Butner. On October 2, 2025, he complained to Smith that re-reading the few books that he had in his possession was not as pleasurable as he expected: "I thought it was going to be easy because I wouldn't remember, but I remember every single line." (GX-367T at 4.)

Moreover on August 10, 2025, when Jeffries first started reading *Is it Alzheimer's?* by Peter V. Rabins, he demonstrated an ability to retain insights from what he read. He told Smith that he learned from the book that the "average length of time that you live with Alzheimer's is ten years" and that the medication Seroquel is "wildly overprescribed" and "leads to advanced . . . morbidity rates." (GX-324T at 3.)

Jeffries also demonstrated the ability to recall interesting news articles that he had read while at Butner. For example, during a September 9, 2025 call with Smith, he reported that "a few minutes" earlier he had read an article about an American Eagle campaign and noted that

"their stock went up thirty-eight percent in a day." (GX-352T at 2–3.) On September 29, 2025, he discussed an article about David Geffen. (GX-365T at 3–4.)

#### *v. Jeffries' Demonstrated Recall of People, Places, and Things*

Jeffries and Smith's friends and family are a frequent topic of conversation in the Butner calls. When Jeffries is engaged in such topics, he is able to recall the names of people and places with ease.

- On July 28, 2025, Jeffries was responsive to Smith's updates about various individuals, including "Annabel," "Gavin," "Paul," "Cristobal," "Susan," "Andrew," "Nick," "Peggy," and "Jeannie." (GX-302T at 3.)

- On July 29, 2025, Jeffries asked, "[H]ow are the workouts going with . . . Tammy?" (GX-304T at 4.)

- On numerous calls, Jeffries and Smith discussed the various travels of their friend "Sandy." On July 29, 2025, Smith informed Jeffries that Sandy had traveled to Michigan. (*See* GX-304T at 2.) Several days later, on August 1, 2025, Smith told Jeffries, "I had a nice chat . . . with Sandy," to which Jeffries responded, "Ohh, good. How's Michigan?" (GX-312T at 3.) On September 1, 2025, Smith told Jeffries that Sandy is "getting ready to leave," to which Jeffries asked, "To go home to Los Angeles?" (GX-345T at 6.) Similarly, on September 29, 2025, Smith informed Jeffries that Sandy was traveling to Europe; two weeks later, on October 14, 2025, Jeffries asked, "Is she in Europe, Sandy?" (GX-365T at 5; GX-370T at 3.)

- On August 14, 2025, in response to Smith's remark that he spoke with a person named "Daisy," who was "Jackie's mother," Jeffries asked "How did she sound?" and recalled that Daisy is 98-years-old. (GX-333T at 8.)

- On August 18, 2025, Jeffries asked, "Have you talked with Valerie? Again?" remembering that Smith had mentioned her the day before. (GX-338T at 5; *see also* GX-335T at 6.)

- On August 24, 2025, after Smith noted that "Elizabeth was back" at church, Jeffries responded, "Oh, really? Good, she must be in a, a wheelchair." (GX-342T at 2.)

- On September 9, 2025, Jeffries recalled "Craig Brommers," "our marketing guy" who was working at American Eagle. (GX-352T at 2–3.)

- On September 16, 2025, Jeffries asked, "Have we ever heard from . . . our friend, Brian, who is living in Hawaii now?" (GX-356T at 4.)

- On September 21, 2025, Jeffries asked about "the house that Kim used to have" and recalled that it was in a "[g]reat location." (GX-361T at 6.)
- On October 16, 2025, Jeffries recalled "Reid's," a hotel in Madeira, Portugal. (GX-371T at 2–3.)
- On October 20, 2025, Jeffries reminded Smith "it's [Cindy's] birthday tomorrow, by the way." (GX-377T at 7.)

In a handful of instances, Jeffries was not able to remember people and asked Smith for clarification. (*See, e.g.*, GX-305T at 8 (July 30, 2025) (in response to Smith's reference to "Kathy," Jeffries responded, "Remind me who that is," and Smith explained that she "took care of Susan"); GX-375T at 4 (Oct. 19, 2025) (same regarding a "Patrice . . . [w]ho ran Club 55"); GX-384T at 4 (Oct. 30, 2025) (same regarding a "David Schaefer").)

### *vi. Jeffries' Recall of Information Important to him*

Review of all of the Butner calls demonstrates that Jeffries is capable of retaining information between calls and following up on issues at a later date when the information is meaningful to him. On August 4, 2025, Smith reported that Jeffries' counsel, Bieber, was supposed to be receiving "bi-weekly" reports from Butner staff:

> Smith: We're supposed to get two weekly, bi-weekly, reports from them. We'll see if we do, but . . .
>
> Jeffries: A bi-weekly report? Each week.
>
> Smith: Yeah, the attorneys . . . Brian I should say.
>
> Jeffries: Oh, what, oh, really? Oh okay, good. Has he gotten one yet?

(GX-317T at 8.) On August 8, 2025, several days and phone calls later, Jeffries followed up: "Is Brian receiving those two reports he's supposed to get every week?" (GX-320T at 2.) Smith corrected him that the reports were not given twice a week, but once every two weeks. (*Id.*)

Jeffries also asked Smith on numerous occasions about his son and daughter-in-law, Andrew ("AJ") and Annabel Jeffries and learned and retain information about their lives. After Smith shared that Andrew was being considered for a job in Santa Barbara, Jeffries repeatedly asked Smith for updates across a number of different calls. For example:

- On August 8, 2025, Jeffries asked, "Anything about the job that was a possibility for AJ?" (GX-320T at 4.)
- On September 11, 2025, Jeffries asked, "What did we hear from, ah, Santa Barbara?" (GX-353T at 2), demonstrating his recall of conversations with Smith two and three days before in which they discussed Andrew's job interview in Santa Barbara. (*See* GX-351T and GX-352T.)
- On the following day, September 12, 2025, Jeffries remarked that he was expecting "the big news today," referring to the anticipated results of Andrew's job interview. (GX-354T at 6.)
- On September 15, 2025, Jeffries asked Smith, "What's going on with Andrew and his job?" and the pair discussed how Andrew's job interview went. (GX-355T at 6–7.)
- On September 20 and 21, 2025, Jeffries asked Smith for updates regarding Andrew's job. (GX-359T at 2–4; GX-360T at 3.)
- On September 27, 2025, Andrew informed his father that he started work on October 6, 2025. (GX-364T at 3.) Several days later, on October 1, 2025, Jeffries told Smith that the following Sunday is "the day before [Andrew] starts his job." (GX-366T at 5.)

Similarly, after learning on July 30, 2025, that his daughter-in-law Annabel was injured in a car accident, Jeffries followed up with Smith on calls days, weeks, and months later to ask about her health, even without prompting or reminder from Smith. (*See* GX-305T at 6–7 (where Jeffries learns of the accident); GX-312T at 4 (Aug. 1, 2025) (Smith stated, "Annabelle was in great form. She was just terrific," to which Jeffries responded, "Was she in pain from all those stitches?"); GX-368T at 4 (Oct. 5, 2025) (Jeffries asked if Annabel is "still on the mend?"); GX-

370T at 5 (Oct. 14, 2025) (Jeffries asked if Annabel has been "going to the doctor all the time," because "[h]er physical situation is the most important thing we got").)[8]

***vii. Jeffries' Engagement with Current Events While Committed at Butner***

Jeffries also made efforts to keep up with current events during his commitment at Butner. In a November 5, 2025 call, after Smith asked whether Jeffries learned of results of various electoral races happening across the United States, Jeffries asked, "Who won . . . New York? Mamdani?" and speculated that the candidate won by "[a] lot, I bet." (GX-393T at 8.) Jeffries also followed news relating to the criminal prosecution of former rapper and music executive Sean Combs (also known as "P. Diddy" or "Diddy") and at times speculated about how that prosecution might affect his own case. (*See, e.g.*, GX-319T at 3 (Aug. 6, 2025) (Jeffries told Smith, "Diddy went to Trump . . . asking for a pardon"); GX-366T at 2 (Oct. 1, 2025) (Jeffries shared that "the prosecutors are pushing" for a sentence of twelve years and that "the sentencing is being given on Friday").)

Jeffries and Smith also discussed other current events across the calls, including Georgio Armani's death and the announcement of Anna Wintour's replacement at Vogue (*see* GX-350T at 5–6 (Sept. 7, 2025)); the passage of a new criminal sentencing law (GX-360T at 2 (Sept. 21, 2025)), a *Wall Street Journal* article about David Geffen (GX-365T at 3 (Sept. 29, 2025)); and Dick Cheney's passing (GX-393T at 3 (Nov. 5, 2025)).

***viii. Jeffries' Use of Strategies to Problem Solve and Recall Information***

Throughout the Butner calls, Jeffries used a number of strategies to aid his memory and processing of information. First, in order to keep track of the progression of the fifteen-minute

---

[8] As noted above, Jeffries also recalled across a number of different phone calls spanning July through October 2025 information learned about the travels of his friend Sandy. *See* Findings of Fact Section III.C.v *supra*.

time limit for each call, Jeffries frequently asked Smith to check the time at the beginning of the call so the pair could track when the call would end. (*See, e.g.*, GX-315T at 2 (Aug. 3, 2025) ("Hey would you wanna check the time and see what time it is so you can, we can time this 15 minutes?"); GX-353T at 2 (Sept. 11, 2025) (Jeffries asking Smith to check the time); GX-355T at 2 (Sept. 15, 2025) (same); GX-358T at 2 (Sept. 19, 2025) (same); GX-362T at 2 (Sept. 22, 2025) (same), GX-370T at 2 (Oct. 14, 2025) (same).)

Second, Jeffries frequently made and used written lists of topics he wanted to address with Smith for each call. (*See, e.g.*, GX-316T at 7 (Aug. 4, 2025) ("Let me look at my list here."); GX-332T at 2 (Aug. 13, 2025) ("I've got a whole bunch of stuff for you. I've been working for you out here."); GX-386T at 3 (Nov. 1, 2025) ("I've got other things on my list . . . ."); GX-392T at 2 (Nov. 4, 2025) ("Listen, I have a whole bunch of things we have to talk about, you ready?"); GX-400T at 3 ("[L]et me see if my list is complete now.").) Moreover, Jeffries asked Smith how many minutes had passed so that he could be sure to cover all of the topics he wanted to address. (*See, e.g.*, GX-324T at 2 (Aug. 10, 2025) ("Listen, check the time, really. Because I've got a lot to say."); GX-362T at 7 (Sept. 22, 2025) ("How much more time do we have?"); GX-379T at 4 (Oct. 28, 2025) ("How much time do we have left?").) Dr. Valdes expressly recommended this strategy of using to-do lists as a method of "maximizing [Jeffries'] cognitive capabilities" in the 2024 Valdes Report, and Jeffries efficiently employs it on the calls. (*See* DX-A at 44–46.)

Third, Jeffries made friends at Butner on whom he relied for favors and assistance with certain tasks. For example, Jeffries experienced difficulty dialing Smith's number through the prison calling system, but he persuaded friends in the facility to dial for him. (*See, e.g.*, GX-390T at 5 (Nov. 3, 2025) ("I feel terrific that I was able to talk to you . . . my friend put you through,

he has magic fingers."); GX-399T at 2 (Nov. 13, 2025) ("[M]y friends made it happen again."); GX-400T at 2 (Nov. 13, 2025) ("[M]y friend Jonathan did it again."); GX-401T at 2 (Nov. 14, 2025) ("[T]hank Jonathan. He got the call through again. He is . . . a miracle worker."); GX-404T at 2 (Nov. 16, 2025) ("Hey, I want you to speak to Jacob, who put the call through.").) Similarly, Jeffries persuaded friends to retrieve coffee for him. (*See, e.g.*, GX-384T at 5 (Oct. 30, 2025) (Jeffries explaining that "my friend" is "going to get me some coffee").) He joked to Smith that "[w]e have wheeling and dealing that goes on in here." (*Id.* at 6.)

Fourth, Jeffries developed problem solving strategies for a variety of issues. For example, he figured out that he could covertly transport salt and hot sauce to his meals by using "a plastic cup" and a "cardboard container," joking to Smith that "I feel like James Bond to tell you the truth." (GX-344T at 3 (Aug. 26, 2025).) Once Jeffries discerned that his commitment at Butner would last around four months, on October 2, 2025, he told Smith, "I've got my calendar up on the wall. . . . I made one. I'm looking at the cement blocks. So each block represents a number of weeks. So it's, it's kind of helping me work my way through a little bit. I do anything for entertainment you know." (GX-367T at 6.)

## IV. Re-Evaluations by Dr. Valdes, Dr. Bardey, Dr. Rosenberg, and Dr. Paradis

### A. 2026 Re-Evaluation and Report by Dr. Valdes

Dr. Valdes re-evaluated Jeffries on January 20 and 21, 2026. (DX-C at 1.) She "administered the majority of measures that [she] previously administered in 2023." (Hr'g Tr. 63:24–25.) Dr. Valdes also reviewed Jeffries' medical records from the period following her last evaluation in 2023 as well as the 2024 Bardey/Rosenberg Report, the 2025 Paradis Report, and the 2025 Morris/Pennuto Report. (*See* DX-C at 10–57.) She also conducted another interview with Smith. (Hr'g Tr. 64:12–15.) However, Dr. Valdes did not listen to any of the 109 phone

calls made by Jeffries while at Butner prior to forming the conclusions set forth in her written 2026 report. ("2026 Valdes Report," DX-C, ECF No. 90-1 at 73–175.)

#### *i. Observations & Neuropsychological Test Results*

Dr. Valdes "noticed definite improvements in [Jeffries'] motor skills and level of confusion" since her 2023 evaluation. (Hr'g Tr. 64:19–20.) She also found that Jeffries' overall IQ, processing speed, attention abilities, and verbal reasoning scores all improved. (*See* DX-C at 63.) Dr. Valdes further observed improvements in Jeffries' working memory, including processing speed, auditory brief attention, and concentration. (*Id*. at 64.) She noted that when comparing Jeffries' current test performances with his 2023 results, Jeffries "evidenced relative stability," improved in "verbal fluency," and improved in figure drawing. (*Id*. at 66–67.)

Nevertheless, Dr. Valdes found that test results showed that Jeffries continued to exhibit cognitive functioning in the bottom 1st to 10th percentiles in certain areas. (*See* DX-C at 83.) Regarding his learning and memory abilities, for example, Dr. Valdes found that Jeffries' "recall was in the bottom 5% after 30 minutes," and that "his ability to learn and recall larger amounts of auditory information was more impaired as compared with age peers . . . ." (*Id.*) Dr. Valdes observed that Jeffries' deficits in memory and executive functioning remained similar to those reported in her 2023 evaluation despite improvement in attention and processing speed, which she attributed in part to "good medical care and medication management" that Jeffries received in the intervening time period. (*Id*. at 84.)

Dr. Valdes attached to her 2026 Report an Appendix comparing Jeffries' neuropsychological test results over time. (*Id*. at 94–102.) The results showed noticeable improvement across several categories and subcategories, including but not limited to:

- Full-Scale IQ (from low average to average);
- Processing Speed Index (from impaired to low average);

- Neuropsychological Assessment Battery (from high average to superior);
- Wechsler Memory Scale ("WMS-IV")[9] Visual Memory (from impaired to borderline);
- Immediate Memory (from impaired to borderline);
- California Verbal Learning Test ("CVLT-3")[10] Short Delay Free Recall (impaired to borderline);
- Short Delay Cued Recall (impaired to low average);
- Long Delay Free Recall (impaired to low average); and
- Long Delay Cued Recall (impaired to low average).

(*See id.*)

At the competency hearing, Dr. Valdes attributed Jeffries' improvements to his "benefit from [] medication" and "sleeping better" since the 2023 evaluation, but also noted that they could be due to "fluctuations." (Hr'g Tr. 65:4–66:3.) Dr. Valdes agreed that there was a "significant improvement" in Jeffries' processing speed index from 2023 to 2026. (*Id*. 95:24–96:5.) She also acknowledged that he improved on tests for "sentence comprehension" or "reading comprehension," which require "more alertness, less confusion, [and] better sleep." (*Id*. 98:2–24.) Dr. Valdes further testified that Jeffries' 2023 test performance was adversely impacted by "some very careless errors during the initial assessment" and could have been diminished due to his frustration during the testing process. (*Id*. at 98:19–20, 220:24–221:2.) She also reasoned that the 2023 test results were lower because, at the time, he had been taking the medication Ambien, which "has known side effects related to memory, and so discontinuing that

---

[9] Dr. Valdes explained that the "Wechsler Memory Scale is a battery of tests that looks at learning and memory auditorily and visually. Just like the IQ test, it has an overall summary score that summarizes an individual's performance on all of the measures." (Hr'g Tr. 133:22–134:4.)

[10] Dr. Valdes explained that the California Verbal Learning Test is a "verbal memory task" that requires learning a list of sixteen words. (*Id*. 142:2–3.)

medication which was done by I believe the neuropsychologist was also a positive for him." (*Id*. 65:10–66:23.)

At the competency hearing, Dr. Valdes agreed that the results of neuropsychological tests are a "snapshot in time" of Jeffries' "cognitive abilities" and "executive functioning." (*Id*. 66:21.) Thus, the 2023 test results reflect Jeffries' performance in 2023. (Hr'g Tr. 210:17–18.)

***ii. Conclusions & Recommendations***

Dr. Valdes opined that Jeffries was suffering from a major neurocognitive disorder, specifically "Dementia with Behavioral Disturbance (mixed etiology)," "Alzheimer's Disease with Late onset (probable)," and "Lewy Body Dementia (possibly concurrently present)." (DX-C at 87.) She further opined that the nature and severity of Jeffries' cognitive impairments affected his ability to understand and participate in legal proceedings. (*Id*. at 86.) She found that Jeffries' memory function was in the "borderline impaired" range and that he would likely have difficulty recalling information provided by counsel or remembering details necessary to testify effectively in his own defense. (*Id*.) Dr. Valdes opined that Jeffries' inappropriate or disinhibited behavior could be misinterpreted by a judge or jury to his detriment. (*Id*.)

Dr. Valdes also concluded that Jeffries suffered from impaired executive functioning and slowed processing speed, which would make it difficult for him to track information, manage multiple pieces of information simultaneously, and follow proceedings without frequent feedback or redirection. (*Id*. at 86–87.) According to Dr. Valdes, these impairments would likely hinder Jeffries' ability to follow court proceedings and assist in his defense. (*Id*. at 87.)
Dr. Valdes reiterated the same recommendations offered in 2023 to "maximize" Jeffries' cognitive functioning, including the "us[e of] external organizers, cues, a daily to-do list, . . . electronic reminders through his phone or a watch, us[e of] a calendar, alarms, and other external

reminders," breaking tasks "down into their simpler components," and ensuring Jeffries' alertness when learning new information." (DX-C at 89–91.)

#### *iii. Impressions of the Butner Calls*

As noted, Dr. Valdes did not listen to any of recordings of Jeffries' calls from Butner prior to reaching the conclusions set forth in her 2026 report. The day before her scheduled testimony at the March 2026 competency hearing, Dr. Valdes listened only to "the first 15 calls or so" while "at the airport." (Hr'g Tr. 200:1–3.) Dr. Valdes opined that the calls were "kind of a mixed bag" and a "little difficult to hear," but that Jeffries "can converse," "the conversation seemed to flow" and his language abilities are "his strongest capabilities." (*Id*. 67:4–11.) Dr. Valdes also found that Jeffries seemed to forget things on the calls and was "paranoid," but did not provide any examples. (*Id*. 67:21–68:15.)

### B. 2026 Re-Evaluation by Dr. Bardey, Dr. Rosenberg, and Dr. Paradis

Dr. Bardey, Dr. Rosenberg, and Dr. Paradis conducted a joint evaluation of Jeffries on January 12 and 13, 2026, in New York City (the "2026 joint evaluation" or "joint evaluation").[11] (GX-3 at 2; DX-G at 3.) The evaluation lasted around 3.5 hours. (GX-3 at 21.) Around half—1.7 hours—of the interview was audio-recorded, and was reviewed closely by the Court. (*See generally* GX-4 to GX-6.)

Following the joint evaluation, Dr. Bardey and Dr. Rosenberg prepared a report dated February 16, 2026 ("2026 Bardey/Rosenberg Report," DX-G, ECF No. 81), and Dr. Paradis prepared a report dated February 13, 2026 ("2026 Paradis Report," GX-3, ECF No. 82). The defense and prosecution experts reached different conclusions as detailed below.

---

[11] Dr. Bardey suggested that the three experts perform a joint evaluation out of concern about Jeffries' participation in two separate evaluations close in time and the possibility that an earlier evaluation might taint the results of the latter. (*See* Hr'g Tr. 285:11–22.)

***i. The 2026 Joint Evaluation***

*1. Day 1*

At the beginning of the joint evaluation, Dr. Rosenberg and Dr. Paradis asked Jeffries if he recalled meeting them before. (GX-4 at 0:00–0:45.) Jeffries incorrectly told Dr. Rosenberg that he met her in "Columbus, Ohio." (*Id.*) After Dr. Paradis reminded him that he met with her a year ago, Jeffries correctly recalled that he had nicknamed her "the kitchen cabinet lady."[12] (*Id.*) Dr. Paradis informed Jeffries that the evaluation was being recorded. (*Id.* 1:30–45.)

a. <u>Questions about Jeffries' Charges and the Proceedings</u>

When Dr. Bardey asked Jeffries if he was aware of the purpose of the evaluation, Jeffries responded, "[T]o show how crazy I really am." (GX-4 at 0:45–1:30.) Dr. Bardey asked Jeffries about recent developments in his life, to which Jeffries responded that he "was in jail." (*Id.* 1:45–2:19.) Though he could not remember the name of Butner, Jeffries correctly identified that the facility was located "in North Carolina" and that he had been there "for four months." (*Id.*) When asked by Dr. Bardey whether the facility was "like a jail jail" or "more like a treatment center," Jeffries answered that it "was supposed to be a treatment center but it turned out to be a jail jail," and described his experience as "terrible." (*Id.* 2:20–38.)

Jeffries described his time at Butner as "part of the sentence that the judge decided on," posited, "I think her thinking was to test whether I really had what was diagnosed, that I had Alzheimer's," and explained, "[T]hey test you for those things." (*Id.* 3:20–4:05.) Regarding his

[12] "[T]he kitchen cabinet lady" is a nickname that Jeffries and Smith used when referring to Dr. Paradis. (*See* GX-312T at 2 (Smith: "[Y]ou didn't like the kitchen cabinet lady either in the beginning and then that worked out."), GX-402T at 7 (Smith: "[T]he doctor, the doctor hired by the government was, the doctor in, who you met in New York when you and Susan went to New York." // Jeffries: "Was that the kitchen cabinet lady?" // Smith: "Yeah, she was employed by the, hired by, the government.").)

evaluators at Butner, Jeffries stated, "[T]hey came to the conclusion that I was sane, which was very bizarre." (*Id*. 4:05–15.) When asked by Dr. Bardey if the judge's "sentence" meant that the case was over, Jeffries correctly responded, "[N]o," and elaborated, "[W]hat's going to happen now is that, there will be a hearing, and at that hearing, it will be determined whether I'm . . . fit to stand trial. If I'm not, then I go away." (GX-4 at 4:15–47.)

Jeffries told the evaluators that he thought he would be found innocent at trial, explaining, "[B]ecause I should be," and that there was "no reason that I'm guilty for the charges." (*Id*. 4:50–5:10.) He responded to questioning about his understanding of his charges as follows:

> Jeffries: Well, that's rather, vague . . . I believe I've been charged with assaulting people, which, if you know me, is –
>
> Dr. Bardey: You mean like beating people up?
>
> Jeffries: Yeah – pretty absurd. I grew up being beaten up not doing the beating . . . .
>
> Dr. Bardey: Who do they think you beat up?
>
> Jeffries: I don't know.

(*Id*. 5:10–52.) Jeffries correctly responded that he believed there were "fifteen" alleged victims, but again repeated, "[I]t's pretty vague." (GX-4 at 5:52–6:14.) When asked about the prosecution's evidence, Jeffries responded that he believed there were witnesses to say "that's what happened," but he wasn't sure what the witness testimony might be beyond "that I've assaulted them." (*Id*. 6:14–45.) Jeffries expressed that he had "absolutely no idea" why his charges were federal in nature, rather than state or local. (*Id*. 6:45–52.) Later in the interview, Dr. Paradis returned to this topic, Jeffries recalled receiving education about the allegations at Butner but said, "I did not hear beyond assault." (*Id*. 39:56–41:49.) To refresh Jeffries' memory, Dr. Paradis mentioned prostitution. Jeffries stated, "[T]hey explained to me what the fifteen charges

were . . . it was assault, it didn't go beyond assault," and shortly thereafter recalled, "[T]he sixteenth charge, I believe had to do with prostitution." (*Id.*)

Jeffries discussed his experiences at Butner and remarked that while the guards were the "meanest, most horrible people in the world," "interestingly enough, the other inmates were, for the most part, pretty nice" and that he "got along with fine with them." (*Id.* 8:15–31.) He stated that he did not meet with mental health professionals until "the very end." (GX-4 at 9:05–29.)

When asked by Dr. Bardey whether he had any prior head injuries, Jeffries recalled that he "fell off a mountain in South Africa" around "five years ago" and that "it was pretty severe." (*Id.* 11:05–27.) He continued, "I admit I was probably drunk but I don't think that had anything to do with it." (*Id.* 11:45–53.) When asked by Dr. Bardey if alcohol "was a significant part of [his] life," Jeffries responded that it was not. (*Id.* 11:53–12:00.)

b. Competency-Related Questions

Dr. Bardey asked a number of questions about Jeffries' counsel. Jeffries commented that he was "not sure how well [Bieber] really understands" the evidence against him. (*Id.* 6:52–7:09.) He explained that Bieber had been his counsel for "two years," that he was initially arrested and charged about three years ago, and that Smith was also arrested and charged. (*Id.* 7:09–40.) When asked about Bieber's responsibilities, Jeffries responded, "[W]ell, at this point, he's . . . working out the calendar, what's to happen, where I have to be . . . ." (GX-4 at 12:07–33.) When Dr. Bardey followed up, "But ultimately, what is his job?" Jeffries responded, "Don't know." (*Id.* 12:33–50.) However, with further prompting from Dr. Bardey and Dr. Paradis, Jeffries eventually responded that Bieber's role is "to defend me" and to "sift through the evidence." (*Id.* 12:50–13:45.) He told the evaluators that he had met with Bieber in-person "not that many" times, but that he has had "many" phone calls with him. (*Id.* 13:45–55.) When asked

whether he trusted Bieber, Jeffries responded that he did, but that he wasn't "sure" about "a lot of what's happened." (*Id*. 14:00–30.)

Jeffries described the prosecution's role as to "put me in jail" and that they would be "judged upon making me guilty." (*Id*. 15:05–37.) He said he "no idea, absolutely no idea" whether the prosecution was neutral, but that he would "assume" it was "against me, because that's [their] job." (GX-4 at 15:37–52.) Jeffries noted that his counsel had met with the prosecutors and described them as "very nice, very open," but then added, "which I doubt." (*Id*. 15:52–16:09.) When asked whether he would meet with a prosecutor one-on-one without his counsel present, Jeffries responded: "I've worked on developing a relationship with Brian [Bieber], so why would I go around his back? Doesn't make sense." (*Id.* 16:09–42.)

Jeffries recognized that the judge has a "neutral" role in his proceedings. (*Id*. 17:28–18:18.) When asked who potential witnesses may be, he responded, "somebody [he] assaulted," but speculated that witnesses may be interested in a "cash grab" and complained, "[T]he only reason I'm here is that we live in a society . . . where . . . people are successful as I have been, people want a piece of that . . . ." (*Id*. 18:35–19:25.)

When asked to describe a plea bargain, Jeffries explained, "[T]he only thing I know about that is that you have to be *guilty*," adding emphasis to the last word, and that a plea is "built around a guilty judgment, so I'm not very interested in that because I'm not very interested in being guilty." (GX-4 at 20:16–48.)

The evaluators also asked Jeffries about potential defense strategies. He responded that the "first strategy was to use my diseases, Alzheimer's and Lewy Body, as a defense that I can't stand trial because I'm not fit to stand trial," which he remarked was a "very sound strategy." (*Id*. 21:00–30.) When Dr. Rosenberg asked what his legal strategy would be if he were found

competent to stand trial, Jeffries explained, "[W]e'd have witnesses for and against me, I would be declared guilty or innocent." (*Id*. 22:12–23:35.) Dr. Rosenberg pressed Jeffries several times to provide a legal strategy that he would pursue if found competent. (*Id*.) He responded, "I ask that all the time, I'm not getting a very clear answer to that," stated that his counsel just tells him, "Don't worry Michael, we've got a great defense," and described his counsel as "not forthcoming." (*Id*. 23:35–45.) Jeffries then commented, "You see, I hope I'm indicating [that] there's a whole bunch . . . I don't know about this whole thing, and it's massively confusing," and emphasized his confusion again. (*Id*. at 23:45–24:00.)

c. Lifestyle Questions

Dr. Paradis explained to Jeffries that she was retained by the prosecution while Dr. Bardey and Dr. Rosenberg were retained by the defense. (*Id*. 25:00–25.) When she asked about his current and prior addresses, Jeffries responded that he currently lives in Florida and denied presently owning other homes. (GX-4 at 25:25–28:28.) He explained that he used to have "many" other houses, around "ten," "all outside Florida," including in Columbus, Ohio, Sutton Square in Manhattan, and Water Mill, New York. (*Id*.)

Jeffries disclosed that he drinks alcohol and that "last night" was the most recent time he had a drink, which was "one half of a glass" of white wine. (*Id*. 28:28–50.) Jeffries first responded that he was drinking with Smith, then corrected himself and said he was with his son and daughter-in-law, who live in Manhattan. (*Id*. 28:50–29:07.) He explained that Smith "wasn't allowed to come with me." (*Id*. 29:50–30:05.)

When asked by Dr. Paradis how he liked to spend his time, Jeffries responded that he was a "voracious reader." (*Id*. 31:20–50.) He reported that he was currently reading a book about Condé Nast "and their miraculous rise . . . during the era of glossy magazines." (*Id*.) Jeffries also recalled having recently watched a show about "two hockey players," which he referred to as

"Fierce Rivalry." (GX-4 at 32:00–33:00.) He remarked that he had recently read an "editorial in New York Times a week ago" about the television show, and that the "point of the editorial was that . . . it represents a change in the gay world, that they're representing people as normal, not just people who dance on boxes and take drugs all the time." (*Id*. 33:00–54.) He also recalled having recently seen "The Young Pope" featuring Jude Law. (*Id*. 33:54–34:20.)

When asked by Dr. Paradis whether he was able to read without difficulty, he responded, "Yeah, but it's not great. Honestly, it's not as good as it was in the past." (*Id*. 35:20–42.) He explained that he "can't recall things" he has read. (*Id*. 35:42–36:08.) Dr. Bardey then asked, "If you pick up a book after a few days, you may have forgotten what you just read?" Jeffries responded in the affirmative (*id*.), which contradicts Jeffries' statement to Smith during an October 2, 2025 call that re-reading books was not pleasurable because "I remember every single line" (GX-367T at 4).

d. Defense Strategies

At one point, Bieber joined the evaluation to review "various work product, summaries of the charges, the names of the victims, [and] the alleged conduct" with Jeffries. (Hr'g Tr. 289:17–19.) This part of the session was not recorded. At the competency hearing, Dr. Rosenberg testified that the following occurred:

> [W]hen you came in the room, we first asked him if he was aware of what evidence exists and his defense strategies that he discussed with his attorneys. He told us he never discussed any defense strategies with his attorneys and that his attorneys had not showed him any evidence. Mr. Bieber then pulled out his laptop and reviewed extensively with him very detailed work product in a very simplified way and walked him through all of the different evidence that existed in the case, and then, step by step, explained potential defense strategies.
>
> We, as evaluators, also tried to explain these to him using as simplified terms as possible. Throughout this entire discussion, Mr. Jeffries repeated he never been exposed to this information, that Mr. Bieber had never had these discussions with him, and that he was not aware of any of this information. Mr. Bieber subsequently shared with us that he had reviewed this information with Mr. Jeffries dozens of times.

(*Id*. 452:22–453:16.)

After Bieber left, the evaluators resumed recording. Dr. Paradis asked Jeffries how he could assist Bieber in his defense, and Jeffries responded:

> I have no idea. Absolutely no idea. Because I think I've given him everything he's asked for, I don't know what would be different . . . I've asked him what he needs from me, and he says, over and over again, "for you to tell the truth," and I have, over and over, told the truth. Period. And that's as far as it goes.

(GX-5 at 0:00–44.)

When pressed by Dr. Rosenberg about whether he could articulate the defense strategy in his own words, Jeffries said, "No. I've sat and listened to this, I'm very confused by it. Because I think it's very technical." (*Id*. at 0:44–1:30.) When Dr. Rosenberg pressed further for "any guesses" that Jeffries could make, Jeffries responded, "No, I really can't, I'm confused about it . . . ." (*Id*.) With further prompting from evaluators, however, Jeffries acknowledged that "part of" the charges against him involved "prostitution," but that he did not know "if it's the whole thing." (*Id.* 2:02–25.)

The evaluators continued to push Jeffries for more detailed responses. Dr. Bardey asked, "Out of all the things they say you did, what is the worst?" (*Id*. 2:28–50.) Jeffries promptly responded, "I don't know. You tell me." (*Id*.) Dr. Bardey then told Jeffries, "You've gotta work a little harder than that . . . try to remember what the worst thing that they said you did." (*Id*.) Jeffries again responded, "I can't remember." (*Id*.) However, Jeffries then asked the evaluators, "C'mon guys, it's all ludicrous, anyone who knows me, can you imagine me *raping* somebody? Come on. Seriously." (GX-5 at 2:50–3:24.) When asked, "is the government alleging that you raped someone?" he responds, "that's what I'm hearing." (*Id*.) Jeffries continued:

> There's no one in the world who would stand up and say I could've raped anybody. No one. Period. . . . No one could stand up and say I was [] involved with raping and assaulting people around the world to the detriment of my business.
>
> Guys, you don't understand how emotional this is. Let me give you an example. I rode down Fifth Avenue today, for the first time in years. And, I looked up at where the A&F store was that I'd opened. . . . it was a beautiful store, I put my heart and soul into that. They've moved the fucking store. That space now goes to Prada. And then, A&F is down in a miserable little store in the middle of the block, I started to cry. That's—that's my life! I'm still crying about it. So how, how in the world could I have . . . doesn't make any sense. None. Build a story around that.

(*Id*. 3:24–4:57.)

During the joint evaluation, Dr. Rosenberg administered a series of neuropsychological assessments. (GX-5 at 6:00–12:24; *see* DX-F at 19–23.) When asked again whether he recalled the names of each of the evaluators, Jeffries responded that Dr. Bardey was "Dr. Bou-jay" and correctly identified Dr. Rosenberg. (GX-5 at 7:11–8:03.) He could not remember Dr. Paradis' name but recalled that he had nicknamed her "the kitchen cabinet lady." (*Id*.)

Towards the end of the first day of the evaluation, Dr. Paradis provided Jeffries with a written, simplified explanation of his charges, which included the following descriptions: (1) "prostitution – paid men," (2) "men went across state lines," (3) "made promises to men for sex," (4) "kept men from leaving easily – ex., took their phones," (5) "rape," (6) "inject penis," and (7) "got together with [boyfriend] and 'no-nose' to interview, get men for sex." (*Id*. 12:30–13:41; *see* GX-503 (Dr. Paradis' Jan. 12, 2026 notes).)

e. Evaluators' Day 1 Debrief

At the end of the first session, the evaluators shared their impressions while inadvertently leaving the recording device on. They expressed concern that during the joint evaluation, Jeffries denied remembering that he was at any sex parties, as alleged by the prosecution.

> Dr. Paradis: The only thing I have problems with is . . . him saying he doesn't remember [the sex parties] . . . I just don't find that believable.

> Dr. Rosenberg: . . . When we met with him last year, he remembered them . . . what he told us last year is that him and [Smith] have an active sexual relationship that often involves . . . another man.
>
> Dr. Paradis: He told me that too.
>
> Dr. Rosenberg: He was more forthcoming . . . he had better recollection for that aspect of his life.
>
> Dr. Bardey: It's just hard to believe he had fifty to sixty wild orgies, flying people all over the world, Morocco, Italy, this, that and the other, and has zero recollection.
>
> Dr. Paradis: And also, it predated the head injury, and it went on for 10 years, allegedly. That's a long period of your life to forget if you can remember other stuff.
>
> Dr. Bardey: No, I share that concern.
>
> Dr. Paradis: The other stuff seems to hang together, so far . . . he's a little better than he was when I saw him last year.
>
> Dr. Bardey: Maybe there's some truth to the fact that having been separated from alcohol for a certain number of months may have had . . . a bit of a positive effect.
>
> Dr. Rosenberg: . . . I was looking through some of the medical records, I do think he was taking some benzos, too . . . obviously at Butner, they said, absolutely not . . . .
>
> Dr. Paradis: And they had him originally on an antipsychotic.
>
> Dr. Rosenberg: Seroquel.

(GX-5 at 15:40–17:55.) Dr. Bardey suggested that the experts seek and review Jeffries' non-counsel calls from Butner. (GX-5 at 19:15–51.)

2. *Day 2*

The evaluation resumed the following day on January 13, 2026. Jeffries recalled Dr. Rosenberg's name, guessed that Dr. Bardey was Dr. "Bardeuax," and again could not recall Dr. Paradis' name but remembered that she was "the kitchen cabinet lady" and complimented her: "I shouldn't say this, but you look very nice today." (GX-6 at 20:35–21:33.)

Dr. Bardey began by asking Jeffries what he could recall from the conversation with Bieber about defense strategies. (GX-6 at 0:45–2:00.) Jeffries responded that the strategies were

"muddled to him," but that the "key strategy was to talk about my Alzheimer's and, Lewy Body disease . . . and that's really what I remember," though he recalled there was "a lot more," but it "went in and out . . . mostly out." (*Id.*) Bardey then asked Jeffries about the charges. (*Id.* 2:00–3:49.) Jeffries stated that he forgot to bring with him the written, simplified explanation of his charges that Dr. Paradis had given him at the end of the prior session. When asked to recount the simplified list of charges, Jeffries described them as follows: "One was that I paid for sex. Two, that I raped someone. Three, that I was somehow supervising, interviewing people," "for sex." (*Id.* 2:00–3:49.) He said that "Matthew" allegedly conducted the interviews and that "apparently no nose's job was to recruit people."[13] (*Id.*) He later added that the allegations include that "I restricted people's exit and that as part of that, I stole their telephones. I was party to people being interviewed, and I assumed that was for their participation in sex parties." (*Id.* 19:20–20:11.) Jeffries recalled facing "fifteen counts" and that "one is apparently the most serious, and the others are pretty much the same." (GX-6 3:49–4:50.) He recalled that the serious charge "had to do with moving people across state lines or country lines." (*Id.*)

Jeffries firmly denied any involvement with any alleged sex parties and stated that there must have been a misunderstanding about "the gatherings we had with people who were going to open stores for us." (*Id.* 6:15–7:14.) He acknowledged that he remembered those events, which occurred at the locations of new stores. (*Id.*) However, Jeffries was also unable to recall any of the store openings in detail, although he recalled a London store opening that was attended by his mother. (*Id.* 7:14–9:12.) He stated, "I doubt she would've been invited to a sex party." (*Id.*) Jeffries denied having an active social life at the time, stating, "My life was the company, period. I had no social life." (*Id.* 11:45–12:29.) He denied having guests over to his home or having

[13] As explained above, "No nose" is the nickname Jeffries gave co-Defendant James Jacobson.

"many" social gatherings, and again insisted, "my whole focus was on the company and opening the best stores I could." (*Id.* 12:29–13:22.) Jeffries also denied having sex outside of his relationship with Smith. (*Id.* 13:30–53.)

Next, Dr. Paradis administered a test comprising of the following twenty-one "true or false" statements pertaining to Jeffries' case:

- "The government is charging me with sex trafficking."
- "The government is charging me with one other person, my partner, Matthew."
- "The government is also charging me with robbery."
- "The government is saying I took part in sex parties."
- "The government is saying these sex parties took place five years ago."
- "The government is saying these sex parties took place outside of the United States."
- "There are about fifteen men making these allegations."
- "They are saying they were paid for sex."
- "The men making these allegations are under the age 18."
- "Some of these men claim we used knives to threaten them."
- "Some of these men claim we stole their money."
- "Some of these men claim we took their phones."
- "Some of these men claim I injected them in their penises."
- "A man I call 'no nose' is also involved in this case."
- "'No nose' is a witness but is not charged."
- "I am being charged with felonies."
- "The men making these allegations were in their 20s and 30s."
- "The government is charging me with internet [pornography]."
- "These men are claiming they were coerced."
- "These men are claiming we made promises."
- "None of these men are filing civil lawsuits against me."

(GX-6 at 15:15–18:40.) Jeffries answered nineteen of the twenty-one questions correctly. (*Id.*) Jeffries incorrectly answered "true" in response to the statement: "The government is charging me with one other person, my partner, Matthew." (*Id* 15:26–31.) In response to the statement "These men are claiming they were coerced," Jeffries incorrectly responded "false." (*Id.* 17:14–23.) When Dr. Paradis questioned Jeffries about this response, he explained that he does not know whether his accusers argue that they were coerced, but that he understands that his defense

strategy is to say that they were not coerced. (*Id*. 18:00–42.) Shortly after this conversation, Jeffries told Dr. Paradis, "You would've made a great teacher, my god!" (GX-6 at 19:12–17.)

When asked again how he would help his counsel defend against the prosecution's allegations, Jeffries responded that he would say, "Brian, you know me, let's talk about me. Could you imagine me ever doing this?" (*Id*. 25:00–26:00.) He also recalled Bieber's stated preference for a "smart" jury and expressed his agreement. (*Id*. 27:21–40.) When evaluators proposed additional strategies for impeaching witnesses, Jeffries responded, "Brian's job is to defend me and if he thought that was correct, he'd bring those things up." (*Id*. 27:40–28:28.)

The evaluators asked Jeffries to consider whether there was potential adverse evidence, such as "documented travel" by victims to areas where Jeffries may have rented a house. (*Id*. 27:21–29:30.) Jeffries responded that he would ask counsel, "How solid those facts are?" (*Id*.) He noted that Dr. Bardey's statement "opens the opportunity to have lots of things that aren't facts" because "I've never rented a house" (*id*.), thereby showing that he can correct erroneous information in real time based on his memories from the time period at issue.[14]

***ii. Dr. Bardey and Dr. Rosenberg's 2026 Evaluation and Report***

In addition to their joint interview with Dr. Paradis, Dr. Bardey and Dr. Rosenberg also conducted collateral interviews with: Bieber on January 13, 2026; Smith on February 4, 2026; and Andrew and Annabel Jeffries on February 16, 2026. (DX-G at 13–14.) They also reviewed the 2025 Morris/Pennuto Report and records from Jeffries' treatment and evaluation at Butner from July 21, 2025 through November 15, 2025, including medical records from Dr. Morris and Jeffries' treating psychiatrist, Dr. Sandy Lee, and the 2026 Valdes Report. (*Id*. at 2–3.) Dr.

[14] As the prosecution explains, "Indeed, the houses at which the events are alleged to have occurred—which are defined in the indictment as the New York Properties—were both owned by Jeffries." (Gov't Resp. at 13.)

Rosenberg also listened to all 109 Butner calls. (*Id*. at 12–13.) Dr. Bardey listened to "some of" the calls, but "not all of them." (Hr'g Tr. 296:22–25.)

Dr. Bardey and Dr. Rosenberg concluded that Jeffries' cognitive impairments rendered him incompetent to proceed. Specifically, they opined that "Mr. Jeffries' associated cognitive impairments impaired his ability to understand the nature and consequences of the charges, consult with counsel in a rational manner, and participate in his defense with a reasonable degree of rational understanding." (DX-G at 2.)

*1. General Observations & Neuropsychological Test Results*

Dr. Bardey and Dr. Rosenberg found that Jeffries continued to suffer from cognitive deficits. They found that his "attention and concentration were adequate during brief, concrete interactions," but that when he was presented with "longer or multi-step information," Jeffries became "increasingly inattentive, distracted," and "disengaged, and demonstrated difficulty maintaining focus over time." (*Id*. at 15.) They perceived that he "provided vague, and frequently inaccurate accounts of his personal history and prior events." (*Id*.) Dr. Bardey and Dr. Rosenberg also observed that Jeffries has "[d]eficits in new learning" because he required "repeated explanation, simplification, and external support to encode new information and was only able to partially recall information after both immediate and longer delays." (*Id*.) Although he demonstrated "somewhat improved recall when provided with prompts or external cues," they found that he continued to suffer from significant impairments. (*Id*.)

At the competency hearing, Dr. Rosenberg testified that on the first day of the evaluation, the evaluators "spent a lot of that time" "explaining concepts to [Jeffries] and the allegations" and also wrote those concepts "on a piece of paper for him to take home," but that Jeffries could recall "very little" of the information on the second day of the evaluation. (Hr'g Tr. 454:10–16.) Dr. Rosenberg further explained:

> He essentially told us he was confused about the defense strategies, that he didn't have any understanding of potential defense strategies, besides the Alzheimer's and Lewy body defense. And that he was not able to understand[] or comprehend a lot of information that [Bieber] had explained to him the day prior.

(*Id*. 454:16–22.)

Dr. Rosenberg and Dr. Bardey found the calls to reflect Jeffries' limited understanding of the legal process. (DX-G at 12–13.) Specifically, they found that:

> [Jeffries'] statements suggested a limited and oversimplified understanding of the structure of the legal and evaluation process, including the respective roles of his attorney and the evaluators. Mr. Jeffries indicated that he did not understand what specific factors inform a determination of competence or incompetence beyond his reported diagnoses of Alzheimer's disease and Lewy body dementia.

(*Id*. at 13.) They found that "[a]cross the reviewed calls, he did not articulate any intent to exaggerate cognitive deficits or misrepresent his level of understanding in order to obtain a particular outcome." (*Id*.)

### 2. *Competency Determination*

Dr. Bardey and Dr. Rosenberg concluded that Jeffries demonstrated uncertainty about the charges against him and the proceedings to adjudicate the charges. (DX-G at 16–17.) Specifically, they found that during the joint evaluation, Jeffries reported that he was charged with "assaulting people" and responded affirmatively when Dr. Bardey asked whether "assault" involved "beating people up." (*Id*. at 15.) They placed weight on Jeffries' report that he did not know the identities of the alleged victims or what their potential testimony may be, although he correctly estimated that there were approximately fifteen victims. (*Id*.) They noted that Jeffries "suggested that a potential witness could be 'somebody who I assaulted,'" and communicated to the evaluators his "belief that the witnesses initiated the case in an effort to obtain money," explaining that his understanding that "the criminal case and a civil case would be combined and that, if he were found guilty, the alleged victims would receive money." (*Id*. at 16.)

Dr. Bardey and Dr. Rosenberg found that Jeffries' "understanding of the defense's approach is to argue that he is not fit to stand trial due to Alzheimer's disease and Lewy Body disease," and that "if he were found unfit to proceed, he would be sent home, and the charges would be resolved." (*Id.*) They placed weight on their perception that, during the joint evaluation, Bieber provided Jeffries with simplified explanations of the allegations against him and potential defense strategies, yet Jeffries nevertheless stated that he had not previously heard those explanations or strategies. (DX-G at 17.) Dr. Bardey and Dr. Rosenberg also found that when presented with a "written summary of the evidence" by Bieber, Jeffries reported not having seen the document before and "having no memory of discussing the evidence in the case," despite Bieber's indications that "he had reviewed this document with Mr. Jeffries in detail on multiple occasions." (*Id.*)

Dr. Bardey and Dr. Rosenberg found that Jeffries exerted adequate effort. (DX-G at 17–18.) They found no evidence that he was exaggerating his deficits. (Hr'g Tr. 484:16–17.)

*3. Conclusions*

After reviewing all available evaluations, medical records, collateral interviews, competency assessments, and the 2026 joint evaluation, and based on Dr. Rosenberg's review of the audio of all 109 Butner calls and Dr. Bardey's review of "some" of the calls, Dr. Bardey and Dr. Rosenberg concluded that Jeffries "meets the diagnostic criteria for major neurocognitive disorder due to multiple etiologies, including Alzheimer's disease, Lewy Bodies disease, and the residual effects of a traumatic brain injury." (DX-G at 19.) With respect to the first prong of the *Dusky* standard, they opined that "Mr. Jeffries' understanding of his legal circumstances remains limited and superficial," citing his "significant difficulty acquiring and retaining information related to the charges against him and the underlying allegations, even when such information

was presented in simplified form and reinforced through repetition and prompting." (*Id*. at 19–20.) With respect to the second *Dusky* prong, they concluded that:

> Mr. Jeffries did not demonstrate the capacities necessary to reliably communicate with counsel, assist in the preparation of a defense, or engage in a rational communication regarding legal strategy. Mr. Jeffries was unable to learn or recall prior conversations with his attorney and did not retain previously reviewed case-related information. The limited information Mr. Jeffries was able to recall, he was unable to process in a rational or reality-based manner or apply meaningfully to his own legal circumstances. . . . Consistent with these findings, review of his recorded telephone calls during his admission to Butner FMC further reflects a superficial and at times confused understanding of the legal proceedings.

(*Id*. at 20.)

Dr. Bardey and Dr. Rosenberg further opined that Jeffries "did not demonstrate the ability to communicate effectively with defense counsel, weigh available options, or provide informed input relevant to his defense." (*Id*.) They expressed concern regarding what they found to be Jeffries' "significant deficits in sustained attention and information processing, particularly during lengthy or complex exchanges," and concluded that "he would be unlikely to be able to follow testimony, comprehend legal arguments, or integrate relevant information in real time during court proceedings." (*Id*.) According to Dr. Bardey and Dr. Rosenberg, Jeffries' "impairments in social judgment and disinhibition" may cause him to "behave in an inappropriate manner in the courtroom." (*Id*.)

#### *iii. Dr. Paradis' 2026 Evaluation and Report*

The 2026 Paradis Report sets forth Dr. Paradis' opinions and findings based on her participation in the 2026 joint evaluation, and her review of all 109 Butner phone calls, the 2025 Morris/Pennuto Report, Jeffries' medical records from his treatment and evaluation at Butner from July 21, 2025 through November 15, 2025, including medical records from Dr. Morris and Jeffries' treating psychiatrist, Dr. Sandy Lee, and the 2026 Valdes Report. (GX-3 at 3–4, 8–19.)

*1. General Observations*

Dr. Paradis made several findings regarding Jeffries' cognitive abilities. She found Jeffries' phone calls from Butner to be highly relevant to the assessment of his functional abilities because they were "unguarded moments, even though he knows he's being recorded." (Hr'g Tr. 915:4–5.) She explained:

> What's interesting about listening to jail phone calls is that even though it says right over there that it's being tape recorded, very intelligent people will start talking about things that their lawyers are not so happy that they said. And it just happens because there is something about it that they, sort of, they drop [their] defenses as they're talking to family, they're talking to people. And real things emerge that may not emerge when you're doing an official evaluation and they know they're being watched.

(*Id*. 915:14–23.) She later added, "that's the advantage of the phone calls, those unguarded moments. People say things they really mean." (*Id*. 926:21–23.)

Dr. Paradis found that "Mr. Jeffries seemed to follow the conversations, ask relevant questions, and recall details from earlier conversations." (GX-3 at 19.) She noted that Jeffries' conversational partners—mostly Smith, as well as Andrew and Annabel Jeffries—"did not appear to be simplifying or repeating information, as if Mr. Jeffries was unable to understand what they said." (*Id*.) She observed that Jeffries "did not speak about events underlying the instant offense," which suggested that he has "some ability to understand the importance of keeping some things private," and showed "judgment and restraint," in contrast to many other defendants, who "slip and talk about legal issues they should not." (*Id*. at 19–20.) Dr. Paradis noted that the subjects of the phone calls frequently included current events, friends' activities, literature that Jeffries was reading, and Jeffries' concerns about the competency evaluation process. (*Id*. at 19–21.) She found that Jeffries "was able to converse normally and recall and relate information" and that he "did not sound confused nor did he appear severely cognitively impaired." (*Id*. at 28.)

Dr. Paradis perceived that during the 2026 joint evaluation, Jeffries was "alert and responsive" and that his thinking was "logical and coherent." (*Id*. at 22.) She found that Jeffries "got the point" of the *New York Times* editorial regarding the television show "Heated Rivalry," which impressed her because it showed that "in a non-testing setting when the information is important to him, when it matters, he reads and he remembers and he relates." (Hr'g Tr. 957:7–17; *see also* GX-502 (Jan. 3, 2026 *New York Times* article).)

*2. Competency Determination*

Based on the 2026 joint evaluation and other information she reviewed, Dr. Paradis found that Jeffries "was able to discuss his legal case in a meaningful manner," "retained well-learned information and understood the roles of court personnel," and "had an adequate understanding of his current legal situation." (GX-3 at 24.) She further observed that he "demonstrated an adequate understanding of defense options," including "what a plea involves" "how his case might proceed," and "advantages and disadvantages of different defense strategies." (*Id*. at 26–27.) For example, Dr. Paradis found that Jeffries understood that there would be a competency hearing, that the role of his attorney is "to defend [him]" and to "sift[] through the evidence," that the prosecutor's role is "to put [him] in jail," and that the judge's role was "neutral." (*Id*. at 25.) She also concluded that Jeffries understood that he was facing sixteen charges, that there were approximately fifteen complainants, who were young men, and that witness testimony could be used against him as evidence. (*Id*.) Dr. Paradis acknowledged that Jeffries "did seem optimistic, perhaps overly optimistic, about his chances of being found not guilty." (*Id*. at 27.)

Regarding Jeffries' use of the words "assault" and "rape" to describe the allegations against him, Dr. Paradis testified, "[T]hose are common terms that are used that I didn't explore further, but it's not that far from what some of these accusations are. You know, some people use the word rape for sexual assaults." (Hr'g Tr. 924:18–21.)

Dr. Paradis acknowledged that Jeffries "does have difficulty following and recalling complex information," but remarked that "when information was provided in a simple manner, and repeated, he was able to recall it." (GX-3 at 27.) She further noted that Jeffries "would likely benefit from having information provided to him in writing." (*Id.*)

In response to cross-examination about Jeffries' representation that he was unable to recall reviewing discovery and defense strategies with counsel. Dr. Paradis testified:

> He made comments like I don't care about that. That he may not be focusing . . . I don't think he is studying his case independently. And you might think that that's what he should be doing, but at this point, his strategy or his motivation and hope is that he's not going to have to learn all of those things because he's going to be found not competent.

(Hr'g Tr. 957:22–958:3.)

*3. Conclusions & Recommendations*

Dr. Paradis formed the opinion that Jeffries' presentation was consistent with "Mild Neurocognitive Disorder due to multiple etiologies," rather than major neurocognitive disorder as she had concluded in 2025 before his commitment to Butner. (GX-3 at 23.) She further clarified:

> Perhaps it is best to acknowledge that the diagnostic manual uses categories, while, in the real world, individuals can fall in between these categories. In some ways, Mr. Jeffries' current cognitive presentation likely falls in an intermediate range between Mild Neurocognitive Disorder and Major Neurocognitive Disorder.

(*Id.*) She acknowledged, however, that Jeffries' neuropsychological test results did reflect "clear and measurable impairments in memory, executive functioning, and processing speed." (*Id.*)

However, Dr. Paradis concluded that Jeffries "is not suffering with symptoms so severe that it renders him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him and properly assist in his defense." (*Id.* at 28–29.) She further concluded, in agreement with Dr. Morris and Dr. Pennuto, that Jeffries does not present with characteristics typical of Alzheimer's disease. She explained, "[W]e have a three-

year period of time and he—it appears that he is not deteriorated significantly, so I would agree that's not typical of Alzheimer's. It can happen, by the way. Alzheimer's—different people do present differently, but it's not typical." (Hr'g Tr. 947:14–19.)

Dr. Paradis agreed with Dr. Morris and Dr. Pennuto that Jeffries is competent to stand trial under the *Dusky* standard. (*Id.*) Regarding the first *Dusky* prong, she concluded that he "absolutely, right now, has a rational understanding of the procedures," and added, "that's because he's a smart man and these things, like, the role of your attorney, he learned that before he had the head injury. He still has it, he retained everything he learned before." (*Id*. 963:21–64:9.) Dr. Paradis also found that the "unguarded moments" displayed in the Butner calls "show that he is very concerned about his case." (*Id*. 915:5–9.) Regarding the second *Dusky* prong, Dr. Paradis testified that the Butner calls show that Jeffries can develop strategies, plan ahead, and handle stress, and that he has "learned to focus, prioritize, communicate what's important to him in an organized way." (*Id*. 966:16 – 978:11.) She concluded, "he's not resourceless. Not saying that he doesn't have a significant impairment, but he is a smart guy, he can learn with help. And he can, in my opinion, he can pivot." (*Id*. 980:10–14.)

Dr. Paradis acknowledged that Jeffries "does need accommodations and, without the accommodations I don't think he would be competent." (Hr'g Tr. 964:13–16.) Specifically, Dr. Paradis found that Jeffries "likely will require considerable support and education by his attorney and legal team," as well as "accommodations during court proceedings." (GX-3 at 28–29.) She further testified that Jeffries "will need much more time from [counsel] than a regular defendant, just as you can have a defendant that is intellectually disabled . . . ." (Hr'g Tr. 962:24–963:1.)

### C. 2026 Addendum to the Valdes Report

On February 11, 2026, Dr. Valdes administered the Texas Functional Living Scale[15] to Jeffries in order to assess his ability to engage in instrumental activities of daily living. On March 6, 2026, Dr. Valdes issued an addendum to the 2026 Valdes Report to document this assessment and to "address ongoing concerns regarding [Jeffries'] cognitive functioning and to provide diagnostic clarity regarding whether or not he meets criteria for Mild Neurocognitive Disorder or Major Neurocognitive Disorder." (2026 Valdes Addendum, DX-D at 1, ECF No. 90-1 at 176–86.) She explained that mild neurocognitive disorder reflects cognitive decline that does not substantially interfere with everyday functioning, whereas major neurocognitive disorder reflects impairment in the ability to independently perform instrumental activities of daily living. (*Id*. at 6–7.) Dr. Valdes acknowledged that Dr. Pennuto diagnosed Jeffries with a mild neurocognitive disorder and found that Jeffries is capable of performing "instrumental activities of daily living." (*Id*. at 6.) She also recognized that Dr. Paradis had initially diagnosed Jeffries with major neurocognitive disorder but changed her diagnosis to mild neurocognitive disorder following the 2026 joint evaluation, as discussed above. (*Id*.)

Based on the results of the Texas Functional Living Scale assessment, Dr. Valdes concluded that Jeffries demonstrated impaired functioning in medical management, memory-dependent tasks, financial management, and problem solving. (*Id*. at 8.) She found that Jeffries' functional memory was poor and that he lacked appropriate health and safety awareness. (*Id*.) In

[15] The Texas Functional Living Scale (or "TFLS") is a "performance-based assessment that evaluates Instrumental Activities of Daily Living (IADLs) in individuals with cognitive impairment, such as dementia," and "was developed as a quantitative measure of cognitively oriented instrumental activities of daily living that does not rely on information from an informant." (DX-D at 2.)

Dr. Valdes' opinion, these findings support the diagnosis of Jeffries with major neurocognitive disorder and reflect significant limitations in everyday functional abilities. (*Id.*)

She opined, "While matters of instrumental activities of daily living are less relevant to courtroom proceedings, they do relate to how the severity of [Jeffries'] cognitive functioning would impact functioning on a daily basis" and would impact his ability to assist his attorney in his own defense and participate in courtroom proceedings. (*Id.* at 8–9.) Dr. Valdes further concluded that Jeffries' memory impairments and inconsistent ability to register new information would require information to be presented repeatedly, with substantial cueing and simplification, in order for him to comprehend and retain it. (DX-D at 8.) To support her conclusions, she also noted that on the Verbal Test of Practical Judgment, Jeffries scored 9 out of 20, indicating moderate impairment. (*Id.* at 5.)

## V. Competency Hearing

The Court held a four-day competency hearing from March 24 through March 27, 2026. (Min. Entries, Mar. 24, 2026; Mar. 25, 2026; Mar. 26, 2026; Mar. 27, 2026.) Based on the parties' stipulation (ECF No. 89) and review of the experts' reports and curriculum vitae, the Court found the parties' experts to be qualified under Rule 702, based on their education, skills, training, and experience, in their respective fields:

- Dr. Cheryl Paradis – forensic psychology
- Dr. Cassondra Morris – forensic psychology
- Dr. Tracy O'Connor Pennuto – forensic neuropsychology
- Dr. Jacqueline C. Valdes – neuropsychology
- Dr. Alexander Bardey – forensic psychiatry, neurology
- Dr. Miranda Rosenberg – forensic psychology

(Hr'g Tr. 5:25–6:4.) Accordingly, Dr. Paradis, Dr. Bardey, Dr. Morris, and Dr. Rosenberg are all qualified to offer opinions relating to Jeffries' cognitive functioning, diagnoses, and competency

to proceed. Dr. Valdes and Dr. Pennuto are qualified to offer opinions relating to Jeffries' cognitive functioning and diagnoses.

All six expert witnesses offered testimony on both direct and cross-examination. (*Id.*) Jeffries was also present in the courtroom. (*Id.*) The parties jointly stipulated to the authenticity and admissibility of all exhibits presented in connection with the competency hearing. (Stipulation, ECF No. 89; Hr'g Tr. 6:5–18.)

At all times during the hearing, Jeffries appeared in court well-groomed and wearing a suit and tie. He sat at the defense table and appeared to follow the testimony of various witnesses, focusing at times on the witnesses and at times on the Court. At no point during the proceedings did he say anything or engage in any outbursts. He engaged in no inappropriate behavior. At one point, when Dr. Pennuto took the stand, Jeffries smiled and waved at her. (Hr'g Tr. 569:10–15.)

**LEGAL STANDARDS**

The Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *See Ryan v. Gonzales*, 568 U.S. 57, 65 (2013); *Musaid v. Kirkpatrick*, 114 F.4th 90, 108 (2d Cir. 2024). "Given the importance of this principle, trial courts themselves are obligated to ensure that the state does not prosecute incompetent defendants." *Musaid*, 114 F.4th at 108. "Competency to stand trial . . . turns on the defendant's ability to participate in the legal process." *Id.* An incompetent defendant who lacks the ability to communicate effectively with counsel may be unable to exercise other rights that are essential to a fair trial. *Cooper v. Oklahoma*, 517 U.S. 348, 364 (1996). Thus, a defendant's competency is implicated not only at trial, but even in pre-trial proceedings in a criminal case, when a defendant must determine how to plea and whether to enter into a plea agreement with the prosecution. *Godinez v. Medina*, 509 U.S. 389, 398 (1993).

As set forth in *Dusky v. United States*, 362 U.S. 402 (1960), in order to determine competency, a court must conduct a two-pronged inquiry into: (1) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"; and (2) whether the defendant "has a rational as well as factual understanding of the proceedings against him." *Id.*; *see also U.S. v. Brennan*, 928 F.3d 210, 216 (2d Cir. 2019). "In applying this test, the district court must weigh evidence and apply evidentiary standards." *Brennan*, 928 F.3d at 216. The determination of whether a defendant is competent to proceed in a criminal prosecution is "a quintessentially judicial task" that requires interpretation of the legal competency standards and application of those standards to the specific facts before the court. *Id*. Accordingly, the Second Circuit has made clear that "[a] medical professional cannot appropriately resolve such legal questions, and a defendant's competence is decidedly the province of the courts." *Id*.

"In the federal courts, competency is determined by a preponderance of the evidence." *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995). "In making a determination of competency, the district court may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment." *Id*. at 411; *see also United States v. Marmolejos*, No. 18-cr-303-1, 2019 WL 2191139, at *1 (S.D.N.Y. May 21, 2019) (same).

## CONCLUSIONS OF LAW

### I. Allocation of the Burden of Proof is Immaterial to the Court's Determination

Both parties acknowledge that neither the Supreme Court nor the Second Circuit have squarely resolved the question of which party bears the burden of proof in establishing a defendant's competency to proceed or lack thereof. (Def. Br. at 21; Gov't. Resp. at 2.) The Supreme Court has stated in dicta that "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence." *Cooper v.*

*Oklahoma*, 517 U.S. 348, 362 (1996). However, neither the Supreme Court nor the Second Circuit has applied this standard.

Jeffries argues that "support . . . exist[s] for the proposition that the Government has the burden of proving the defendant is competent to stand trial." (Def. Br. at 22.) He relies on *Brown v. Warden, Great Meadow Correctional Facility*, 682 F.2d 348, 352 (2d Cir. 1982), and *United States v. Zovluck*, 425 F. Supp. 719, 721 (S.D.N.Y. 1977). However, these decisions were superseded by *United States v. Nichols*, where the Second Circuit reiterated that it has not resolved the allocation of the burden of proof in competency determinations, and that such allocation "will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." 56 F.3d at 410. Accordingly, upon finding that the evidence is not in equipoise, numerous courts in this Circuit have resolved the question of a defendant's competency without deciding the legal question of which party bears the burden of proof. *See, e.g.*, *Marmolejos*, 2019 WL 2191139, at *1 n.1; *United States v. Wolfson*, 616 F. Supp. 2d 398, 415 (S.D.N.Y. 2008); *U.S. v. Robertson*, No. 13-cr-486, 2015 WL 520220, at *6 n.6 (E.D.N.Y. Feb. 9, 2015); *see also U.S. v. Thomas*, No. 22-3021, 2022 WL 17330661, at *2 (6th Cir. Nov. 29, 2022) (affirming district court's conclusion that "the burden of proof was immaterial to" the court's competency determination where the evidence was not in equipoise); *U.S. v. Washington*, 968 F.3d 860, 864 (8th Cir. 2020) (same).

The evidence here is far from balanced between the parties, as explained in detail below. Rather, it squarely shows that Jeffries meets both prongs of the *Dusky* standard and is therefore competent to stand trial. Thus, even if the prosecution bears the burden to prove by a preponderance of the evidence that Jeffries is competent, it has more than met that burden here.

## II. Jeffries has a Rational and Factual Understanding of the Proceedings

The prosecution contends that Jeffries "has demonstrated that he understands the charges, the legal proceedings and their consequences, offered realistic defense strategies, communicated effectively, [and] consistently advocated for himself." (Gov't Br. at 47.) Jeffries concedes that he has "a superficial understanding of the legal system and can articulate the roles of various actors within it" but contends that he does not understand the charges and allegations and cannot "appreciate the seriousness of his situation as a result of his major neurocognitive disorder." (Def. Br. at 35.)

The evidence before the Court clearly demonstrates that Jeffries understands the purpose of the criminal proceedings against him, courtroom procedures, the roles and functions of the various participants, and key legal concepts, such as the concepts of a guilty plea, attorney-client confidentiality, a bench versus a jury trial, and considerations involved in a defendant's decision to testify. Furthermore, Jeffries understands the nature of the charges and allegations against him and the serious consequences he faces, which include but are not limited to financial penalties and incarceration. To date, Jeffries has focused on pursuing a strategy of being found incompetent to proceed. Nevertheless, he has demonstrated his understanding that he may be found competent and that this action may lead to grave consequences. Far from demonstrating a merely "superficial" understanding, Jeffries has shown a rational and factual understanding of the proceedings to adjudicate the criminal charges that he faces.

### A. Jeffries Understands the Purpose of the Criminal Proceedings Against him, Courtroom Procedures, and the Functions of Various Participants

The parties largely do not dispute that Jeffries understands the purpose and components of his criminal proceedings as well as the roles of various participants, although Jeffries argues that his understanding is superficial and limited. Jeffries' responses during interviews with Dr.

Morris, Dr. Bardey, Dr. Rosenberg, and Dr. Paradis demonstrate that he harbors a more than adequate comprehension of each of these topics. Moreover, Jeffries' phone calls with Smith show that he understands Bieber's responsibility to advocate for him and the role of the judge, and that over time he learned about and came to understand the competency evaluation and restoration process at Butner. Thus, there is ample evidence of Jeffries' rational and factual understanding of the criminal proceedings. *See* Findings of Fact Section III.C.i–ii *supra*.

In February 2025, before Jeffries' custodial hospitalization, Dr. Bardey and Dr. Rosenberg found that Jeffries accurately described "certain courtroom roles and functions," including "his defense attorney's role, the prosecutor's role, . . . the judge's role," and "the involvement of witnesses and evidence in trial proceedings." (DX-F at 24.) Moreover, they concluded at that time that Jeffries' "Factual Understanding (FAC) and Rational Understanding (RAC) scores [on the Evaluation of Competency to Stand Trial – Revised]] fell within the normal range, suggesting intact basic comprehension of courtroom procedures." (*Id.*)[16]

Similarly, when Dr. Morris evaluated Jeffries in November 2025 using the R-CAI assessment, Jeffries accurately described the functions of the various participants in a criminal proceeding. (GX-2A at 32.) He "defined a defendant as 'the accused' and correctly identified himself as the defendant in his case." (*Id.*) He further described the role of defense counsel as "to protect the client" by "arguing their case effectively" and described himself as the client. (*Id.*)

---

[16] In February 2025, Dr. Bardey and Dr. Rosenberg also found that, before he was committed to Butner, Jeffries was unable to determine whether a jury is neutral, aligned with the defense, or aligned with the prosecution and that he inaccurately defined a plea deal as "having the charges dropped." (DX-F at 24.) These findings do not carry weight because Jeffries' responses to questions about the role of a jury and the concept of a plea bargain during his November 2025 evaluation with Dr. Morris and the January 2026 joint evaluation show that he has a more than adequate understanding of the jury's role and the nature of a plea bargain, as discussed below.

When asked by Dr. Morris how he would handle a disagreement with his attorney, Jeffries responded that he would "tell him" about the disagreement and would possibly retain a new attorney. (*Id*. at 33.) Jeffries also explained that the role of the prosecutor is "to prove that the person is guilty" and the role of the judge is to "determine[] . . . whether the person is innocent or guilty and then to work out the penalty." (*Id*. at 32.) He further demonstrated an understanding of the difference between a bench trial and a jury trial and that, in the latter, it is the jury's role to "determine guilt or innocence of the accused." (*Id*.) Jeffries also described a witness as someone who "would experience or viewed the . . . crime," and explained that the role of a witness in court is to "[t]estify[] to that which he or she had seen." (GX-2A at 33.)

Significantly, Jeffries provided substantially similar answers in the 2026 joint evaluation. (*See* DX-G at 16 (Dr. Bardey and Dr. Rosenberg noting that Jeffries described defense counsel's role as "to defend me," and the prosecutor's role as "trying to put me in jail" and being "judged upon making me guilty"); GX-3 at 25 (Dr. Paradis documenting Jeffries' statements describing the prosecutor as "against me," defense counsel's role as "sift[ing] through the evidence," and judge as "neutral").)

Jeffries' phone calls to Smith from Butner also show his comprehension of the roles and responsibilities of various participants in a criminal proceeding. Jeffries referred several times to the role of the judge to weigh the evidence and determine whether or not he is competent to proceed. (*See, e.g.*, GX-333T at 2–3; GX-402T at 2.) Moreover, Jeffries has demonstrated a clear grasp of the role of defense counsel in light of his frequent instructions to Smith about how to ensure that Bieber is advocating for his interests. Jeffries asked Smith to provide Bieber with information about the logistics and timing of the Butner competency assessment process and to urge Bieber to do more to advocate for Jeffries' early and smooth departure from Butner, to work

with Smith's counsel on defense strategies, and to aggressively pursue Jeffries' defense against the charges. (*See, e.g.*, GX-302T at 8 ("Keep pressuring Brian, by the way . . . I don't trust what's going on there at all. I don't, I don't think anything is going well."); GX-312T at 6 ("But I think the question is, what does Brian think? Is he gonna have a chance to work this out? . . . I would put him in the corner. I really would. Does he feel responsible somehow for this, um, disaster?"); GX-315T at 2–3 ("[Bieber's] got to figure out who [the competency evaluator] is so he can, he can get somebody on that."); GX-351T at 3–4 ("Say to Brian: 'you better be prepared.' If they come back and say 'we don't agree that [these are] [t]he illnesses,' . . . Brian's gotta be ready to go with some other strategy really fast.").) Jeffries repeatedly implored Smith to speak with Bieber to ensure the latter was advocating for Jeffries while he was detained at Butner. (*See, e.g.*, GX-308T at 2, GX-328T at 2, GX-350T at 2.)

In light of these phone conversations, the Court finds that Jeffries' responses to questions about the role of his counsel during the 2026 joint evaluation paint a misleading picture. In the joint evaluation, Jeffries described Bieber's responsibilities as "working out the calendar." (GX-4 at 12:07–33.) But in the Butner calls, Jeffries showed his understanding of his counsel's role in procuring information about the competency evaluation process, explaining to Jeffries the scope of his rights and what to expect at different stages of the criminal proceedings, developing defense strategies, and advocating for Jeffries' rights and interests. (*See id.*; Findings of Fact Section III.C.i–iii *supra*.) Based on the Court's own review of the audio recordings of all 109 Butner calls and the 2026 joint evaluation, Jeffries' statements about his defense counsel's role

during the 2026 joint evaluation do not reflect the depth of his understanding.[17]

Jeffries concedes that:

> across the multiple competency evaluations, [he] was able to recall, for example, the functions of the Court, the prosecution, defense counsel, the witnesses, and the jury, because as Dr. Cheryl Paradis [] testified at the March 27, 2026 competency hearing, Mr. Jeffries learned about those concepts prior to his 2018 traumatic brain injury in South Africa.

(Def. Resp. at 5.) He also acknowledges that Dr. Valdes testified that "'well-learned' abilities and information are typically 'the last to go in some kind of neurodegenerative dementia.'" (*Id.*) Accordingly, the record amply demonstrates that Jeffries fully grasps the purpose of the criminal proceedings against him, courtroom procedures, and the functions and roles of different participants in the proceedings.

### B. <u>Jeffries Understands Key Concepts Involved in his Criminal Proceedings</u>

Jeffries has demonstrated his understanding of numerous concepts involved in his criminal proceedings. These include: innocence, guilt, a guilty plea, a defendant's exercise of the rights to testify and to decline to testify at trial, and attorney-client confidentiality.

First, Jeffries understands the difference between guilt and innocence, between a guilty plea and a trial, and the consequences of those distinctions. In November 2025, he told Dr.

---

[17] To be clear, the Butner calls do not show that Jeffries was unaware that he could call his counsel himself. Rather, they show that Jeffries knew he could do so, but that counsel calls were at times logistically difficult to accomplish from Butner and that Jeffries sought Smith's help to ensure that Bieber was working as zealously as possible on Jeffries' behalf. On October 23, 2025, Jeffries told Smith: "And if you could talk to Brian. I, I haven't been able to get through to him or to you." (GX-378T at 3.) Similarly, on October 30, 2025, Jeffries stated: "Okay, so I'll try to get in touch with [Bieber] now, getting these calls through is like pulling teeth. I can't believe the call just went through to you [Smith]." (GX-383T at 3.) Additionally, the phone calls show that Jeffries called Bieber throughout the duration of his custodial hospitalization. (*See, e.g.*, GX-310T at 2 (Aug. 1, 2025) (Jeffries: "I just had Brian on the phone."); GX-379T at 2 (Oct. 28, 2025) (Jeffries complaining that Bieber "is tuning out totally . . . He didn't even know who was calling when I called him last time, and he's, he's lying a lot. It's very odd."); GX-382T at 3 (Oct. 29, 2025) (Jeffries: "I called Brian.").)

Morris that the plea options are guilt, innocence, and not guilty by way of insanity. (GX-2A at 32.) He explained that "not guilty" means "you didn't do it," and guilt means that "you did it." (GX-2A at 32; DX-AI at 1 (Dr. Morris' Nov. 18, 2025 R-CAI Notes).) Similarly, during a call with Smith when expressing his frustration at being detained at Butner, Jeffries revealed his understanding of the distinction between innocence and guilt:

> I don't know what happened to the concept of innocent until proven guilty. I haven't been proven guilty. . . . I have not been convicted of anything. Isn't there a concept in American jurisprudence that you're innocent until proven guilty?

(GX-382T at 5 (Oct. 29, 2025).)

In the course of Dr. Morris' administration of the R-CAI assessment in November 2025, Jeffries initially incorrectly stated that a defendant must plead "not guilty" to accept a plea bargain, which prompted Dr. Morris to explain what a plea bargain entails. (GX-2A at 33.) Two days later, when she revisited this topic with Jeffries, he answered that a defendant must plead guilty to accept a plea bargain and by doing so, must give up the right to appeal, and that sentencing follows a guilty plea. (*Id*. at 34.) Several months later, on January 12, 2026, Jeffries correctly responded to questions during the joint evaluation about the concept of a guilty plea, explaining that a plea is "built around a guilty judgment" and commenting, "I'm not very interested in that because I'm not very interested in being guilty." (GX-4 at 20:16–48.) This evolution in Jeffries' understanding of the concept of a guilty plea shows not only that he is able to learn and recall new information, but also that he can apply what he has learned to develop a rational position with respect to himself: in this case, the decision to continue to plead not guilty.

Second, Jeffries understands that he has the choice to testify or to not testify at trial. During the R-CAI evaluation, Jeffries correctly told Dr. Morris that defendants can testify in their own cases but that it is not required and specifically stated, "As a matter of fact, I would

advise not to because it could prove their guilt." (GX-2A at 32; DX-AI at 2.) In addressing his right to choose whether to testify, Jeffries also correctly identified that perjury is a felony crime. (GX-2A at 32; DX-AI at 2.) After Jeffries expressed that he was not sure which counsel would question him first if he chose to testify, Dr. Morris provided education, and Jeffries correctly recalled that his lawyer would question him first. (GX-2A at 32; DX-AI at 2.) He explained that the benefit of a defendant testifying was to "present his point of view" while the potential risk was that the defendant would "do a [b]ad job" and "open the road for prosecution to strengthen the prosecution's case." (GX-2A at 32; DX-AI at 2.)

Third, during the R-CAI evaluation with Dr. Morris, Jeffries also demonstrated an understanding of attorney-client confidentiality, which he explained to mean that "what I talk to him about is privileged." (GX-2A at 33; DX-AI at 4.) When asked to define privilege, Jeffries responded, "It means it is between us." (GX-2A at 33; DX-AI at 4.)

### C. Jeffries Understands the Nature and Seriousness of the Charges and Allegations Against him

In arguing that he lacks a rational and factual understanding of the proceedings, Jeffries principally contends that he remains confused about the nature of the charges and allegations against him and has an "inability to appreciate the seriousness of his situation as a result of his major neurocognitive disorder." (Def. Br. at 35.) He further asserts that the evidence shows his "failure to recognize, or even once articulate the possibility of spending any time, let alone the rest of his life, in prison if convicted . . . ." (*Id.* at 37.)

There is no dispute that when evaluated in 2024 and February 2025, Jeffries did not demonstrate a complete understanding of the charges against him. (Gov't Br. at 53; Def. Br. at 35.) However, at this time, the opposite is true. At various points since Dr. Morris' administration of the R-CAI assessment in November 2025, when questioned about the charges

and allegations, Jeffries has begun reflexively with the answer "I don't know," but with follow-up questioning, has shown an understanding of the interstate prostitution and sex trafficking charges and allegations, albeit at times without using those precise terms. Moreover, Jeffries' responses also reveal his grave and rational concerns about being found competent to proceed and potential incarceration and financial penalties for such crimes.

#### *i. Jeffries Comprehends the Nature of the Charges and Allegations*

Jeffries' responses during interviews with Dr. Morris in 2025 and in the 2026 joint evaluation reflect that he has gained and retained an understanding of the criminal charges and allegations against him. On October 30, 2025, Jeffries told Dr. Morris that his charges were "a mystery" to him. (Hr'g Tr. 734:3–6; GX-2A at 16.) Dr. Morris provided Jeffries a printed copy of the Indictment, reviewed it with him, and then took it back. (Hr'g Tr. 734:7–13.) Around two weeks later, on November 14, 2025, in response to Dr. Morris' questions, Jeffries responded that he was facing "16" charges pertaining to "prostitution and sex trafficking." (3500-CM-13 at 13 (Dr. Morris' Nov. 14, 2025 interview notes).)[18] Later, on November 18, 2025, in response to similar questioning by Dr. Morris, Jeffries correctly answered that he was facing fifteen counts of interstate prostitution as well as an additional count, but that he could not remember the name of the additional count. (GX-2A at 31; DX-AI at 1.) Dr. Morris found that Jeffries was able to accurately describe interstate prostitution with the following response: "I guess I did horrible things to people, these horrible things, because they're felonies. So that would—what would that

[18] The Court considers Dr. Morris' November 14, 2025 interview notes as part of the evidentiary record because the parties stipulated to each others' exhibits. (ECF No. 89; Hr'g Tr. 6:5–18.) Although the prosecution did not include this particular document on their exhibit list for the competency hearing, they provided it to the defense and the Court. (*See* ECF No. 94.) The prosecution relied on these notes in their brief (*see* Gov't Br. at 35 n.8, 53), and Jeffries did not raise any admissibility concerns with this piece of evidence (*see* Def. Br.; Def. Resp).

mean? Interstate prostitution, took people from state to state and used them as prostitutes." (Hr'g Tr. 746:21–25; DX-AI at 1; *see also* GX-2A at 31.) Dr. Morris determined that Jeffries required education about the sex trafficking count but that he was able to retain the information she provided. (GX-2A at 31.) Jeffries explained his understanding of the sex trafficking charge as follows: "Moved, I guess, underaged girls across state lines, which is highly likely you can see me with a seven-year-old girl." (Hr'g Tr. 747:3–5; *see also* DX-AI at 1.) But when asked whether the victim had to be a minor female, Jeffries responded, "No." (Hr'g Tr. 747:6–8, 757:6–14; DX-AI at 2–3.) He later explained that the accusers were adults and that he intends to argue that adults can consent to sex. (Hr'g Tr. 747:6–8, 757:6–14; DX-AI at 2–3.) Furthermore, two days later, in another interview with Dr. Morris, Jeffries was unable to recall the term "sex trafficking" but nevertheless described the element of coercion involved in such a charge:

> Oh, right, coercion, force, coercion, which is my point of view with the judge, which is my friend Judge Judy's point of view because that these were adults and they had the ability to make up their own minds about being moved. You are not coercing a child; they are adults.

(Hr'g Tr. 772:6–12; DX-AI at 5.) When Dr. Morris asked how Jeffries was alleged to have coerced people, Jeffries responded: "[O]h, the ability to be Abercrombie models." (Hr'g Tr. 772:13–15; DX-AI at 5.)

Moreover, several months later, in January 2026, Jeffries' responses to questions in the joint evaluation by Dr. Bardey, Dr. Rosenberg, and Dr. Paradis demonstrated adequate understanding of the charges against him. On the first day of the evaluation, during the initial questioning about his charges, Dr. Bardey interrupted with a leading question as follows:

> Jeffries: I—I believe I've been charged with assaulting people, which if you know me, is –
>
> Dr. Bardey: You mean like beating people up?

(GX-4 at 5:10–52.) When Dr. Paradis later returned to this subject about Jeffries' charges, Jeffries recalled receiving education at Butner but said, "I did not hear beyond assault." (*Id.* 39:56–41:49.) After Dr. Paradis pressed further, he stated, "[T]hey explained to me what the fifteen charges were . . . it was assault, it didn't go beyond assault." (*Id.*) Shortly thereafter, Jeffries recalled, "[T]he sixteenth charge, I believe had to do with prostitution." (*Id.*)

Jeffries then generally resisted engaging with the evaluators regarding the nature of the charges. He repeatedly answered: "I don't know"; "I really don't know"; "I have no idea"; "Absolutely no idea"; "I don't remember"; "And there's just a lot I don't know." (GX-4 at 5:51–7:25, 14:40–45; GX-5 at 2:30–40; GX-6 at 8:00–28.) The evaluators took a break to permit Jeffries to confer with his lawyer and, afterwards, again asked him questions about the charges, albeit without recording the exchange. According to Dr. Paradis, when asked about the allegations as explained by defense counsel, Jeffries responded:

> [that] I had sex with them. I promised or somebody promised things. I took their cell phones. I stick [sic] a needle in their penis [and promised] that I could improve their career as a model. . . . Sex with people who were drugged and unconscious. I offered rewards for having sex . . . could be models . . . restricted exit . . . for example took cell phones . . . .

(GX-3 at 26.) Jeffries also understood that the charged conduct is alleged to have occurred around the world. (*Id.*) After counsel left the room, Dr. Paradis asked Jeffries about the worst charge against him, to which he responded: "I don't know. You tell me." (GX-5 at 2:38–40.) At that time, Dr. Bardey told Jeffries, "You've gotta work a little harder than that . . . try to remember what the worst thing that they said you did." (*Id.* 2:28–50.) Jeffries responded, "I don't remember." (*Id.*) The admonition by Jeffries' own expert that he needed to "work a little harder" underscores that Jeffries was making inadequate effort to respond candidly to the evaluators' questions about his understanding of the charges. When pressed further, Jeffries

responded with emotion that the charges involved "raping and assaulting people around the world to the detriment of my business." (*Id*. 3:40–57.) He explained why these charges were so serious:

> Guys, you don't understand how emotional this is. Let me give you an example. I rode down Fifth Avenue today, for the first time in years. And, I looked up at where the A&F store was that I'd opened. . . . it was a beautiful store, I put my heart and soul into that. They've moved the fucking store. That space now goes to Prada. And then, A&F is down in a miserable little store in the middle of the block, I started to cry. That's—that's my life! I'm still crying about it.

(*Id*. 3:57–4:37.) It is clear from the emotion in Jeffries' voice that he appreciated the seriousness of the allegation that he engaged in sex crimes during the time period when he was pursuing his life's work at Abercrombie.

In order to test his ability to learn and retain information, at the end of the first day of the joint evaluation, Dr. Paradis gave Jeffries a written description of seven allegations by the prosecution for him to take home, review, and bring back the next day. The allegations were:

> (1) "prostitution – paid men,"
> (2) "men went across state lines,"
> (3) "made promises to men for sex,"
> (4) "kept men from leaving easily – ex., took their phones,"
> (5) "rape,"
> (6) "inject penis," and
> (7) "got together with [boyfriend] and 'no-nose' to interview, get men for sex."

(GX-5 at 12:30–13:41; *see* GX-503.) The next day, Jeffries did not bring the list with him to the evaluation, but he correctly recalled five of the seven allegations on the list. Jeffries identified allegations #1, #5, and #7 when he responded, "One was that I paid for sex. Two, that I raped someone. Three, that I was somehow supervising, interviewing people," "for sex," that "Matthew" (Smith) allegedly conducted the interviews, and that "apparently no nose's job was to recruit people," using his nickname for Defendant Jacobson. (GX-6 at 2:00–3:49.) Jeffries identified #2 when he recalled that the most serious charge "had to do with moving people across

state lines or country lines." (*Id*. 3:49–4:50.) Jeffries later recalled #4 when he added, "I restricted people's exit and that as part of that, I stole their telephones." (*Id*. 19:20–20:11.)

Furthermore, in response to Dr. Bardey's question about what he was alleged to have done that gave rise to the charges, Jeffries responded:

> Well, the things that were on that sheet of paper, I suppose, that I paid for sex. Another thing I didn't mention is that I restricted people's exit. I raped people. And I was a part of interviewing people.

(GX-6 at 5:23–49.) Around fifteen minutes later, in response to Dr. Paradis' request that he name the seven allegations on the list again, Jeffries added: "Okay. That I paid for sex. That I raped someone. That I restricted people's exit. As part of that, I stole their telephones. I was party to people being interviewed and I assume that was for their participation in sex parties." (GX-6 at 19:37–20:10.)

Although, at times, Jeffries did not use the legal terms for his charges, his responses to the evaluators' questions show his understanding of the nature of the interstate prostitution and sex trafficking charges and the prosecution's core factual allegations as well as the fact that the charges arise from his alleged conduct while working at Abercrombie. Additionally, during the 2026 joint evaluation, Jeffries recalled that he was facing fifteen counts and that "there's one that is apparently the most serious and then the others are pretty much the same," reflecting the education he had received from Dr. Morris in October and November 2025. (DX-G at 16; GX-5 at 3:58–4:19; *see also* GX-2A at 16.) While Jeffries stated at different times that he was facing fifteen or sixteen charges, he nevertheless showed comprehension that nearly all of the charges involved the same alleged offense and that only one charge involved a different and more serious alleged offense, which is accurate. Moreover, the pattern of Jeffries' responses during the 2026 joint evaluation support the findings of Dr. Paradis and Dr. Morris that Jeffries initially responds

to questions about his understanding of the charges and allegations with a refusal to engage, but that when pressed, provides responses showing that he has learned and retained information about the nature of the interstate prostitution and sex trafficking charges and the prosecution's allegations.

The audio recordings of the 2026 joint evaluation thus contradicts Dr. Bardey's opinion that "from the first day to the second day" of the joint evaluation, Jeffries "did not recall again, what the charges were. So what little memory he had at that—during the first day, during that two- or three-hour period was gone by the second day." (Hr'g Tr. 288:3–7.) It also contradicts Dr. Rosenberg's opinion that Jeffries was never able to accurately recite his charges in any of his competency evaluations. (*See id.* 463:2–4.) To the extent that Dr. Bardey and Dr. Rosenberg focus on Jeffries' failure to use the term "sex trafficking," such a failure does not show that Jeffries lacks a rational and factual understanding of the charges and allegations against him. *See United States v. Greene*, 767 F. App'x 793, 797 (11th Cir. 2019) ("[T]he standard for mental competence does not require that a defendant have a clear understanding of legal terminology[.]"); *United States v. Nelson*, No. 20-cr-243, 2022 WL 16832743, at *6 (N.D.N.Y. Nov. 9, 2022) ("[T]he standard of legal competency does not require knowledge of 'the legal terms and vernacular of attorneys and judges.'"); *see also United States v. Collins*, No. 3:16-cr-00352, 2020 WL 1467094, at *9 (D. Or. Mar. 24, 2020) (reasoning that the "[d]efendant's inability to name the specific charges against him does not render him incompetent" where he demonstrated an understanding of the underlying factual allegations).

Jeffries also understands the relevant time frame of the prosecution's allegations. Although Jeffries struggled to recall exact dates in his responses to Dr. Morris, he demonstrated an understanding that the charged conduct allegedly occurred while he was working for

Abercrombie. (*See* GX-2A at 34.) Additionally, Jeffries' emotional statements during the 2026 joint evaluation show that he has retained the association between his tenure at Abercrombie and the timing of the allegations that he "was involved with raping and assaulting people around the world to the detriment of [his] business." (*See* GX-5 at 3:24–4:57.)

Finally, to the extent that Jeffries lacks immediate recall of legal terms—such as the term "sex trafficking"—or certain details relating to the allegations, this ignorance is the result of his own lack of interest.[19] Prior to and throughout his hospitalization at Butner, Jeffries simply did not wish to engage with the charges and allegations against him. For example, during an October 3, 2025 call, he told Smith: "[Dr. Morris] . . . gave me a document that read out all of our charges, *which I have not paid any attention to*." (GX-383T at 2 (emphasis added).) By Jeffries' own admission and his tone, as of July 2025, he failed to learn about the charges against simply because he chose not to do so.

Although not required for the determination that Jeffries has a rational and factual understanding of the criminal proceedings, the Court finds that Jeffries was not forthcoming when questioned about the charges and allegations against him by Dr. Morris or the evaluators in the 2026 joint evaluation. For example, Dr. Morris also found that Jeffries "often says, I don't know" and "often needs a little bit more encouragement to answer some of those questions or prompting to answer some of those questions." (Hr'g Tr. 754:12–15.)[20]

---

[19] To be clear, Jeffries has used the term "interstate prostitution" several times when describing the bulk of the charges against him. (*See* GX-2A at 31; Hr'g Tr. 746:21–25.)

[20] During her evaluation of Jeffries' cognitive functioning, Dr. Pennuto also found that Jeffries "requir[ed] significant encouragement to continue, and he appeared to be randomly responding without attempt to incorporate feedback given." (GX-2A at 28 n.6.)

Similarly, in the joint evaluation, Jeffries freely recalled details about his career and work at Abercrombie from 2005 to 2014—including opening a flagship store on Fifth Avenue in Manhattan, traveling for the company, and attending store events—but claimed not to remember or denied having "an active social life," inviting people to his home, or attending social events that occurred during the same period. (GX-6 at 6:15–13:32.) At the end of the first day of the 2026 joint evaluation, when the experts discussed Jeffries' denial that he had any recollection of engaging in sex parties as alleged by the prosecution, Dr. Paradis found that it was unusual for Jeffries to have forgotten about events taking place during a long period of his life that predated the 2018 TBI. (GX-5 at 15:40–17:55.) Dr. Bardey responded, "I share that concern." (*Id.*) Similarly, Dr. Rosenberg admitted that during the 2025 Bardey/Rosenberg evaluation, Jeffries had been "more forthcoming" and "had a better recollection for that aspect of his life." (*Id.*) Dr. Bardey further explained: "It's just hard to believe that he had fifty, sixty wild orgies, flying people all over the world, in Morocco, Italy, this, that and the other, and has zero recollection of it." (*Id.*) Additionally, although Jeffries told the evaluators in the 2026 joint evaluation that he could not remember anything he read, around six months earlier during a call from Butner, Jeffries told Smith that he remembered every line that he read. (GX-367T at 4 (Oct. 2, 2025).)

To be clear, the Court does not find that Jeffries was intentionally faking his memory deficits either to the joint evaluators or Dr. Morris. Rather, the examples above show that during the November 2025 R-CAI assessment at Butner and in the 2026 joint evaluation, Jeffries chose

not to discuss in a forthcoming manner the charges and allegations against him, which required evaluators to ask repeated follow-up questions in order to elicit his actual understanding.[21]

### *ii. Jeffries Recognizes the Seriousness of the Allegations*

Jeffries has a rational understanding of the potential consequences of the charges against him—including that he may suffer both financial penalties and incarceration. As addressed in detail above, during the 2026 joint evaluation, Jeffries responded with emotion after Dr. Bardey admonished him to "try harder" to answer questions about his understanding of the charges and allegations, conveying an understanding of the seriousness of the charges that he committed sex crimes "to the detriment of [his] business" while at the height of his career at Abercrombie. (GX-5 at 3:57–4:37.) Additionally, during the November 2025 evaluation by Dr. Morris, Jeffries correctly described the possible penalties associated with a conviction as "financial because that would affect me the most I think *or incarceration like this*." (Hr'g Tr. 751:3–4 (emphasis added); DX-AI at 1.) Similarly, after Dr. Morris asked Jeffries about the prospect of going to trial in the event that he is found competent to proceed, Jeffries complained about Butner and the fact that he did not want to go to prison. (DX-AI at 3; Hr'g Tr. 760:5–10.)

It is precisely because Jeffries understands the seriousness of standing trial and the potential financial and carceral penalties if convicted that he is profoundly interested in being found incompetent to proceed. As a result, Jeffries made a significant effort to understand the competency evaluation and restoration process at Butner, including by identifying who would

[21] Dr. Bardey and Dr. Rosenberg did not offer a credible medical or psychological explanation for why Jeffries could remember certain events from the 2005 to 2014 period, including details about his work for Abercrombie—but not other events. (*See* Hr'g Tr. 368:14–373:4 (Dr. Bardey); *id*. 515:14–518:9 (Dr. Rosenberg).) Moreover, neither address Dr. Rosenberg's own reflection at the end of the first day of the 2026 joint evaluations that Jeffries was more forthcoming during the February 2025 Bardey/Rosenberg evaluation.

evaluate him, when he would be evaluated, and what information the evaluators were considering. *See* Findings of Fact Section III.C.i *supra*. As Jeffries came to understand that the Butner evaluators were likely to find him competent notwithstanding his diagnoses, he exhibited profound concern about the serious consequences of such a determination and instructed Smith to relay his questions and concerns to Bieber.

For example, early on in his custodial hospitalization, Jeffries realized that his evaluation may not occur soon:

> It seems that . . . there is only one person who checks this stuff, some title. And the waiting line is very long. Which means there's no way we're gonna get out before four months. And I, I think Brian was, at best, sloppy, worst dishonest about this. And I need your point of view about it, because I think we've gotta respond. And I, I wonder if there's something that can be done based upon this. What are you thinking?

(GX-307T at 3.) The following day, Jeffries reiterated these concerns to Smith:

> The question is, is there anything we can do about that? . . . [Bieber] didn't research it well enough to know that this was going on . . . If he'd researched it, he'd know there's no chance of getting on the waiting list . . . And did he lie about it is my point of view? . . . That's why I asked him if he was a liar . . . I put him totally in the crosshairs.

(GX-309T at 5.) Over the course of his stay at Butner, Jeffries pieced together additional information about the competency evaluation process and correctly identified that most people are committed to Butner for a full four months. GX-339T at 3; *see also* 18 U.S.C § 4241(d) (permitting commitment for up to 120 days). Regarding the length of his commitment, Jeffries told Smith, "It seems to me that everyone here is on a four-month deal . . . that's what everyone is in for here. Everybody. And, there are like 3,000 people here." (GX-339T at 3.) After Jeffries learned that Dr. Morris was involved in the evaluation process, he commented, "Oooh, that's a bad idea because she hates me." (GX-312T at 2.) After Dr. Morris required him to sign release forms, Jeffries observed, "They'll review the information about the testing that I've had and determine whether it was good or not." (GX-333T at 2.) He added, "they're going to make the

recommendation that they think it is or is not good. And then the judge will make the decision." (*Id*. at 3.) Jeffries also correctly distinguished Dr. Pennuto's role in administering neuropsychological tests from Dr. Morris' role in conducting the overall competency evaluation and forming an opinion as to his competency to stand trial. (*See* GX-378T at 4.) He further correctly explained to Smith that the evaluators' report would be provided to this Court, the prosecution, and defense counsel. (GX-402T at 2.) Finally, Jeffries ultimately learned that "having Alzheimer's or Lewy body dementia [does not] automatically make[] somebody incompetent." (Hr'g Tr. 796:13–15; *see* GX-408T at 7.) At that point, Jeffries again instructed Smith to tell Bieber to start working on a strategy. (GX-408T at 7.)

The record thus reveals Jeffries' clear understanding that an adverse competency opinion by the Butner evaluators could result in this Court's determination that he is competent to proceed, the continuation of the criminal proceedings against him, and potentially disastrous consequences. On August 6, 2025, Jeffries explained to Smith that counsel had told them "[t]hat the organization [Butner] is charged with getting the, the patients to the state that they can go on trial," and that "I am saying if we go to that state *we're, we're screwed. So we have to figure this out*." (GX-318T at 3 (emphasis added).) After this call, Jeffries repeatedly implored Smith to act with urgency, recognize the seriousness of the situation, and develop defense strategies. In one call, Jeffries conveyed his frustration to Smith about his lawyer and detention in Butner as follows: "[T]hey're not protecting me because I'm going crazy. Absolutely crazy. We need answers to this goddamn stuff, Matthew. We can't just sit here like this, we're like sitting ducks. And you can't believe what's going on to me. Here with me. Here. This is . . . an unbelievable place." (GX-325T at 2.) Later, on the same call, Jeffries stated, "Matty, it's a mess, believe me,

you cannot hide from this anymore. It is a mess. And we're in a vice, a total vice, and I don't see any way out of this thing." (*Id*. at 5.)

Indeed, at times, Jeffries was so concerned about the serious consequences of being competent and therefore proceeding to trial that he accused Smith of not recognizing the gravity of the situation. (*See, e.g.*, GX-315T at 5 ("Please, Matthew, don't I, I don't think you're serious about this"); GX-315T at 9 ("So go fight, please. Fight hard. It wouldn't hurt to be nasty with them. Put them on notice. They think we're easy marks, they really do. I'd tell them that. Okay? Did you hear me? Matty?"); GX-316T at 4 ("I don't know why you think you can't talk to these people on Sunday. They're . . . they should be working their asses off, to tell you the truth.").) Jeffries reiterated these concerns when he came to the realization that Dr. Morris was going to find him competent. (*See* GX-402T at 3–6 ("I'm very anxious . . . I am imploding. And you have to tell [Bieber] that . . . I think they're looking for a way to forget about this, uhm, Alzheimer's or Lewy whatever it is, and . . . declare me competent. I think that's their goal, and I think that's terrible. We can't make that happen.").)

Moreover, Jeffries has shown his understanding that even if he is found incompetent to proceed, Smith's case could be severed and still go forward. During an October 30, 2025 call, after Smith stated that Jeffries would be found incompetent and thus "won't stand trial," Jeffries responded: "Right. But you will." (GX-383T at 2; *see also* GX-402T at 4 (Jeffries: "[N]ow go to my real concern and that's you."); *id*. at 8 (Jeffries discussing travel and stating "I don't wanna take these trips by myself"); GX-408T at 7 (Jeffries: "Are we being aggressive enough about presenting our case that she's going to let it go at that point? And there's two things. One is you and then me.").) Finally, even Jeffries' expert, Dr. Bardey, acknowledged that Jeffries

understands that the charges against Smith would proceed to trial even were this Court to find Jeffries incompetent. (Hr'g Tr. 338:25–339:2.)

### D. Jeffries' Arguments to the Contrary are Unpersuasive

Jeffries makes three principal arguments to support his view that he lacks a rational and factual understanding of the proceedings. First, he contends that because he suffers from major neurocognitive disorder, and not mild neurocognitive disorder as found by the prosecution experts, he fails to understand the seriousness of his situation. (Def. Br. at 23–35.) Second, Jeffries argues that Dr. Morris' opinion that he has a rational and factual understanding of the proceedings must be rejected because she is biased and because both she and Dr. Pennuto minimized his cognitive deficits and failed to recognize that his "inappropriate" behaviors show a failure to grasp the seriousness of the charges. (Def. Br. at 29–35; Def. Resp. at 5–10.) Third, relying on the opinions of Dr. Bardey and Dr. Rosenberg and the Butner calls, Jeffries argues that he remains confused about the charges and allegations, cannot think of anything in the proceedings beyond the competency issue, and does not appreciate the risk of imprisonment. (Def. Br. at 35–40; Def. Resp. at 11–17.) Each of these arguments is unpersuasive.

#### *i. Neither Jeffries' Diagnosis nor his Results on Neuropsychological Tests Resolve the Issue of his Competency*

Jeffries contends that he suffers from major neurocognitive disorder, which is characterized by "substantial impairment of cognitive performance," and therefore does not appreciate the serious consequences of the charges and allegations against him as required to meet the first *Dusky* prong. He further argues that there is an "irreconcilable contradiction" between the findings of defense experts (Dr. Valdes, Dr. Bardey, and Dr. Rosenberg) and the prosecution experts (Dr. Paradis and Dr. Pennuto) as to whether he has major neurocognitive disorder. (Def. Br. at 26.) However, whether Jeffries' decline in cognitive functioning is

characterized as a major or a mild neurocognitive disorder does not determine whether he is incompetent to proceed. The Court's conclusion that Jeffries meets the first prong of *Dusky* takes into account Jeffries' cognitive decline in a number of areas and the extent of those declines as well as his current capabilities as shown by his neuropsychological test results and other evidence. Accordingly, even if Jeffries suffers from major neurocognitive disorder, Jeffries has a more than sufficient rational and factual understanding of the proceedings.

Jeffries relies on Dr. Valdes' 2026 test results as "unequivocal proof of a significant 'decline in cognitive function' and 'substantial impairment in cognitive performance'" and criticizes Dr. Pennuto for diagnosing him with mild neurocognitive disorder based on purportedly "less-than comprehensive" neuropsychological testing. (Def. Br. at 28.) These arguments are unpersuasive. As explained further below, Dr. Valdes' 2026 testing confirms that Jeffries' cognitive functioning in areas relevant to competence—including but not limited to intelligence, verbal and reading comprehension, verbal abstract reasoning, verbal learning of structured and unstructured material, and working memory—are in the average range, varying from low average to high average. *See* Conclusions of Law Sections III.A.i *infra*. Other evidence shows that these abilities translate to Jeffries' abilities to communicate well, ask pertinent questions, and learn and retain information, particularly when the information is contextualized. *See* Conclusions of Law Section III.A.ii–iii *infra*. Moreover, the Court also places weight on the critiques by Dr. Paradis and Dr. Pennuto that Dr. Valdes' procedures, which include lengthy testing sessions with insufficient breaks, may have caused Jeffries to underperform on the tests she administered in 2026. *See* Conclusions of Law Section III.E.i *infra*. Moreover, Dr. Valdes' 2026 test results are nevertheless consistent with a number of the test results obtained by Dr. Pennuto in 2025, notwithstanding Jeffries' criticisms. Dr. Pennuto found that Jeffries' scores in

intelligence, verbal and reading comprehension, verbal learning of structured and unstructured material, attention, and working memory fell within the low average to upper end of average ranges. *See id*.

Jeffries' focus on the diagnosis of major neurocognitive disorder misses the forest for the trees. The Court need not resolve whether Jeffries is suffering from a major or mild neurocognitive disorder for three reasons. First, courts have found numerous defendants diagnosed with major neurocognitive disorders competent to proceed. *See, e.g.*, *United States v. Salery*, 681 F. App'x 854, 855–57 (11th Cir. 2017) (affirming competency finding notwithstanding defendant's symptoms consistent with major neurocognitive disorder and conflicting expert opinions on competency); *United States v. Chun*, No. 17-20451, 2019 WL 6683878, at *12 (E.D. Mich. Dec. 6, 2019) (finding defendant competent despite two expert diagnoses of major neurocognitive disorder and probable Alzheimer's disease); *United States v. Pfeiffer*, No. 16-cr-23-A, 2019 WL 2435487, at *1 (W.D.N.Y. June 11, 2019) (finding defendant competent "despite his deficits" which included an expert diagnosis of major neurocognitive disorder); *United States v. Lowe*, No. 618-cr-57, 2022 WL 738550, at *2 (E.D. Ky. Jan. 26, 2022), *report and recommendation adopted*, No. 618-cr-57, 2022 WL 736434 (E.D. Ky. Mar. 10, 2022) (same involving expert diagnosis of major neurocognitive disorder and traumatic brain injury); *United States v. Deruiter*, No. 2:14-cr-46, 2017 WL 9360880, at *25 (M.D. Fla. May 16, 2017), *report and recommendation adopted*, No. 2:14-cr-46, 2017 WL 3308967 (M.D. Fla. Aug. 3, 2017) (finding defendant competent even where he had cognitive deficits).

Second, the Court has fully considered Jeffries' cognitive deficits as shown through the results of neuropsychological tests as well as evidence of his actual functional capabilities in determining that he has a rational and factual understanding of the criminal proceedings against

him. Experts on both sides agree that the results of neuropsychological tests are only one measure that must be considered alongside evidence of an individual's functional abilities when determining competency:

- Dr. Bardey testified, "The assessment of competency is not based on a single finding in a single test. It's an overall assessment of the individual's functioning. The psychological testing and neuropsychological testing are data points that I consider, but are not in any way by themselves dispositive of the issue of competency." (Hr'g Tr. 292:7–16.)

- Dr. Morris testified, "[T]he testing is just one data point. We also have to observe Mr. Jeffries' functionally." (*Id*. 881:3–4.)

- Dr. Pennuto agreed in testimony that neurocognitive testing alone cannot be used to determine whether a person is competent to stand trial, and that testing is just one piece of information considered when diagnosing a person with a cognitive disorder. (*See id*. 575:19–24.)

As Dr. Paradis observed, the Court has the benefit of neuropsychological testing and evaluation of Jeffries over the course of three years as well as evidence of his functional abilities. (Hr'g Tr. 907:12–14, 992:9–19.) During that time, Jeffries' performance on certain neuropsychological tests have improved, as numerous experts have acknowledged, likely due to better medication management and sleep, and potentially due to abstinence from drinking alcohol while detained at Butner. (Hr'g Tr. 184:16–23 (Dr. Valdes testifying that some improvement in the scores may be attributed to improved medication and abstinence from alcohol), 325:23–326:14 (Dr. Bardey) (same), 612:15–19 (Dr. Pennuto) (same), 991:19–992:1 (Dr. Paradis) (same)).[22] This Court's determination that Jeffries has a rational and factual

---

[22] Dr. Morris and Dr. Rosenberg both testified that Jeffries' scores on neuropsychological tests improved. (Tr. 546:9–19 (Dr. Rosenberg), 826:5–9 (Dr. Morris).) Dr. Morris was not questioned about the cause of the improvement. At the end of the first day of the 2026 joint evaluation, Dr. Rosenberg speculated as to whether the change in medication was a contributing factor. (GX-5 at 15:40–17:55.)

understanding of the proceedings is grounded in the evidence that he has certain cognitive abilities and strengths, notwithstanding his declines in other areas, *and* evidence of his actual functional abilities as illustrated by the 109 Butner phone calls, Dr. Morris and Dr. Pennuto's observations spanning multiple months, and the audio recordings of significant portions of a two-day evaluation in January 2026.

Third, in determining Jeffries' rational and factual understanding of the proceedings, this Court does not place weight on Dr. Valdes' findings regarding Jeffries' performance on the Texas Functional Living Scale assessment. Dr. Valdes administered this test to Jeffries in order to determine whether he suffers from major neurocognitive disorder, which is associated with a cognitive decline of "sufficient severity" to impair instrumental activities of daily living, as opposed to mild neurocognitive disorder, which is marked by cognitive decline that does not impair daily activities. (Hr'g Tr. 46:15 –47:5.) Dr. Valdes found that Jeffries "was unable to write a check to pay a hypothetical bill, could not microwave a frozen meal, and was unable to articulate that he should call '911' in the event of an emergency (instead stating that he would call a phone operator and then his partner)." (Def. Br. at 28; *see also* DX-D at 4.) However, as Jeffries concedes, the TFLS "assesses capabilities that are less relevant to an individual's ability to understand courtroom proceedings." (Def. Br. at 28.) Additionally, the results reflect, in part, Jeffries' practice of delegating and directing others to perform on his behalf tasks related to instrumental activities of daily living. For example, on the Butner calls, Jeffries directed Smith to accomplish specific tasks, such as communicating with the couple's financial manager, procuring items and making appointments in advance of Jeffries' release from Butner, and coordinating a call with defense counsel. *See* Findings of Fact Sections III.C.ii–iii, vii *supra*.

These calls show that Jeffries remains involved in the management of his affairs but delegates specific tasks to others. *See* Findings of Fact Section C.ii–iii.

Indeed, this Court finds persuasive and well-supported Dr. Paradis' finding that Jeffries "is a man that's used to being in charge and if you listen to the phone calls he's telling Mr. Smith do this do that like he's in charge." (Hr'g Tr. 967:14–17.) Similarly, Dr. Pennuto confirmed Jeffries' practice of delegating tasks when she testified as follows about Jeffries' responses to questions about his daily functional habits:

> [I]t was noteworthy that Mr. Jeffries laughed when I asked him if he was able to drive and he said, I haven't driven in 20 years. He has someone to drive for him and he has somebody to manage his finances. So it was clear that he wasn't doing those things, but not because he wasn't able. It was because he had made other arrangements.

(*Id*. 637:24–638:5.) Thus, Dr. Valdes' findings regarding Jeffries' functional abilities based on the TFLS, which is central to her diagnosis of major neurocognitive disorder, carry little weight in the determination of whether Jeffries has a rational and factual understanding of the proceedings.

***ii. Jeffries' Challenges to Dr. Morris and Dr. Pennuto's Conclusions are Unavailing***

Jeffries argues that Dr. Morris' opinion that he meets the first prong of the *Dusky* standard is unreliable and unsupported. (Def. Br. at 29–35; Def. Resp. at 5–10.) He accuses her of bias and contends that both Dr. Morris and Dr. Pennuto minimize Jeffries' cognitive deficits and fail to recognize that he has engaged in "inappropriate" behaviors showing a failure to grasp the seriousness of the offenses. (*Id.*) However, these arguments are belied by the record.

First, Jeffries relies on a number of his calls to Smith that took place during the first month of his time at Butner in challenging Dr. Pennuto's findings concerning his functional abilities, but fails to account for contrary evidence in the record. For example, Jeffries argues that based on an August 17, 2025 call to Smith, he "ha[d] no idea how much money he had in his

commissary account," whereas Dr. Pennuto found that the Butner calls show Jeffries' ability to manage his finances. (*See* Def. Br. at 29 (citing GX-335T at 4).) However, Jeffries fails to account for an earlier call to Smith on July 28, 2025, in which Jeffries asked, "Would you have, Gavin send um, another thousand dollars through? Because I'm eating this up like crazy." (GX-301T at 4.) When Smith asked what Jeffries spent his money on, Jeffries explained, "I was going to try to get a Kindle, so I've got, uh, $400 for calls, and $400 for the commissary, but I need another thousand." (*Id.*) Similarly, on November 13, 2025, Jeffries directed Smith to allocate the remainder of his commissary funds among four of his peers at Butner, specifically noting that $447 should be provided to each person. (GX-399T at 2–4.) As Jeffries explained, "$1,791 is the total balance . . . on my commissary account, and then I divided it among four people." (*Id*. at 3–4.)

Jeffries' critique of Dr. Pennuto's finding that the Butner calls show his ability to track time is similarly contradicted by the record. Dr. Pennuto found that notwithstanding Jeffries' memory deficits, he had devised strategies to keep track of time, such as by asking Smith to identify the time or how much time had passed during certain points of their calls. (Hr'g Tr. 630:13–631:21.) This finding is supported by the Butner calls based on this Court's review of the audio recordings. *See* Findings of Fact Section III.C.viii.

Jeffries also relies on calls during his first month at Butner to argue that his confusion while at the facility underscores his lack of any rational or factual understanding of the proceedings. Jeffries cites an August 12, 2025 call where he noted that he forgot to order a clock from the commissary and did not understand the daily lockdown procedure at Butner. (*See* Def. Br. at 30 (citing GX-329T); *see also* Hr'g Tr. 724:19–725:2 (Dr. Morris explaining Butner lockdown).) However, neither of these examples contradict Dr. Morris' finding that Jeffries has a

rational and factual understanding of the proceedings or the result of Dr. Pennuto's findings regarding Jeffries' cognitive and functional abilities because they are all taken from Jeffries' first month at Butner, when he was still adjusting to the facility's rules and procedures. (*See* GX-302T (July 28, 2025), GX-329T (Aug. 12, 2025).)

Jeffries argues, unpersuasively, that Dr. Morris and Dr. Pennuto "minimized" his "disinhibited" behavior, and that such behavior shows that he will act inappropriately in the courtroom due to his cognitive deficits. (Def. Br. 32–35.) There is no dispute that before Jeffries was committed to Butner, Dr. Valdes, Dr. Paradis, Dr. Bardey, and Dr. Rosenberg each expressed concerns that Jeffries was engaging in "disinhibited" behavior—defined as "not [being] able to inhibit" one's "responses" and "behavior"—during the evaluation process. (Hr'g Tr. 586:21–23 (quoting Pennuto).) For example, in her February 2025 assessment of Jeffries, Dr. Paradis pointed to his comments referring to her as a "tough bitch" and a "cunning bitch." (GX-1 at 12; *see also* Hr'g Tr. 911:9–912:21.) Similarly, in her February 2025 report, Dr. Rosenberg found that while Jeffries was "engaged, witty, and gregarious . . . as the evaluation progressed and he was questioned on topics that he was unable to recall, he became disinhibited and irritable." (DX-F at 18–19.)

However, the Butner calls and Jeffries' more recent behavior in the late 2025 evaluations and the 2026 joint evaluation show that rather than engaging in "disinhibited" behavior, Jeffries has a cheeky and irreverent personality and uses charm in an effort to build rapport and influence others, particularly the prosecution's experts whom he hopes to win over. In October and November 2025, Jeffries joked to Dr. Pennuto, "We can be married," called her a "bitch" when she administered a difficult test, and called her "girl." (Hr'g Tr. 578:3–579:13, 580:15–16.) Jeffries told Dr. Paradis, "You look very nice today," "You would've made a great teacher," and

"Your writing is terrific, along with your hair." (GX-6 at 19:12–17, 21:03–16, 30:45–51.)[23] Jeffries also made comments encouraging Dr. Morris to leave Butner because the facility is "awful." (Hr'g Tr. 794:19–20; DX-AJ at 33.) Dr. Morris reasoned that his comments were not the result of irrational thinking:

> I think primarily Mr. Jeffries thought Butner was a really terrible place, as we've heard him say, that it was intolerable, and so he was making comments that I was better than being at Butner, that I should not be at Butner because it's a really terrible and intolerable place.

(Hr'g Tr. 794:23–795:2.) She further opined, "I don't think that's uncommon. I think Mr. Jeffries was, as I mentioned before, trying to present himself as a likeable individual and was trying to, for lack of a better way of saying it, get me on his side." (*Id.* 795:5–8.)

Thus, the conduct on which Jeffries relies to argue that he is so "disinhibited" that he does not understand the criminal proceedings against him or the seriousness of the charges and the potential consequences is indicative of Jeffries' personality—not cognitive deficits that render him incapable of harboring a rational and factual understanding of the proceedings. Moreover, as explained further below, Jeffries' efforts to compliment, tease, and charm his evaluators, even sometimes using irreverent and casual language, reveals his intelligence, communication abilities, and strategy of trying to get the prosecution experts on his side. *See* Conclusions of Law Section III.A.iii *infra*; *see also* GX-405T at 3 (Jeffries discussing Dr. Morris with Smith and describing his efforts in "[j]ollying her," [m]aking her laugh, "flattering her").

[23] The Court's findings regarding Jeffries' personality traits are supported by Jeffries' own brief, where he argues that on one occasion in Butner, he "grabbed" Dr. Morris' arm when discussing his distress at being committed in the facility, he did so not in an aggressive way, but in an effort to impress upon her the depths his feelings. (Def. Br. at 32.) This is further supported by Dr. Morris' testimony. (Hr'g Tr. 730:14–25.)

Next, Jeffries challenges Dr. Morris' conclusions from the R-CAI assessment, arguing that, according to his interpretation of her interview notes, she did not ask three specific questions that relate to his capacity for recall: "(1) whether he remembered everything that happened on the day(s) of the alleged offense; (2) whether he expected to tell counsel everything that he knows and remembered about the offense; and (3) whether he expected any problems in telling counsel everything." (Def. Resp. at 8; *see also* DX-AI at 4.) Dr. Morris testified that she elected not to ask all of the questions because "some of the questions are a bit redundant . . . a defendant may answer some of the questions in the context of other questions," while other questions "aren't always the most relevant" to the defendant's situation. (Hr'g Tr. 889:6–16.) She further emphasized that the R-CAI is a "flexible" instrument." (*Id*. 889:1.)

The Court recognizes that Dr. Morris did not identify guidelines or standards that she applied to determine which specific R-CAI questions to pose and which ones were unnecessary, and that she made the determination based on Jeffries' responses to questions already posed. (*Id*. 890:2–891:11.) Nevertheless, she identified a reliable methodology by explaining that not every question on the R-CAI relates to every defendant and that a defendant's responses to certain questions may be responsive to other questions as well. Here, the questions that Dr. Morris *did* ask elicited responses from Jeffries that, along with voluminous other information in the record, support the determination that Jeffries has a rational and factual understanding of the proceedings. *See* Conclusions of Law Section II.A–C *supra*. Moreover, Jeffries appears to have provided information responsive to questions #1 and #2 when responding to other questions. When asked whether he had confidence in his attorney, Jeffries responded "Yes," and indicated that he could help counsel "by absolutely telling the truth about everything" and "not fabricating and making up stories trying to dodge the system." (DX AI at 3.) These responses directly relate

to question #2, which asks whether Jeffries "expected to tell counsel everything that he knows and remembered about the offense." Similarly, in response to questions about when the alleged offenses took place, Jeffries responded in a manner that was in part responsive to the question "whether he remembered everything that happened in the days of the alleged offenses."[24] Accordingly, Dr. Morris' determination that, based on Jeffries' responses to the R-CAI, Jeffries has a rational and factual understanding of the charges is based on reliable principles and methods and is well-supported as required by Rule 702, Fed. R. Ev.

Similarly, Jeffries criticizes Dr. Morris for concluding that he required only "minimal" rather than "moderate" education in the course of the R-CAI assessment and for failing to identify a metric applied to determine whether the volume of education required was minimal as opposed to moderate. (Def. Br. 33–34; Def. Resp. at 10.) Whether the amount of education Dr. Morris provided was "minimal" or "moderate" is not material, however, because the Court has fully accounted for the fact that Dr. Morris did provide Jeffries with education on numerous occasions when he provided incorrect answers in response to questions during the R-CAI assessment. This is not surprising because, as noted above, Jeffries admitted that until Dr. Morris provided him the Indictment and explained its contents, he had been uninterested in engaging with it. (*See* GX-383T at 2.) Moreover, after receiving education from Dr. Morris, Jeffries was able to learn and retain the information and provide correct responses to follow-up questions on

---

[24] Dr. Morris' notes indicate that she asked Jeffries about when the alleged offenses took place, and he responded that they were alleged to have taken place a long time ago. (DX-AI at 4.) After she asked for a range of years, her notes indicate that he responded, "[W]ell it was after it's a very wide range very wide range 25 years that is a long time, wide range." (*Id.*) Dr. Morris then encouraged him to try his best, and Jeffries provided a response that she documented as, "[O]kay I was still in the company and I was there for 25 years um . . . I am bad at this. I am bad at looking at dates they run together in my mind. Let's say 1990 to 2015." (*Id.*) At that point, she provided education about the timeframe of the alleged unlawful conduct. (*See id.*)

the R-CAI. It is particularly significant that Jeffries recalled some of the information even *months later* during the 2026 joint evaluation. *See* Conclusions of Law Section II.A–B *supra*.

Jeffries also accuses Dr. Morris, Dr. Pennuto, and Dr. Paradis of being biased against him. (Def. Br. at 31 n.8, Def. Resp. at 5 n.3.) The Court finds no evidence of bias by any of these experts. Far from exhibiting bias or discounting Jeffries' cognitive deficits and behavior, Dr. Morris' opinion that Jeffries has a rational and factual understanding of the criminal proceedings and underlying findings are well-supported by the data on which she relies, which include their conversations at Butner, the Butner calls, Jeffries' presentation/responses during evaluations, and Dr. Morris' direct observations of his adaptability and resourcefulness during his later months at Butner, as addressed above. *See* Findings of Fact Section III.B, Conclusions of Law Section II.A–C *supra*.

Additionally, Dr. Paradis reached the same opinion—that Jeffries has a rational and factual understanding of the proceedings against him—based, among other things, on the 2026 joint evaluation, her independent review of Dr. Morris and Dr. Pennuto's reports and attached materials, Jeffries' Butner medical records, and the Butner phone calls. The suggestion of bias against Dr. Paradis is particularly unpersuasive because of her demonstrated objectivity in this action. Notwithstanding her role as a retained prosecution expert, Dr. Paradis initially determined that Jeffries was not competent to proceed based on his presentation in evaluations in 2023 and 2024 and the early neuropsychological test results. *See* Findings of Fact Section II.C *supra*. She changed her opinion in 2026 only after reviewing voluminous additional evidence documenting his improved understanding of the charges and allegations against him, comprehension of the seriousness of the proceedings, and functional abilities relating to intelligence, memory, processing, reading and verbal comprehension, including but not limited to the Butner calls and

her direct observations during the 2026 joint evaluation. *See* Findings of Fact Section IV.B.iii *supra*.

Finally, there is absolutely no evidence to suggest that Dr. Pennuto was biased in her responses to cross-examination by defense counsel. Jeffries provides no reasoning or explanation for this accusation. (*See* Def. Br. at 31 n.8.) Dr. Pennuto testified credibly and objectively at the competency hearing and made a good faith effort to respond to defense counsel's questions. Nor is there any evidence of bias in Dr. Pennuto's written report.

#### *iii. Jeffries' Understanding of the Proceedings Against him is More than Superficial*

Jeffries argues that he remains confused about the charges and allegations against him, relying on the opinions of Dr. Bardey and Dr. Rosenberg. (Def. Br. 35–40.) Specifically, he points to testimony from these experts regarding their impressions of the Butner calls. Dr. Bardey reviewed only "some of" of the calls and testified in part: "He never talks about issues at trial. He never talks about the discovery. He never talks about witnesses he would like [Bieber] to call. There's no conversation." (Hr'g Tr. 296:22–25, 402:10–12.) When asked upon cross-examination about Jeffries' comments that he might be "screwed" if he goes to trial, Dr. Bardey responded, "I think that's consistent with his very superficial understanding of these proceedings. He doesn't elaborate . . . in terms of the details of what would happen, in terms of what trial would look like, what evidence would be presented." (*Id*. 298:2–6.) Dr. Bardey interprets Jeffries' conduct as "conflating the issue of competence and being found guilty." (*Id*. 342:19–20.)

These opinions by Dr. Bardey are poorly supported and unpersuasive. As explained at length above, in evaluations with Dr. Morris, Dr. Bardey, Dr. Rosenberg, and Dr. Paradis, Jeffries demonstrated a more than adequate understanding about the charges and allegations

against him, these proceedings, the functions of various participants, and defense strategies. *See* Conclusions of Law Section II.A–C *supra*. Moreover, Jeffries *did* occasionally attempt to discuss his legal case with Smith, who reminded him that they could not discuss the subject over the phone, which successfully redirected Jeffries to change the topic.[25] Most significantly, contrary to Dr. Bardey's findings, Jeffries' fixation on the issue of competency is not irrational. In the Butner calls, Jeffries shows a rational concern that the competency determination is a threshold issue that will determine whether he will face the burden of further proceedings, including trial. Notably, towards the end of his commitment at Butner, but prior to Dr. Morris' administration of the R-CAI assessment, as Jeffries came to realize that the evaluators would find him competent, Jeffries shifted his focus to trial preparation and defense by preparing a list of issues to discuss with counsel. These questions include: (1) "What are the charges?"[26] (2) "What are your arguments against each of them? (3) "What are . . . your prognosis [sic] for each of them?" (4) "[I]s this going to be a trial or is it going to be [] judge decided? (5) "How much will all this cost?" (6) "[W]hen will this case be finally finished?" (GX-389T at 6–7.) Thus, Dr. Bardey's opinion that the Butner calls show Jeffries' lack of rational and factual understanding of the

---

[25] (*See, e.g.*, GX-300T at 2 (Jeffries asking how the call with Bieber went and Smith responding, "We can't talk about it on the phone," which redirected Jeffries); GX-377T at 2–3 (Jeffries raising his life expectancy with Alzheimer's as a potential defense strategy and Smith responding, "Can we not talk about it?" and Jeffries suggesting that Smith "talk to Brian about it on the phone"); GX-385T at 3 (Jeffries raising the theory that "these people were adults, and, there was no force involved," and Smith responding, "We shouldn't talk about it but yeah, yeah absolutely . . . " and changing the subject); GX-389T at 6–7 (Jeffries outlining questions for counsel, including prognosis for the charges and whether it will be a bench trial or jury trial, and Smith responding, "We can't talk about this on the phone," which redirected Jeffries).)

[26] This call occurred on November 2, 2025—*before* Dr. Morris conducted her R-CAI assessment and educated Jeffries about his charges. (*See* DX-AI.) Thus, Jeffries' question "What are the charges?" comports with the fact that he did not understand his charges before Dr. Morris educated him about them during the R-CAI assessment.

proceedings are unsupported and unreliable, thereby failing to meet the requirements of Rule 702(b) and (c).[27]

Jeffries also relies on Dr. Rosenberg's opinion that the Butner calls reflect Jeffries' lack of a rational and factual understanding of the proceedings. Dr. Rosenberg concluded that Jeffries' frequent discussion of international travel is a "reflection of both impaired memory" and "impaired judgment and reasoning." (Hr'g Tr. 447:11–448:1.) She further found that his statements reflecting a lack of understanding of the charges and "inconsistent statements" about whether Jeffries wants to be found competent. (*Id*. 448:2–10.) Dr. Rosenberg also interpreted Jeffries' criticisms of his counsel, particularly his concern that counsel did not correctly inform him about the length of his potential custodial hospitalization before he entered Butner, as evidence that "he does not remember those conversations that he had with [defense counsel]"

[27] Dr. Bardey did not listen to all of the Butner calls, yet relied on them to reach sweeping conclusions about Jeffries' competence based on listening only to "some" of them. For example, he relied on the Butner calls to conclude that Jeffries has an "inability to learn new information, to manipulate information, to shift sets, to pull from different memories or different recollections of what happened or where he was during the time of the alleged offense conduct, he's completely incapable of -- of dealing with any of that." (Hr'g Tr. 303:9–14.) Dr. Bardey further relies on the Butner calls to draw the following broad opinions:

> [T]he jail calls are very superficial, are very chatty, sometimes are filled with odd statements, tangential statements, illogical statements. Sometimes talking about making plans for something that clearly is not going to happen. But he's not challenged in these phone calls. And he sometimes contradicts himself. He'll on one day say he doesn't know the charges and on the other day give some sense that he's been told, that he's repeating that. So there's a lot of inconsistencies in his presentation, which in my mind is consistent with the ebb and flow of illness and incapacity.

(*Id*. 393:18–394:1.) Other than his finding that Jeffries is "very chatty" on the Butner calls, the aforementioned opinions are unsupported by the calls as a whole. In general, the calls show that Jeffries is able to cover the topics that he wishes to address within the severe constraints of a 15-minute timed jail call, to engage in a conversation, to follow and process information, ask pertinent questions, and recall information previously learned auditorily. Moreover, Jeffries' "chattiness" is an aspect of his personality—not a sign of incompetence or even unusual in the context of a detained person calling a loved one from jail.

and that Jeffries was acting out of paranoia and out of character. (*Id*. 449:4–5.) These opinions are unsupported by the Butner calls and the record as a whole and therefore do not meet the Rule 702(b) standard. Jeffries' discussions of international travel reflect what he wants to be thinking about—his hope that he will be found incompetent and can, at some point, pursue a life of international travel with Smith. *See* Findings of Fact Section III.C *supra*. Indeed, Jeffries told evaluators in 2026 that he was not interested in a plea bargain because it is "built around a guilty judgment," explaining, "I'm not very interested in that because I'm not very interested in being guilty." (GX-4 at 20:16–48.) Jeffries' statements in the calls to Smith and in his evaluations are consistent with Dr. Morris' conclusion that Jeffries was "unwilling to discuss alternative strategies" because he was "very optimistic," at least initially, that his primary defense strategy of being found incompetent would prevail. Hr'g Tr. 778:19–779:8; *see also* Conclusions of Law Section III.E.iii *infra*.

As already noted, the record shows that Jeffries did not seek to engage with his charges at all until Dr. Morris forced him to do so during the R-CAI assessment. *See* Conclusions of Law Section II.C *supra*. Moreover, Jeffries' complaints about his defense counsel are not unusual. *See United States v. Davis*, No. 22-5939, 2024 WL 305518, at *4 (6th Cir. Jan. 26, 2024) ("[A] defendant is not rendered incompetent . . . merely because he cannot get along with his counsel or disapproves of his attorney's performance"); *United States v. Bradley*, 644 F.3d 1213, 1270 (11th Cir. 2011) ("[T]hat a client and his lawyer clash . . . does not mean that the client is incompetent to stand trial."). Dr. Rosenberg provides no examples of Jeffries' premorbid functioning showing that Jeffries' criticisms of counsel are somehow "out of character" or born of "paranoia." (*See* Hr'g Tr. 449:7–13, 500:16–20.) Finally, Dr. Rosenberg's finding that Jeffries

purportedly made inconsistent statements about whether he wanted to be found competent is entirely unsupported. The aforementioned opinions therefore fail to comply with Rule 702(b).

Also central to Jeffries' argument that he cannot appreciate the consequences of his criminal charges is his alleged "failure to recognize, or even once articulate the possibility of spending any time, let alone the rest of his life, in prison if convicted." (Def. Br. at 37.) This is contradicted by the record in three ways. First, Jeffries told Dr. Morris in the November 2025 R-CAI that he is facing possible "financial" penalties "or *incarceration like this*" (Hr'g Tr. 751:3–4 (emphasis added); DX-AI at 1.) Second, in one of his many calls urging Smith to consult with counsel and express their collective frustration, Jeffries explicitly acknowledged that incarceration is a penalty for the charged offenses when he said, "I know it's not your personality [being difficult], but this isn't your personality, either. *Sitting in jail. Is it?*" (GX-315T at 9 (Aug. 3, 2025) (emphasis added).) He then repeated, "I said, get in there and do it. I know it's not your personality. But your personality isn't *to be sitting in jail* either. . . . *Or have me there.*" (*Id.* (emphasis added).) Jeffries thus connected an unsuccessful defense plan with a risk of imprisonment, which is why he wanted Smith to speak with counsel immediately. Third, as explained above, Jeffries repeatedly underscored to Smith that he was deeply concerned about his case. *See* Conclusions of Law Section II.C.ii *supra*; Findings of Fact Section III.C.ii *supra*. That Jeffries does not explicitly reference imprisonment in each call to Smith when sharing these concerns does not show that he fails to comprehend the seriousness of these proceedings.

Additionally, Jeffries' remaining arguments regarding the import of the Butner calls are unavailing. (*See* Def. Resp. at 11–17.) He first cites examples showing his confusion about the competency evaluation and restoration process, as well as the impact of this process on the proceedings against Smith. (*See id.* at 11–13.) This Court has made extensive findings showing

that Jeffries resolved that confusion by learning about the competency evaluation and restoration process while at Butner and grasping that Smith's case would proceed even if Jeffries were found incompetent. *See* Findings of Fact Section III.C.i, Conclusions of Law Section II.C *supra*. Jeffries also cites calls in which he discusses future international travel with Smith, which as explained above, simply show Jeffries' choice not to engage with his charges. (*Id*. at 13–15.) Finally, Jeffries relies on the Butner call in which he told Smith about the questions he wants posed to Bieber, including "What are the charges" and "What are your arguments against each of [the charges]?" (*Id*. at 15–16.) These calls are evidence not of Jeffries' confusion but his understanding that he must get on top of his defense promptly because he may be found competent to proceed.

Finally, Jeffries' reliance on *United States v. Hemsi*, 901 F.2d 293, 295 (2d Cir. 1990), for the notion that he has only a superficial understanding of the proceedings is entirely unpersuasive. (*See* Def. Resp. at 7.) Here, the evidentiary record is not limited to showing that Jeffries can only recite the names of charges or witnesses,[28] but rather ample evidence shows that he grasps the nature of the charges and the prosecution's allegations, the seriousness of the proceedings, the roles of different participants, and key legal concepts. Moreover, in *Hemsi*, the Second Circuit confirmed that courtroom demeanor is a relevant factor to consider in

[28] As addressed in the discussion of the second *Dusky* prong below, Jeffries makes much of his contention that he cannot recall the names of witnesses, such as the complainants, even as he can recall other details about the time period in question. Whether he can remember specific names is not dispositive of whether he has a rational and factual understanding of the proceedings due to the nature of the alleged conduct. The Indictment alleges that Jeffries, Smith, and Jacobson hired and paid staff to facilitate and supervise sex events in Jeffries' New York homes as well as hotels in England, Italy, France, Morocco, and other locations to which fifteen different men were transported for the purpose of engaging in commercial sex acts with Jeffries and Smith between 2008 and 2015. (Indictment, ECF No. 1 ¶¶ 5–6, 15.) It further alleges that Jacobson recruited the men and that staff transported the men to and from the sex events. (*Id*. ¶¶ 6, 8.) Thus, Jeffries' specific knowledge of the names of the complainants or other witnesses is not dispositive.

determining competency. *Id*. Jeffries' demeanor during the four-day competency hearing was entirely appropriate. *See* Findings of Fact Section V *supra*.

### E. Conclusions

For all of these reasons, based on the Court's careful review of the record, Jeffries has a rational and factual understanding of the criminal proceedings against him, the charges and allegations made by the prosecution, and the serious consequences he faces. The opinions of Dr. Paradis and Dr. Morris that Jeffries meets the first prong of the *Dusky* standard are well-supported and based on reliable principles and methods. (*See* GX-3; GX-2A.) Ultimately, the Court agrees with the following testimony by Dr. Paradis:

> The first prong, whether he understands and has a rational understanding, he absolutely does. And that's because he's a smart man and these things, like, the role of your attorney, he learned that before he had the head injury. He still has it, he retained everything he learned before. That doesn't mean that he will answer the question correctly because he has word finding problems. He says I don't know, but when you prompt him and give him queues, he answers. For sure he answers the first prong.

(Hr'g Tr. 964:4–12.) To the extent that there is information Jeffries does not know, such as the term "sex trafficking" for Count 1 of the Indictment or certain of the prosecution's allegations, the Court places significant weight on Dr. Paradis' conclusion that Jeffries "made comments like I don't care about that" and that he was not "studying his case independently" because "his strategy or his motivation and hope is that he's not going to have to learn all of those things because he's going to be found not competent." (Hr'g Tr. 957:22–958:3.) This finding is entirely supported by this Court's independent review of the record, including but not limited to audio recordings of the Butner calls and the 2026 joint evaluation. Similarly, the Court also finds reliable and well-supported Dr. Morris' conclusion that "[a]lthough [Jeffries] at times needs prompting to arrive at the most accurate and inclusive response, when prompting was provided, Jeffries demonstrated the ability to recall and discuss information accurately" with respect to his

understanding of the criminal proceedings, charges, and allegations and "demonstrated the ability to appreciate the seriousness of the charges against him." (GX-2A at 34–35.)

Furthermore, the reliable and well-supported opinions of Dr. Paradis and Dr. Morris about Jeffries' engagement with his charges and ability to retain sufficient information undercut several opinions of Dr. Bardey and Dr. Rosenberg as detailed above. Dr. Bardey and Dr. Rosenberg concluded in February 2025 that for Jeffries, "each interaction is experienced as entirely new, regardless of how many times the same information is presented." (DX-F at 27.) Such an opinion simply does not reflect what the record shows is Jeffries' current understanding of his charges or his capacity for learning and retaining information that is important to him. Similarly, the record contradicts the opinions of Dr. Bardey and Dr. Rosenberg set forth in their January 2026 report and testimony at the competency hearing that Jeffries "demonstrated significant difficulty acquiring and retaining information related to the charges against him and the underlying allegations, even when such information was presented in simplified form and reinforced through repetition and prompting." (DX-G at 20). By contrast, the Butner calls show that Jeffries learned a great deal about the Butner competency evaluation and restoration process. And Dr. Morris' evaluation, the Butner calls, and the 2026 joint evaluation reveal that Jeffries did learn and retain information relating to his charges and the underlying allegations.

Thus, the record provides ample evidence that Jeffries has a rational and factual understanding of the proceedings, including an understanding of the criminal proceedings, the functions of participants, key legal concepts, the nature and seriousness of the charges and allegations against him, and the potential consequences that he faces. *See, e.g., Chun*, 2019 WL 6683878, at *6 (relying on expert opinions that defendant "was able to demonstrate and retain a basic understanding of the legal proceedings against him, including the charges against him and

their consequences, his plea options, and the roles of courtroom participants," and the "basic understanding of the nature and objectives of a trial"); *Deruiter*, 2017 WL 9360880, at *25 (crediting expert findings that defendant "understands the adversarial nature of the legal process and the roles of a jury or attorney" and "has an adequate level of understanding of the legal process" and "the nature and consequences of the proceedings against him"); *United States v. Corral*, No. 3:22-cr-00048, 2023 WL 3843006, at *2 (E.D. Cal. June 6, 2023), *report and recommendation adopted*, No. cr-22-0048, 2023 WL 4254250 (E.D. Cal. June 29, 2023) (finding dispositive defendant's "expressed [] ideas about legal proceedings to family members he talked with on the phone" and his "statements about legal strategies and the roles of the attorneys, judge, and jury, as well as his role as the defendant"); *Watson v. Smith*, No. 1:24-cv-00567, 2024 WL 3905475 (E.D. Cal. Aug. 22, 2024), *report and recommendation adopted*, No. 1:24-cv-00567, 2025 WL 871247, at *13 (E.D. Cal. Mar. 20, 2025) (relying on evidence that defendant "was able to understand the nature of the proceedings, the charges he faced, and the roles of the attorneys, judge, witnesses, and jurors").

## III. Jeffries has a Sufficient Present Ability to Consult With his Lawyers With a Reasonable Degree of Rational Understanding

The prosecution argues that Jeffries has the present ability to consult with his lawyers with a reasonable degree of rational understanding as required by the second prong of *Dusky* due to his intelligence, "strong communication skills," "ability to think strategically and participate in his defense," the ability to plan, switch gears, and make decisions, and the ability to "engage with his attorney regarding the charges," "if he chooses to do so." (Gov't Br. at 64–65, 77, 79.) Jeffries disagrees. He maintains that he "has never, since the inception of this case, contributed in a meaningful way to a discussion with counsel" about his case and "has done absolutely nothing to assist in the preparation of his own defense." (Def. Br. at 40–41.) According to Jeffries, he has

"[n]ot once" "ever independently recalled the identities of the complainants, provided counsel with pertinent information about each complainant's respective allegations, or identified relevant areas of potential inquiry for cross-examination of the complainants." (*Id.*) Jeffries relies heavily on his neuropsychological test results and the opinions of Dr. Bardey, Dr. Rosenberg, and Dr. Valdes to argue that he does not meet the second *Dusky* prong. (*See generally id*. at 40–50.) He further argues that he has a tendency to "confabulate"—or fill in gaps in his memory with false information—which prevents him from consulting with counsel. (*Id*. at 43–44.)

Jeffries has a more than sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding. Jeffries' phone conversations with Smith provide meaningful insight into Jeffries' intelligence and ability to ask pertinent questions, engage in critical thinking, express himself, learn information, recall it days later, and engage in self-advocacy. The neuropsychological test results and related expert findings show that Jeffries retains cognitive functioning in certain areas at levels that enable him to communicate with and assist his counsel, notwithstanding his cognitive deficits in other areas. Jeffries has sufficient intelligence, the ability to learn, retain, and recall relevant information, a meaningful ability to remember information he learns visually, and an aptitude for thinking strategically. All of these skills enable him to engage with his attorneys in advancing his defense if he chooses to do so.

### A. Jeffries is Sufficiently Intelligent, Resourceful, and Able to Communicate Well

Jeffries' presentation in interviews, his neuropsychological test results, the Butner calls, and the 2026 joint evaluation confirm that he is intelligent and able to communicate effectively. He has the ability to ask pertinent questions when he needs information, seek assistance from others, advocate for his attorneys to help him, and use the information he learns to help guide his

defense strategy. These capacities enable Jeffries to engage with his attorneys with a reasonable degree of rational understanding.

#### *i. Jeffries Retains Average Intelligence and Related Cognitive Skills*

Jeffries retains sufficient intelligence and cognitive abilities in numerous areas directly relevant to his ability to consult with counsel in his own defense. Dr. Valdes' 2026 testing[29] shows that Jeffries has a Full-Scale IQ in the average range as assessed by the WAIS-IV test, which assesses "intellect and psychological functioning." (DX-C at 63 (reporting a summary score of 92).) She estimated that Jeffries' premorbid intellectual functioning was in the "high average to superior range," based on his academic achievements, which include an MBA from Columbia Business School, and his "performances on tasks that are generally more resistant to the effects of organic brain impairment and emotional distress." (*Id.*; *see also* DX-F at 3.) Jeffries also tested average on the WAIS-IV General Ability Index, which measures reasoning and problem solving skills. (DX-C at 63, 95 (reporting score of 96); Hr'g Tr. 178:18–25.) Jeffries scored "at the lower end of average" in components of the WAIS-IV test measuring his working memory, and "at the lower end of low average" in components measuring processing speed.[30] (DX-C at 64.) Dr. Valdes found that Jeffries achieved the strongest results on

[29] The Appendix to the 2026 Valdes Report provides the following explanation of the mechanism for scoring the neuropsychological test results:

> Standard scores of less than or equal to 69 are impaired, 70-79 are borderline impaired, 80-89 are low average, 90-109 are average, 110-119 are high average, 120-129 are superior and 130+ is very superior. . . . Scaled scores of 1-3 are defective, 4-5 are borderline defective, 6-7 are low average, 8-11 are average, and 12-13 are high average.

(DX-C at 95.)

[30] Jeffries scored a 97 on the WAIS-IV Working Memory Index and an 84 on the Processing Speed Index. (*See* DX-C at 63, 94.)

neuropsychological tests assessing his reading and verbal comprehension, in which he scored "at the upper end of average to high average" and "at the upper end of average," respectively.[31] (*Id.* at 63–65.)

Dr. Pennuto's 2025 testing yielded similar results. On tests for attention and working memory, Jeffries' scores "fell in the average range," while his verbal abstract reasoning fell at the "upper end of the average range."[32] (GX-2A at 26.) On tests measuring verbal learning of both structured and unstructured verbal material, Jeffries scored in the "low average" range, [33] and his language abilities primarily fell within the low average to average range. (GX-2A at 26–27.)[34] Thus, while it is undisputed that neuropsychological test results show that Jeffries has experienced decline in certain areas of cognitive functioning as compared to his premorbid

---

[31] Jeffries scored a 106 on the WAIS-IV Verbal Comprehension Index. (*See* DX-C at 65, 95.) On reading comprehension, Jeffries' scores on the WRAT-5 Blue Form—which assesses reading composite, word reading, sentence comprehension, math computation, and spelling—ranged from 97 to 109. (*See id.*) Jeffries' Test of Premorbid Functioning score, which also assesses reading ability, was 111. (*See id.*; *see also* Hr'g Tr. 83:4–86:10 (Dr. Valdes explaining TOPF).)

[32] Jeffries' attention and working memory skills were assessed through the WAIS-IV "digit repetition skills" test. (GX-2A at 26.) His verbal abstract reasoning was assessed through the WAIS-IV "similarities" test. (*Id.*)

[33] Dr. Pennuto explained that the unstructured verbal learning task involves remembering "a random list of words, with "no meaning or context or structure to it." (Hr'g Tr. 605:14–20.) By contrast, structured verbal material is presented in the form of "a story" with "context," which she found "benefits [Jeffries'] recall." (*Id.*)

[34] Jeffries' unstructured verbal learning skills were assessed in the CVLT3 (Alternate), a word list-learning task. (GX-2A at 26–27.) His structured verbal learning skills were assessed in the RBANS Update b narrative recall test. (*Id.* at 27.) Jeffries' language abilities were assessed in the RBANS Update b picture naming test, the Boston Naming Test (which requires naming objects), the COWA: FAS test for lexical fluency (which requires "verbally produc[ing] a series of words that begin with the same letter"), and the RBANS Update b test for semantic verbal fluency, which requires the test taker to "quickly verbally produce a series of words which share the given category." (*Id.*)

functioning,[35] Jeffries' performance in the 2025 and 2026 neuropsychological evaluations show that he retains meaningful cognitive abilities in terms of his intelligence, verbal and reading comprehension, language abilities, reasoning, problem solving, working memory, attention, processing, and verbal learning. These metrics, along with other areas of his cognitive functioning, represent a "snapshot" in time of Jeffries' cognitive abilities.[36]

However, the Court does not view Jeffries' neuropsychological test results in a vacuum.[37] It is significant that Jeffries' intelligence, verbal and reading comprehension, language abilities, reasoning, problem solving, working memory, attention, processing, and verbal learning abilities as measured by tests are borne out in his actual, functional abilities to follow and participate in a conversation, ask pertinent questions, seek assistance, advocate for his attorneys to help him, and use the information he learns to help guide his defense strategy as shown through his presentation in the Butner calls and in the 2026 joint evaluation as detailed below.

---

[35] To be clear, it is also undisputed, however, that Jeffries' results on certain neuropsychological tests improved from 2023 to 2025, when Dr. Pennuto tested him, and even in 2026, when Dr. Valdes tested him. (Def. Br. at 26; Gov't Br. at 12–13.) As Jeffries concedes, Dr. Valdes' 2026 results documented improvements in Jeffries' simple verbal reasoning, brief auditory attention, and concentration (all improved to the average range of functioning), simpler processing speed and visual attention (from impaired/borderline-impaired to low average/average), visual construction, and semantic verbal fluency and visual spatial judgment (to low average). (Def. Br. at 26.) As Dr. Paradis credibly testified, Jeffries has not demonstrated "rapid deterioration" since initially being diagnosed with cognitive deficits by Dr. Valdes in 2023. (Hr'g Tr. 991:3–13.)

[36] (Hr'g Tr. 66:15–21 (Dr. Valdes agreeing that the testing is a "snapshot in time" of Jeffries' abilities); *id*. 533:23–534:3 (Dr. Rosenberg explaining that "it was so important for us to reevaluate him because competency is a fluid thing"); *id*. 285:2–7 (Dr. Bardey explaining that the evaluation is a "snapshot in time" and that "you expand that snapshot by looking at more data points").)

[37] The Court also places weight on the criticism that Dr. Valdes' test administration involved prolonged testing days and insufficient break time, which may have caused Jeffries fatigue and to underperform. *See* Conclusions of Law Section III.E.i *infra*. The Court finds significant, however, that even if Jeffries' scores on Dr. Valdes' 2026 assessments accurately represent his cognitive functioning, he still retains the abilities and strengths discussed above.

***ii. Jeffries is Adaptable and Resourceful***

Jeffries' intelligence contributes to his ability to be adaptable and resourceful during his time at Butner. For example, Jeffries showed an ability to learn and conform his conduct to the facility's rules. Dr. Morris downgraded Jeffries' housing privileges from level four to level two following an incident in which Jeffries either got lost or was exploring a part of Butner without the required authorization. *See* Findings of Fact Section III.B.i *supra.* Jeffries lamented to Smith about the loss of privileges. (*See* GX-316T at 6.) He correctly explained that the level of privileges afforded to a detainee is based on the detainee's conduct. (*See* GX-329T at 2.) Jeffries applied this understanding by conforming his own conduct to the facility's norms. Dr. Morris increased his access to level three privileges because he demonstrated "appropriate" behavior and "had not engaged in any additional rule breaking behavior." (Hr'g Tr. 721:12–18; DX-AJ at 13.) Jeffries secured level four privileges several weeks later, and Dr. Morris observed that Jeffries did not have any other disciplinary issues during his time at Butner and "appeared to be able to follow the rules." (*See id*. 722:2–724:17, 725:15–20; GX-2A at 15.)

When in need of assistance at Butner, Jeffries showed that he can be creative, adaptable, and engage in self-advocacy. For example, Jeffries approached Dr. Morris with concerns about his safety upon learning that Butner staff were associating him with Jeffrey Epstein and requested permission to leave the facility before his scheduled departure. (Hr'g Tr. 737:19–21.) Similarly, when Jeffries experienced difficulties dialing the phone to call Smith, he enlisted fellow detainees at Butner to do so for him. *See* Findings of Fact Section III.C.vii *supra*. To account for the fifteen-minute time limit, Jeffries routinely asked Smith to check the time at various points during the calls to ensure that he could cover his desired topics in the allotted time. *See id*. To that end, Jeffries also used written lists to remember issues to address on his calls with Smith. *See id*. Moreover, even when he did not have paper, Jeffries demonstrated

resourcefulness by writing to-do lists on toilet paper. (*See id.*; *see also, e.g.*, GX-332T at 2; GX-336T at 4; GX-359T at 4.) To count down the remaining weeks of his commitment at Butner, Jeffries used the cement blocks on the wall of his cell to create a makeshift calendar. (*See* GX-367T at 6.) Finally, Jeffries "notic[ed] cues" such as hallway signage and used them so that he could navigate Butner by foot without assistance, despite the fact that Butner is a large, complex, and "difficult to navigate" institution, as Dr. Morris acknowledged. (Hr'g Tr. 721:2–3, 723:10–20.)

Jeffries also utilizes nicknames to aid his memory. For example, while he could not recall Dr. Paradis' name during the 2026 joint evaluation, he called her the "kitchen cabinet lady" at least three different times, using a nickname that he and Smith had previously given her. *See* footnote 12 *supra*; GX-4 at 0:00–0:45; GX-5 at 7:11–8:03; GX-6 at 20:35–21:33.

***iii. Jeffries has Strong Communication Skills***

The record reflects that Jeffries can communicate well as shown by his calls to Smith from Butner. The Butner calls span four months and catch Jeffries in "unguarded moments" that provide insight into his true functional abilities and weaknesses. (*Id.* 915:4 (quoting Paradis).) The Butner calls are particularly pertinent to assessing whether Jeffries possesses the ability to consult with counsel in his own defense, as all of the experts acknowledge.

Dr. Paradis explained, based on her extensive experience listening to the calls of defendants from correctional institutions, that defendants "drop [their] defenses as they're talking to family, they're talking to people. And real things emerge that may not emerge when you're doing an official evaluation and they know they're being watched." (Hr'g Tr. 915:14–21.) She also explained why defendants speak more candidly despite receiving notification at the beginning of each call that the call is being recorded: "[W]e see it over and over in actually fully cognitive, intact people . . . they talk about things they shouldn't all of the time." (*Id.* 915:23–

916:1.) Similarly, as Dr. Morris explained, "[I]t's important to see [Jeffries'] functional abilities" in addition to considering his performance on neuropsychological tests and his presentation and oral responses to questions in a competency evaluation. (*Id*. 860:20–21.) Dr. Bardey and Dr. Rosenberg agreed that the Butner calls are important because they are a "window into [someone's] mental state" when they are not in a clinical setting, which was why, after the first day of the 2026 joint evaluation, Dr. Bardey suggested that the evaluators obtain recordings of the Butner calls. (*Id*. 296:4–9, 503:4–7; GX-5 at 19:15–51.)

First, during the calls, Jeffries communicated effectively with Smith on a range of topics, including the competency restoration and evaluation process at Butner, and used that information to advocate for his counsel's assistance. *See* Findings of Fact Section III.C.i *supra*. As previously discussed, Jeffries asked Smith to get information from counsel about who would be conducting his evaluation, the purpose of the evaluation, and how long he would be detained at Butner. *See,* Conclusions of Law Section II.C.ii.[38] Jeffries expressed concerns to Smith about whether his experts—Dr. Valdes, Dr. Bardey, and Dr. Rosenberg—adequately supported their findings relating to the issue of his competence, whether they would be perceived as "not independent," and recognized that his diagnoses of probable Lewy Body Dementia and Alzheimer's disease may not resolve the question of his competence. (GX-402T at 4, 7.)

Toward the end of his commitment at Butner, Jeffries anticipated, without being told, that Dr. Morris would find him competent. When Smith asked Jeffries what was causing him to reach this conclusion, Jeffries responded, "Everything she's saying *and how she's saying it*. . . . [A]m I 100% about this? No. But the downside is so huge, Matty. So huge!" (GX-405T at 3 (emphasis

[38] (*See e.g.*, GX-305T at 9 (asking for spelling of Dr. Morris' name); GX-314T at 3 ("we need to find out" who is overseeing Jeffries' evaluation); GX-340T at 2 ("I think, um, you need to check with Brian to find out who said that it could possibly be sooner than four months.").)

added).) The Court finds reliable and well-supported Dr. Morris' finding that Jeffries' statements on this call show that Jeffries was "picking up on potentially some social cues or nonverbal cues," "integrating that information," "reasoning through that information," and "coming to a conclusion after he's—after he's reasoning through . . . his observations of [Dr. Morris] and [their] interactions together." (Hr'g Tr. 787:24–788:4.) Jeffries thereafter reached the conclusion, on his own, that his diagnoses were not necessarily sufficient to ensure that the Court will find him incompetent, which prompted him to direct Smith to ask Bieber, "Are we being aggressive enough about presenting our case?" (GX-408T at 7.)

This series of events shows that Jeffries can articulate his concerns, ask pertinent questions, learn and track new information, communicate that information to another person (here, Smith), and seek the assistance of his counsel in devising next steps based on that learned information. Moreover, the fact that Jeffries was able to discern that Dr. Morris was likely to find him competent to proceed further shows that Jeffries was able to read cues during his interactions with her, to process that information in order to formulate a rational understanding, and then to reach out to his counsel for assistance with next steps.

Jeffries' ability to effectively communicate is not limited to his effort to understand the competency evaluation and restoration process, but expands across topics that are important to him, including his personal and financial affairs with Smith. For example, Jeffries asked Smith questions and conveyed his concerns about whether their financial planning adequately took into consideration the needs of his son Andrew as well as Jeffries' and Smith's respective life expectancies and living expenses. (*See, e.g.*, GX-323T at 3; GX-332T *generally*; GX-333T at 4–6; GX-333T at 5; GX-349T at 6; GX-356T at 3; GX-362T at 6.)

Second, Jeffries uses his communication skills to influence and persuade others, deploying different approaches in different situations. For example, Jeffries instructed Smith numerous times to communicate with Bieber using specific phrases and a "tough" manner and tone in order to ensure that Bieber was taking his concerns seriously and working diligently on his case. (*See, e.g.* GX-382T at 3 (telling Smith to "be tough" with counsel); GX-315T at 8–9 (urging Smith to tell counsel "we're not very happy with where we are"); GX-408T at 7 (Jeffries asking, "Are we being aggressive enough about presenting our case . . .?").) At one point, after Jeffries spoke with his counsel about his displeasure at learning that he would be detained at Butner longer than expected, Smith remarked, "They were scared to death after you spoke to them yesterday." (GX-314T at 4.)

In another example, Jeffries frequently used humor and charm in an attempt to ingratiate himself with Dr. Morris, Dr. Pennuto, and Dr. Paradis, albeit with varying degrees of success. *See* Conclusions of Law Section II.D.ii *supra*. He told Smith that he was trying to "jolly" Dr. Morris by "[m]aking her laugh" and "[f]lattering her." (GX-405T at 3.) Dr. Morris confirmed this account and testified that Jeffries "ma[de] jokes," "was trying to make [her] laugh," and was "trying to get me on his side to make me like him, to have a positive view of him . . . ." (Hr'g Tr. 789:9–20.) Similarly, Dr. Pennuto reported that Jeffries was "laughing and joking about how much fun he was having with the testing" and that he told her, "We can be married. I'm gay, but that doesn't matter." (Hr'g Tr. 579:11–13.) Dr. Pennuto observed that Jeffries "appeared to be purposely testing the limits and enjoying the interaction." (*Id*. 579:4–5.) Relatedly, Jeffries later asked Dr. Pennuto in passing, "[H]ey, when are we going to meet again? I had so much fun with you." (*Id*. 577:1–2.) Jeffries similarly used humor and charm with Dr. Paradis in the 2026 joint evaluation. (*See, e.g.*, GX-4 at 34:45–56 (telling her, "We have a lot in common, maybe we're

related!"); GX-6 at 19:12–17 ("You would've made a great teacher, my god!"); *id*. 21:03–16 ("By the way, I shouldn't say this. You look very nice today."); *id*. 30:45–51 ("Your writing is terrific, along with your hair.").)

These examples show that Jeffries' use of charm, flattery, humor, and irreverence to gain the approval and favor of his evaluators demonstrates his resourcefulness, strong communication skills, strategic behavior, and functional ability to process and use information in an effort to advance his interests. Dr. Morris credibly and persuasively testified that "in order to act in that manner to get somebody on your side or to attempt to try to get somebody on your side, you . . . have to hold information and intentionally modify your behavior . . . ." (Hr'g Tr. 789:25–790:10). Dr. Paradis reached a similar conclusion about Jeffries' remarks to her in the 2026 joint evaluation. Disagreeing with Dr. Bardey and Dr. Rosenberg's opinion that Jeffries demonstrated "disinhibition" in complimenting her, Dr. Paradis testified,

> [H]e made one comment and he said something like, you know, you look nice today. I just don't think that raises to the level of being inappropriate. I think the fact that he only complimented me, he was aware that I was hired by the prosecution, that's a strategy.

(*Id*. 994:24–995:4.) Although Jeffries complimented Dr. Paradis several times during the joint evaluation, Dr. Paradis accurately noted that Jeffries did not compliment Dr. Bardey or Dr. Rosenberg. (*See id*. 983:1–2.) Based on direct review of the audio-recorded portions of the 2026 joint evaluation, this Court finds persuasive and well-supported Dr. Paradis' finding that Jeffries' compliments are indicative of a strategy to gain her favor rather than disinhibition.

Third, Jeffries' phone calls show that he is able to converse effectively and that his interlocutors do not appear to tailor their speech to someone who is facing substantial cognitive impairments. Smith did not use short, simple sentences, speak slowly or at a higher volume, repeat himself, or limit the amount of information shared on calls with Jeffries. *See generally*

Findings of Fact Section III.C *supra*.[39] Thus, Dr. Paradis' finding that Jeffries' conversational partners in the Butner calls "did not appear to be simplifying or repeating information, as if Mr. Jeffries was unable to understand what they said," is well-supported by the audio recordings. (GX-3 at 19.) Moreover, on the calls with Smith, Jeffries followed what Smith was saying, asked follow-up questions and made germane comments, switched between topics, and kept track of time. *See generally* Findings of Fact Section III.C *supra*.

Fourth, following his commitment to Butner in July 2025, Jeffries communicated well in the various evaluations with experts in this case, thereby showing that he can consult with counsel in his own defense. At his July 2025 intake with Dr. Morris at Butner, Jeffries' "eye contact was good, and his speech was within normal limits in rhythm, volume, and rate," and "[n]o significant articulation deficits were noted." (GX-2A at 13.) In December 2025, Dr. Pennuto reported that Jeffries' communication skills were "sensical and logical." (Hr'g Tr. 581:17–21.) In February 2026, Dr. Bardey and Dr. Rosenberg characterized his speech as "articulate, fluent and normal in rate, rhythm, and volume" and his thought processes as "linear and goal directed." (DX-G at 14–15.) They further reported: "No delusional content was elicited, and there was no evidence of internal preoccupation or response to internal stimuli." (*Id*. at 15.) Similarly, also in February 2026, Dr. Paradis described Jeffries' thinking as "logical and coherent," and that while "there were times when he searched for words," he was "alert and

[39] On the calls, there are times when Jeffries or Smith repeated information or asked for the other to repeat what they said because they had trouble hearing the other person due to audio quality issues. (*See, e.g.*, GX-312T at 7 (Jeffries: "I can hear you." // Smith: "You can hear me?" Jeffries: "I can always hear you, it's just you can't hear."); GX-325T at 5 (Smith: "I can't hear you at all. I think you're telling me about last night in your room and the light going off?"); GX-336T at 6 (Jeffries: "Don't do this to me. I'm in a wreck about this." // Smith: "Don't do what? I'm sorry. Can't hear."); GX-347T at 3 (Smith: "Who guided you?" // Jeffries: "My friend." // Smith: "I can't hear you." // Jeffries: "My friend.").)

responsive" and his speech was "normal." (GX-3 at 22.) Dr. Valdes noted in her 2026 report that Jeffries' "speech was generally fluent, easy to understand, logical and coherent, although at times he required additional time to retrieve a word he wanted to use, or would state that he could not think of a name or word when in conversation." (DX-C at 58.) Such findings support the determination that Jeffries is able to consult with counsel with a reasonable degree of rational understanding. *See United States v. Ioulevitch*, 508 F. App'x 73, 75 (2d Cir. 2013) (affirming competency finding where expert opined that defendant was "'oriented to time, place, and person,' that her thought process was 'organized,' and that her speech was both 'spontaneous' and 'organized,' none of which indicated that she was unable to understand the proceedings or participate in her defense"). Additionally, this Court's review of the audio recordings of the 2026 joint evaluation confirms that Jeffries is able communicate effectively about a range of topics, including his work at Abercrombie during the time period of the challenged conduct.[40]

Accordingly, Jeffries retains sufficient intelligence and strong communication skills, which enable him to share what he knows, formulate and ask pertinent questions of his counsel, integrate information, and engage in back-and-forth conversation. All of these abilities and skills are integral to Jeffries' ability to consult with his counsel with a reasonable degree of rational understanding.

[40] Although Dr. Paradis, Dr. Bardey, and Dr. Rosenberg expressed concerns about Jeffries' confused presentation and comments in their 2024/2025 evaluations (GX-1 at 11–12; DX-F at 18–19), these concerns do not extend to the evaluations and interviews conducted at Butner in late 2025 or thereafter. This Court finds Jeffries' performances in the October/November 2025 and January 2026 evaluations to be more representative of his present communication skills and related functional abilities.

### B. Jeffries has Strong Reading Skills

Jeffries possesses strong reading skills, which further support his ability to learn and remember information in preparation for trial and during trial.

Jeffries is an avid reader. While at Butner, Jeffries frequently requested that Smith send him more books because he had "[run] out of things to read." (GX-335T at 3.) At one point, he bemoaned that he had "only four books that [he had] not read" at Butner. (GX-354T at 3–4.) At times, Jeffries resorted to re-reading the books in his possession and remarked, "I thought it was going to be easy because I wouldn't remember, *but I remember every single line*." (GX-367T at 4 (emphasis added); *see also* GX-301T at 6.) Jeffries also frequently read the news while at Butner. (*See, e.g.*, GX-352T at 2–3; GX-365T at 3–4).) Similarly, Jeffries reported to Dr. Bardey, Dr. Rosenberg, and Dr. Paradis in the 2026 joint evaluation that he was a "voracious reader" and that he was currently reading a book about Condé Nast "and their miraculous rise . . . during the era of glossy magazines." (GX-4 at 31:20–50.)

Jeffries' reading abilities are consistent with the results of Dr. Valdes' 2026 neuropsychological testing, in which Jeffries scored "at the upper end of average" in reading comprehension. (DX-C at 65.) Jeffries' strong reading skills are material to his ability to consult with counsel in his own defense because, in February 2025, the prosecution provided him with "written witness statements" and other written disclosures, including "nearly all 3500 material," and has been producing Rule 16 discovery "on a rolling basis." (Gov't Br. at 72.) Thus, to the extent that Jeffries chooses to engage with this written material with the assistance of his defense team, his reading skills will assist him in learning about various witnesses in advance, rather than for the first time as witnesses testify at trial.

### C. <u>Jeffries is Able to Retain and Recall Relevant Information</u>

Jeffries maintains that he suffers from a memory disorder that prevents him from learning, retaining, and recalling information such that he would be unable to follow witness testimony at trial as needed to assist his counsel in his own defense. The record is replete with evidence, however, that Jeffries retains a more than adequate ability to retain and recall information pertinent to him. As explained at length above, Jeffries learned and was able to recall important information about the nature of his charges and the prosecution's allegations. *See* Conclusions of Law Section II.C *supra*. While at Butner, he also grasped—and was able to retrieve days later—relevant information about the competency evaluation and restoration process. Similarly, Dr. Pennuto observed that when she encountered Jeffries in passing at Butner days after his October 23, 2025 evaluation, he "remembered not only me, but the purpose of our meeting and the fact that we were planning to meet again." (Hr'g Tr. 577:6–7.)

In the Butner calls, Jeffries demonstrated an ability to learn topics discussed orally with Smith and to retrieve that information in subsequent calls days and weeks later. For example, after learning from Smith that his son Andrew was being considered for a job in Santa Barbara, in at least eight subsequent calls, Jeffries asked Smith about the status and results of Andrew's interview for the position.[41] Similarly, after hearing from Smith that his daughter-in-law was injured in a car accident, Jeffries independently asked about her well-being in subsequent calls,

---

[41] (*See, e.g.*, GX-319T at 7–8 (learning that Andrew was being considered for the position); GX-320T at 4 ("Anything about the job that was a possibility for AJ?"); GX-353T at 2 ("What did we hear from, ah, Santa Barbara?" (recalling conversations in GX-351T and GX-352T from two and three days prior)); GX-354T at 6 (Jeffries lamenting that he was expecting "the big news today," referring to the results of Andrew's interview); GX-355T at 6–7 (discussing Andrew's interview); GX-359T at 2–4 (asking Andrew for updates on the results of his job interview); GX-360T at 3 (same); 366T at 5 (Jeffries recalling that Sunday is "the day before [Andrew] starts his job").)

including at least one call that took place months after Jeffries first learned about the car accident.[42] He also retrieved and followed up on information about the travels of his friend Sandy, days and weeks after he first learned of it auditorily.[43] Thus, contrary to Jeffries' contention, the record reflects that he is able to learn, retain, and recall sufficient information so that he can track conversations across time—even when he only learns the information by hearing it. These skills enable Jeffries to follow witness testimony at trial and make pertinent connections from one trial day to the next.

Jeffries also demonstrated this level of recall of learned information in the 2026 joint evaluation. For example, Jeffries recounted that he had recently read an insightful *New York Times* editorial about how a recent television show signified increasing social acceptance of gay people. (*See* GX-4 at 32:00–33:54; GX-502.) Dr. Paradis noted that Jeffries misremembered the title of the television show as "Fierce Rivalry" rather than "Heated Rivalry," but nevertheless found that:

> [W]hen I was preparing the case, I went and looked for [the *New York Times* article] and I read it, and I believe he was spot on, that he got the point of this article, why it was meaningful, and I was impressed with that. That it shows in a non-testing setting when the information is important to him, when it matters, he reads and he remembers and he relates.

(Hr'g Tr. 957:7–17.) Similarly, at the conclusion of the first day of the 2026 joint evaluation, Dr. Paradis gave Jeffries a written document setting forth a simplified list of seven key allegations

[42] (*See* GX-305T at 6 (learning of Annabel's accident); GX-312T at 4 (following up about Annabel's condition); GX-368T at 4 (same); GX-370T at 5 (same).)

[43] (*See* GX-304T at 2 (Smith informing Jeffries that Sandy had traveled to Michigan); GX-312T at 3 (Smith: "I had a nice chat . . . with Sandy." // Jeffries: "Ohh, good. How's Michigan?"); GX-345T at 6 (Smith telling Jeffries that Sandy is "getting ready to leave" and Jeffries responding, "To go home to Los Angeles?"); GX-365T at 5 (Smith informing Jeffries that Sandy was traveling to Europe); GX-370T at 3 (Jeffries asking "Is she in Europe, Sandy?").)

about Jeffries' alleged conduct to review at home. (GX-5 at 12:30–13:41, DX-G at 17; *see also* GX-503.) As discussed in detail above, the following day, Jeffries recalled five of the seven allegations. DX-G at 18; *see also* Conclusions of Law Section II.C.i *supra*. Additionally, while he could not recall the specific names of the charges or that there were sixteen charges, he stated that there were fifteen charges and correctly noted that "one charge was the most serious and that the remaining charges were the same." (DX-G at 18.) Jeffries' recall of the charges against him was consistent with his performance on Dr. Paradis' "true or false" test, in which he correctly answered nineteen out of twenty-one questions about the specific allegations underlying the interstate prostitution and sex trafficking charges. *See* Findings of Fact Section IV.B.i.2 *supra*.

The neuropsychological test results suggest that Jeffries' abilities to retain and recall information are stronger when he is presented with information in writing or a visual format as opposed to only auditorily. *See* Findings of Fact Section III.C.iv *supra*. These strengths are consistent with the evidence discussed above about his recall of the *New York Times* editorial and five of the seven allegations on Dr. Paradis' shorthand description of the prosecution's allegations against Jeffries. It is further supported by Dr. Valdes' 2026 opinion that Jeffries' "reading comprehension abilities were commensurate with reading abilities and at the upper end of average," that his "recall of visual information was low average," and that he "was able to retain 46 percent of the information learned" visually. (DX-C at 65; Hr'g Tr. 151:11–14; *see also* DX-C at 74.) Although Jeffries' ability to retain information received solely through auditory means is lower—Dr. Valdes found in 2026 that Jeffries retained only 12 percent of information that he received verbally (Hr'g Tr. 152:4–6)—the Butner calls discussed above amply show that Jeffries nevertheless retains a sufficient ability to learn, retain, and recall information days and weeks later even after first learning the information only by hearing it.

Jeffries has also shown an intact memory regarding details about his personal life and relationships. For example, in phone calls with Smith, Jeffries recalled the names of friends and family members without much difficulty. *See* Findings of Fact Section III.C.v–vi. In one call, Jeffries remembered that his friend "Daisy" was 98 years old and asked, "How did she sound?" when Smith spoke to her. (GX-333T at 8.) In another call, he recalled that his friend "Brian" was "living in Hawaii now." (GX-356T at 4.) In another, he noted that a recent American Eagle advertising campaign was run by "Craig Brommers," "our marketing guy" who "was very good" and "walked out when I left." (GX-352T at 2–3.) The calls show that Jeffries can remember such information without any prompting from Smith.[44] These conversations confirm that Jeffries is able to remember information about people and places that are important to him, which squarely relates to his ability to learn and retrieve information in a trial setting and to communicate with defense counsel about facts pertinent to the charged conduct and cross-examination of witnesses.

### D. <u>Jeffries is Able to Understand Defense Strategies and Work With his Attorney to Meaningfully Engage in his Defense</u>

Jeffries has articulated defense theories and considerations pertinent to developing defense strategies and areas for the cross-examination of witnesses. For example, during the

[44] Similarly, when Smith referenced that their friend "Sandy" was traveling to Madeira, Portugal, Jeffries asked, "Could it be that she's staying at Reid's?" identifying the name of a hotel in Madeira. (GX-371T at 2.) When his son told Jeffries about his new job working for a hotel in Santa Barbara, Jeffries asked, "Was this, the hotel where the Kennedys spent their honeymoon[?]" and "they were definitely in someplace around where you are." (GX-364T at 4.)

Although the parties have not submitted evidence addressing whether Reid's is a hotel in Madeira or whether President John F. Kennedy, Jr. and his wife Jacqueline Kennedy Onassis honeymooned in Santa Barbara, it appears that Jeffries correctly recalled such information. *See*, Reid's Palace, A Belmond Hotel, https://www.belmond.com/en/hotels/europe/portugal/reids-palace-madeira (last visited Aug. 19, 2026); Margaret Myre, *San Ysidro Ranch: The Kennedys Slept Here*, Travel Weekly (Sept. 4, 2008), https://www.travelweekly.com/Travel-News/Hotel-News/The-Kennedys-slept-here (reporting on the Kennedy's honeymoon in Santa Barbara at the San Ysidro Ranch).

Butner calls he articulated rational defense positions that the complainants against him were consenting adults and that no force was involved in the alleged acts—both of which are an effort to attack the prosecution's allegations. (*See* GX-385T at 3; GX-375T at 2–3.) In the 2026 joint evaluation, Jeffries expressed an interest in demonstrating that the complainants were financially motivated, which is a rational strategy to impeach a witness by attempting to show witness bias. He also articulated to the evaluators that he would argue that he did not have the character associated with the alleged conduct. *See Thompson v. Henderson*, 143 S. Ct. 2412, 2413 (2023) (describing "standard and long-accepted trial practices" to include "attempting to undermine the credibility of adverse witnesses, seeking to bolster the credibility of the attorney's client, raising the possibility of a counterparty's pecuniary motives, and suggesting that witnesses may have been coached or coordinated their stories"); *see, e.g., United States v. Block*, No. 16-cr-595, 2019 WL 1254762, at *6 (S.D.N.Y. Mar. 19, 2019), *aff'd*, 797 F. App'x 668 (2d Cir. 2020) (noting agreement that the "prospect of [] a financial award might show a witness's motive, bias, or interest" where "a testifying witness might assume that the odds of a large award are increased by a conviction of the defendant"). Jeffries also expressed his agreement with counsel's assessment that a "smart jury" would be preferable. (GX-6 at 27:21–40.)

Moreover, Jeffries understands that he can rely on his counsel to suggest and identify key defense strategies. In the 2026 joint evaluation, when evaluators proposed additional strategies for impeaching witnesses, Jeffries responded, "Brian's job is to defend me and if he thought that was correct, he'd bring those things up." *Id*. 27:40–28:28; *see United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993) ("Even perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers. That level of comprehension is not a requirement of competency.") In the same vein, Jeffries has also

shown an ability to identify and correct factual discrepancies, a skill he may use when listening to witness testimony in order to inform his counsel's preparation for cross-examination. As discussed earlier, Jeffries has also demonstrated that he can hear information and correct errors in real time, such as he did when Dr. Bardey asked him to consider whether the prosecution had evidence of "documented travel" by victims to areas where Jeffries may have rented a house. (GX-6 at 27:21–29:30.) Jeffries responded that he would ask counsel, "How solid those facts are?" and pointed out that "I've never rented a house." (*Id.*) As the prosecution points out, the alleged locations of the sex events are two New York properties owned by Jeffries. (Gov't Resp. at 13.) Jeffries thus retains sufficient memory abilities to make similar real-time corrections to his defense counsel during the course of trial.

### E. Jeffries' Remaining Arguments do not Establish that Jeffries is Unable to Assist his Counsel with a Reasonable Degree of Rational Understanding

Jeffries argues that he cannot assist his counsel with a reasonable degree of rational understanding because he: (1) has memory issues, (2) purportedly is incapable of understanding or recalling his defense strategy, and (3) assertedly has a tendency to confabulate. (Def. Br. at 40–50; Def. Resp. at 17–29.) None of these arguments are supported by the record.

#### *i. Jeffries' Memory Deficits Must Be Considered Alongside His Other Capabilities*

Jeffries invokes his memory deficits, as shown in Dr. Valdes' 2026 testing, to contend that it will be "difficult for him to learn/register, retain, and recall information, especially in larger amounts," as required at trial. (Def. Br. 45–49.) As explained above, however, the Butner calls and Jeffries' performance in the 2026 joint evaluation shows that he has the ability to understand defense strategies, to work with his attorney, and to learn, retain, and recall information. *See* Conclusions of Law Section III.A.ii–iii *supra*. Although Jeffries' ability to retrieve and recall information is stronger when new information is presented to him in visual or

written form, even when new information is presented only auditorily, Jeffries is able to grasp and retrieve that information in subsequent weeks and days when the subject matter is important to him, as was the case with information about the Butner competency evaluation and restoration process, his son's job interview, his daughter-in-law's injuries from a car accident, and his friend Sandy's travel. *See* Findings of Fact Section III.C.v–vi, Conclusions of Law Section III.C *supra*.

The Court's inquiry is focused on Jeffries' abilities as they exist today—not what they used to be. As Dr. Paradis credibly testified, "the question isn't how much he has lost. But how is he functioning and what do you need to function to be competent." (Hr'g Tr. 938:14–16.) As discussed above, Dr. Valdes' 2026 testing demonstrates that Jeffries' retains cognitive abilities in key areas: he is of average intelligence, has above average reading comprehension abilities, and has average reasoning, problem solving, working memory, processing, and verbal comprehension skills. *See* Conclusions of Law Section III.A.i *supra*. Significantly, these cognitive abilities translate into Jeffries' functional abilities to learn and retrieve new information, adapt to new circumstances, and problem solve as shown through the Butner calls and Jeffries' ability to follow the rules of the facility over the course of his commitment. All of these skills help Jeffries account for any deficits in memory, processing speed, set shifting, and learning large and complex amounts of information as documented by Dr. Valdes' 2026 neuropsychological test results.

A closer review of Jeffries' specific test results also paints a more nuanced picture of his memory abilities. While Jeffries demonstrated some impairments in his verbal memory abilities, he specifically did better—and indeed, scored in the average range—on memory tasks that provided him with relevant context and narrative. Dr. Valdes, Dr. Morris, and Dr. Pennuto all agreed that Jeffries was able to remember more information when information presented to him

auditorily was contextualized, *e.g.* presented in a narrative or a true/false format rather than randomly.[45] For example, while certain tests asked Jeffries to memorize a random list of words, others required Jeffries to remember a story. Jeffries performed slightly better on the latter. (Hr'g Tr. 136:12–137:12 (Dr. Valdes testifying that Jeffries' ability to remember a story immediately after hearing it was "adequate," then "borderline impaired" 30 minutes later); *id*. 604:9–605:6 (Dr. Pennuto testifying that Jeffries' immediate short story recall was "low average" and late recall was "average"); DX-C at 74–75 (Dr. Valdes reporting that Jeffries' ability to recall lists of 10 words and 16 words was borderline impaired).) While Jeffries' abilities declined when asked to recall a story after some time, his performance improved when provided additional context. (*See* GX-2A at 27 (Dr. Pennuto reporting that Jeffries' verbal memory "pattern of performance indicates [his] recall benefits from verbal information being provided with context/structure.").) These test results regarding Jeffries' ability to remember contextualized information are more pertinent to the trial context than Jeffries' performance on other memory tests.[46]

---

[45] Dr. Valdes' 2026 Report indicated that Jeffries' ability to learn a story was at the "lower end of average," but improved to average when he was provided with a true/false format. (DX-C at 74– 75.)

Dr. Morris testified: "Mr. Jeffries does better when he's asked information that's contextualized and he can relate to and he has some connection to." (Hr'g Tr. 860:22–24.)

Dr. Pennuto testified: "[A] narrative, [] a story that's provided to him and that context, that structure of the verbal information, benefits his recall." (*Id*. 605:18–20.)

[46] Upon direct examination, Dr. Pennuto testified as follows:

> Q. So is it fair to say you agree with Dr. Valdes who testified that the defendant performs better when information is contextualized in a story?
>
> A. Yes.

Moreover, Jeffries' performance on the 2026 neuropsychological tests must be understood in the context of how Dr. Valdes administered the tests. She evaluated Jeffries over the course of two days. (Hr'g Tr. 186:16–18.) The first day of the evaluation lasted five hours, with only one fifteen minute break for coffee because Jeffries "declined a lengthier lunch break." (*Id*. 187:4–13.) The second day of the evaluation lasted five and a half hours with a midday lunch break of an unspecified duration. (*Id*.) Referring generally to both days of testing, Dr. Valdes testified that Jeffries was given only "multiple short breaks." (*Id*. 220:15–16.)[47] Both Dr. Paradis and Dr. Pennuto critiqued this approach. Dr. Paradis referred specifically to the duration of the test administration:

> I spent ten years doing neuropsych evaluations in rehab medicine and the way I was trained and I believe the research support[s] it, this is an 80-year old man. And you don't test someone for five hours because people get tired, older people get tired, people with traumatic brain injuries get tired. So how reliable is your data? They're not going to get better when they're tired, they're going to get worse. I mean, it's not just older people, I know there was a whole controversy when they made the SATs longer, the people said they were adding the writing in the end. But you can't expect 17-year olds to focus [] for four hours. So yes, in my training, you don't test someone for that length of time if you want to get their best performance.

(Hr'g Tr. 928:20–929:14.) Dr. Pennuto testified that it is not her practice to test elderly patients for four to five hours, in part out of concerns for "fatigue." (*Id*. 624:18–625:1.) As a result, she also found "noteworthy" the order in which tests are given, because "[i]f someone performs

---

> Q. On that basis, would information communicated as part of a narrative, like a witness testifying, be easier to comprehend than a random list of words?
>
> A. Yes.

(Hr'g Tr. 605:24–606:6.)

[47] Dr. Valdes' testimony at the competency hearing about when Jeffries took breaks during each day of testing is more specific than her general statement in her 2026 report that "Mr. Jeffries was able to work for several hours time before requiring bathroom breaks or 15 minute to 30-minute breaks to have a cup of coffee, snack, or have lunch." (DX-C at 82.)

poorly on tests, on particular tests and you can look at the order and determine if that could potentially have been due to fatigue." (*Id*. 625:7–10.) Dr. Valdes' report did not indicate the order in which she administered neuropsychological tests. (*See* DX-C.) Thus, crediting these reliable and supported opinions of Dr. Paradis and Dr. Pennuto, Dr. Valdes' 2026 neuropsychological testing may overrepresent Jeffries' cognitive deficits, including deficits in remembering information acquired auditorily, due to the length of the testing and lack of sufficient breaks on the first day of the evaluation, which may have caused Jeffries fatigue.

Jeffries relies on incidents in which he did not remember particular information, or misstated what he understood, to argue that his memory is inadequate to permit consultation with counsel. But even taking into account all of these incidents, they do not rebut the evidence of his adequate memory. Jeffries points to the fact that he told Dr. Bardey, Dr. Rosenberg, and Dr. Paradis that he was in Butner because it was "part of the sentence that the judge decided on." (Def. Resp. at 23.) This response is taken out of context. When Dr. Bardey followed up to ask whether the judge's "sentence" meant that the case was over, Jeffries correctly responded, "[N]o," and elaborated, "[W]hat's going to happen now is that, there will be a hearing, and at that hearing, it will be determined whether I'm . . . fit to stand trial. If I'm not, then I go away." (GX-4 at 4:15–47.) Thus, while Jeffries used the wrong words, he accurately remembered why he had been committed to Butner and the next steps in his proceedings.

Jeffries also points to his inability to explain the allegations, citing his response to evaluators that "I can't say [what the allegations are] beyond the fact that they say I've assaulted them." (Def. Resp. at 23.) As this Court has already explained, this response and others by Jeffries during the 2026 joint evaluation are attributed to his lack of effort and refusal to be forthcoming in that evaluation and in his interviews with Dr. Morris and Dr. Pennuto, as

acknowledged by the defense and prosecution experts. *See* Conclusions of Law Section II.C.i *supra*; Findings of Fact Section IV.B.i.1.e *supra*.

Next, Jeffries cites his statement in the 2026 joint evaluation that he met Dr. Rosenberg in Columbus, Ohio. (Def. Resp. at 23.) Although it is true that Jeffries forgot that he first met Dr. Rosenberg in Florida, such evidence of his memory deficits does not counter the ample record showing that he has sufficient memory to aid and consult with this counsel in his own defense.

Finally, Jeffries invokes these examples of his memory deficits to suggest that he "overstated his ability to assist counsel with confronting the prosecution's witnesses because he is unable to remember who the alleged victims are, their claims against him, or the events that allegedly occurred." (Def. Resp. at 26.) This argument is not persuasive because Jeffries has demonstrated a sufficient understanding of the prosecution's allegations and thereby understands the alleged victims "claims against him." *See* Conclusions of Law Section II.C *supra*. Additionally, as noted above, Jeffries' specific knowledge of the names of the alleged victims or other witnesses is not dispositive because of the nature of the alleged conduct. The Indictment alleges that Jeffries, Smith, and Jacobson hired staff who facilitated numerous sex events between 2008 and 2015, that staff transported the men to the event locations, and that Jacobson recruited men for the events were. *See* footnote 28 *supra*. Thus, there were numerous people involved and some played intermediary roles. Additionally, as the prosecution aptly points out, Jeffries' purported amnesia is not dispositive in part because he allegedly "was not the only person present for the underlying events in this case" and, supposedly, "there is evidence independent of Jeffries's recollection as to the events in question." (*See* Gov't Br. at 17.)

### *ii. Jeffries' Examples Purportedly Showing That he Does not Understand Defense Strategies are not Convincing*

Jeffries' assertion that he lacks the ability to understand defense strategies on the basis that he "previously misidentified both his competency issue and 'good character' as 'defense strategies'" is unpersuasive. (Def. Br. at 42–43.) First, Jeffries has formed a rational understanding that a threshold finding of incompetency would be beneficial to him and is a type of "defense" in that it could potentially save him the burden of proceeding to trial. Moreover, while Jeffries contends that establishing his good character is not a second reality-based defense, Jeffries is not expected to know how the Federal Rules of Evidence might apply to such character evidence at a trial to adjudicate the charges. Rather, Jeffries has formed a rational position that he would never engage in the type of force or coercion that the prosecution alleges and would seek to convince the jury of that fact. Finally, Jeffries has also identified a third and fourth rational defense strategy: (3) that complainants who brought civil suits against him are financially motivated and are therefore not credible witnesses; and (4) that the complainants were adults who consented to sexual activity and are therefore not credible in testifying that Jeffries forced or coerced them to engage in sexual conduct. (Gov't Resp. at 14–15.)

Jeffries' contention that he is incapable of remembering defense strategies based on his responses during the 2026 joint evaluation and Dr. Bardey and Dr. Rosenberg's related opinions is unconvincing for two reasons. First, as discussed in detail above, this Court has found that Jeffries was not forthcoming during the 2026 joint evaluation, as all three evaluators, including Dr. Bardey, acknowledged. *See* Conclusions of Law Section II.C.i *supra.* Second, the Court finds credible Dr. Paradis' testimony that the way Bieber presented information to Jeffries before the evaluators questioned him about his understanding contributed to Jeffries' confusion and

inattentiveness when responding to questions about what he understood about his counsel's explanation of evidence and defense strategies:

> I worked for ten years in rehabilitation medicine working with people that had brain damage and working [with] people using strategies and techniques to help them compensate for the brain damage that may never get better. And so, for Mr. Jeffries, he had a traumatic brain injury, he needs help. *And when I watched you talk with him, that's the time that he tuned out, he did, I noticed.* . . . I did remember that, when you spoke, well, *you spoke the way that you go off on a tangent, you went on and on and you didn't simplify, you didn't chunk it in small digestible pieces, you didn't write anything down.* You talked to him like you talk to me right here. . . . So he was totally engaged in our back and forth during both interviews, *the only time that I saw him get that almost glazed look was when you went on and on*.

(Hr'g Tr. 959:16–960:11 (emphasis added).) Dr. Paradis' testimony was not only credible, but reliable, as it is based on her ten years of experience working in rehabilitation medicine with people who, like Jeffries, suffered a traumatic brain injury.[48] Moreover, her opinion that Jeffries' responses to the questions about Bieber's explanation of evidence and defense strategies is not indicative of Jeffries' true understanding, is well-supported and reliable. It is also consistent with

[48] Dr. Rosenberg provided a different description of how Bieber shared information with Jeffries about the evidence and defense strategies:

> So when you [Bieber] came into the room, you brought your computer and you had a work product in which you organized some of the evidence, including witness testimony, and then described in detail, in very basic and simple terms, how you would go about defending him and walked him through the work product extensively. We, as the examiners chimed in every now and then to *also simplify concepts*.

(Hr'g Tr. 521:1–8 (emphasis added).) While Dr. Rosenberg opined that Bieber conveyed the information "in very basic simple terms," she also explained that he described the information "in detail" and "extensively," and that the evaluators "chimed in" in order to "simplify concepts." (*Id*.) Her admission that the evaluators needed to "simplify concepts" is consistent with Dr. Paradis' observation that Bieber did not sufficiently simplify and break up information, went "off on a tangent," and "didn't write anything down." (*Id*. 959:16–960:11.)

Accordingly, the Court finds Dr. Rosenberg's conclusion from this portion of the evaluation, that Jeffries "was not able to" "describe the defense strategy in his own words," less persuasive than the corresponding opinions of Dr. Paradis. (*Id*. 521:15–17.)

this Court's finding, explained in detail above, that Jeffries demonstrated the ability to understand and remember most of the prosecution's allegations against him after receiving the information auditorily and in a simplified form drafted by Dr. Paradis. *See* Conclusions of Law Section II.C., Section III.C *supra*. Thus, Dr. Bardey and Dr. Rosenberg's opinions to the contrary are unsupported by the record, which shows that Jeffries has articulated defense strategies and identified pertinent facts and issues that would help counsel devise defense strategies. *See* Conclusions of Law Section III.D *supra*; *see also, e.g.*, GX-385T at 3 ("'These, these people were adults, and, there was no force involved,' which I think is kind of key, isn't it? To our suit?" ); GX-375T at 2–3 (asking Smith to share with Bieber his takeaways from *Is it Alzheimer's?* by Peter V. Rabins).

### ***iii. The Evidence of Jeffries' Tendency to Confabulate is Weak***

Jeffries' argument that he is incapable of consulting with counsel in his defense due to a tendency to confabulate is similarly unavailing. Jeffries relies on incidents that are explained by his failure to be forthcoming in competency evaluations rather than an attempt to compensate for memory deficits by presenting false information. As this Court has already explained, any ignorance by Jeffries regarding the allegations against him and anticipated defense strategies is the result, in part, of his failure to engage with the charges and allegations due to his overarching desire to be determined incompetent to stand trial. *See* Conclusions of Law Section II.C *infra*. Jeffries' lack of effort was even noted by the evaluators during numerous interviews, including defense expert Dr. Bardey. *See id*. Of note is Dr. Morris' conclusion that Jeffries "was unwilling to discuss alternative strategies" and that his approach stemmed "not [from] an inability but rather an unwillingness to take a different approach to his case." (GX-2A at 35.) When pressed about Jeffries' repeated responses of "I don't know," she further testified:

> [T]hroughout the evaluation period, it was obvious to me that Mr. Jeffries, when either allowed more time to respond or when promoted to respond more fully, he was able to do so. It was not my opinion that he did not remember this information, but that he would initially respond that way, and then he would be able to provide more information.

(Hr'g Tr. 876:19–25.) The Court places weight on Dr. Morris' testimony in light of her credibility and the fact that her opinion is supported by her extensive contacts with Jeffries, which totaled approximately 30 to 35 interactions and evaluations over the course of several months. *Id*. 726:6–11; *see also* DX-AI, DX-AJ, DX-AK (Dr. Morris' notes and Jeffries' Butner records documenting their interactions); *United States v. Casteel*, 717 F.3d 635, 641–43 (8th Cir. 2013) (affirming district court finding of competency, which gave greater weight to one expert opinion because they "interacted with [defendant] more frequently and for a longer period than" the other expert did).

Thus, the Court also finds credible Dr. Paradis' testimony that Jeffries was not "studying his case independently" because "his strategy or his motivation and hope is that he's not going to have to learn all of those things because he's going to be found not competent." (Hr'g Tr. 957:22–958:3.) There is little to no evidence in the record to support Dr. Bardey and Dr. Rosenberg's opinion that Jeffries is unable to assist his counsel in his own defense because his memory deficits cause him to confabulate. *See* Conclusions of Law Section II.D.iii *supra*; DX-F at 19.[49]

[49] Jeffries also relies on an anecdote, characterized as a hypothetical, in which he purportedly confused a United States Probation Officer with Bieber's daughter, as another example of his tendency to confabulate. (Def. Br. at 43–44; *see also* Hr'g Tr. 392:2–393:1.) This brief interaction, which Jeffries' counsel strangely seeks to enter into evidence through testimony by Dr. Bardey about a complex and hard-to-follow hypothetical, is simply irrelevant. The Court recognizes that Jeffries' memory has declined from his premorbid functioning. However, as exhaustively detailed in this Opinion and Order, his memory deficits when learning information through reading, visually, or even auditorily are not so significant as to render him unable to consult with counsel in his own defense.

### F. Conclusions

For all of the aforementioned reasons, Jeffries has a more than sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding as required by the second prong of *Dusky* due to his intelligence, strong communication skills, and sufficient abilities to learn, remember and retrieve information, think strategically, and participate in his defense. He has demonstrated abilities to ask pertinent questions, engage in critical thinking, follow and fully participate in a conversation, express himself, learn information and recall it days and weeks later, and engage in self-advocacy to advance his interests. All of these skills enable him to assist his counsel in advancing his interests at all stages of these proceedings.

## IV. The Court's Competency Determination is Supported by the Decisions of Other Courts

As exhaustively detailed above, Jeffries meets both prongs of the *Dusky* standard. To the extent the burden of proof is on the prosecution to show that Jeffries is competent to proceed, the prosecution has met and exceeded that burden. To be clear, it is this Court's determination that Jeffries is competent to proceed regardless of the adoption of any specific trial accommodations.

This Court's conclusion that Jeffries is competent to proceed is consistent with that of other courts, which have found defendants competent despite expert testimony that the defendant suffered from traumatic brain injury, cognitive deficits, Alzheimer's disease, and/or Lewy Body Dementia. *See Casteel*, 717 F.3d at 640 (affirming the district court's finding of competency notwithstanding expert testimony that the defendant suffered "from paranoid schizophrenia with depression, dementia, and mental retardation"); *United States v. Rainone*, 32 F.3d 1203, 1207–08 (7th Cir. 1994), *cert denied*, 515 U.S. 1102 (1995) (affirming the district court's competency determination despite an expert report showing that the defendant was "showing early signs of senile dementia of the Alzheimer's type"); *United States v. Madison*, No. 6:17-cr-15, 2020 WL

8461574, at *3, 30, 37 (M.D. Fla. Oct. 29, 2020), *report and recommendation adopted*, No. 6:17-cr-15, 2020 WL 7768460 (M.D. Fla. Dec. 30, 2020) (finding the defendant competent despite his "history of traumatic brain injuries" and "vascular dementia"), *aff'd*, No. 21-12611, 2022 WL 4298175 (11th Cir. Sept. 19, 2022); *United States v. Brockman*, 604 F. Supp. 3d 612, 613 (S.D. Tex. 2022) (finding an 80-year-old defendant competent notwithstanding findings that he "has Parkinson's Disease, may have Alzheimer's Disease, and . . . is suffering from some degree of age-related cognitive decline"); *United States v. Henderson*, No. 3:22-cr-14, 2025 WL 582553, at *3–6 (E.D. Tenn. Feb. 21, 2025) (finding the defendant competent notwithstanding two expert diagnoses of Lewy Body Dementia).

## V. The Court will Adopt Trial Accommodations

The evidence before the Court suggests that granting Jeffries certain accommodations may be beneficial to him and to the efficient administration of trial, particularly in light of Jeffries' age (82 years), potential to be fatigued by lengthy trial days, and documented deficits in certain areas of cognitive functioning. As Dr. Paradis explained, "[J]ust as you can have a defendant that is intellectually disabled. . . . You can have a defendant that's a juvenile, you can have a defendant with a serious ADHD or learning disability. So there are a lot of defendants that need a lot more help." (Hr'g Tr. 962:23–963:5.)

Accordingly, the Court adopts the following trial procedures to facilitate Jeffries' participation in trial:

- Trial will be held Monday through Friday each week, although there may be exceptions based on the Court's schedule.
- Each trial day will last from 1:00 p.m. to 5:00 p.m. in order to permit Jeffries to discuss the prior trial day's testimony with counsel on the morning of each new trial day.

- There will be at least two or three 15-minute breaks during each trial day as scheduled by the Court. The Court may time these breaks to take place after the conclusion of witness testimony to enable Jeffries to consult with counsel regarding the testimony heard.

- The Court will provide additional or more lengthy breaks as needed.

- The parties shall jointly order the transcript for each trial day with a 24-hour return so that the parties may review the transcripts promptly as trial proceeds.

- Defense counsel may need to repeat and rephrase questions and simplify legal concepts during meetings with Jeffries.

To be clear, the Court does not adopt the aforementioned trial procedures in order to "restore" Jeffries to competency, as he suggests. (Def. Br. at 50–52.) The extensive findings above support this Court's conclusion that Jeffries is competent to stand trial under the *Dusky* standard. Jeffries is intelligent, capable, and deeply motivated to pursue his legal defense. The trial procedures set forth above will facilitate his participation and are akin to the adoption of similar procedures by other courts where defendants have had particular needs. *See, e.g.*, *United States v. McCray*, No. 1:15-cr-212, 2021 WL 4786026, at *1 (N.D. Ga. Oct. 14, 2021) (finding defendant competent to stand trial but ordering "reasonable accommodations . . . to be provided before and during trial to improve his ability to assist in his defense"); *United States v. Lopez-Ozuna*, No. 24-cr-06035, 2025 WL 1144567, at *51 n.18 (D. Ariz. Apr. 18, 2025) (recommending defendant be found competent and accommodations such as "frequent breaks both because of fatigue and so he can confer with his attorneys," and indicating that "defense counsel may need to repeat and rephrase questions and simplify legal concepts during their meetings"), *report and recommendation adopted*, No. cr-24-06035-001-TUC-AMM, 2025 WL 1774773 (D. Ariz. June 27, 2025); *United States v. Deruiter*, No. 2:14-cr-46, 2017 WL 9360880, at *28 (M.D. Fla. May 16, 2017) (same), *report and recommendation adopted*, No. 2:14-cr-46, 2017 WL 3308967 (M.D. Fla. Aug. 3, 2017); *United States v. May*, No. 06-40005-01, 2008 WL

4974829, at *3 (D. Kan. Nov. 19, 2008) (finding defendant competent and ordering "frequent breaks . . . and questions and proceedings explained in simple terms").

Jeffries argues that shortened trial days and frequent breaks cannot compensate for his memory deficits and that the defendants in cases involving trial accommodations never went to trial and did not suffer from Alzheimer's disease and Lewy Body Dementia. (Def. Resp. at 27–29.) Relying on *Musaid v. Kirkpatrick*, 114 F.4th 90 (2d Cir. 2024), he further contends that "[c]ompetency is fleeting" and that he may become incompetent "at some point during the proceedings . . . ." (Def. Br. at 51.) These arguments are unpersuasive.

First, the possibility that Jeffries will "at some point" become incompetent is speculative and unsupported. The Court's duty is to determine whether Jeffries is presently competent to proceed. The record demonstrates that he is. Moreover, Jeffries' cognitive functioning has largely remained stable, with some improvements in certain areas and declines in others. Thus Jeffries' circumstances are different from that of the defendant in *Musaid*, who was diagnosed with schizophrenia and "found by medical professionals to be incompetent to stand trial ten times" largely because he refused medication each time he was detained in Rikers. *Musaid*, 114 F.4th at 93. There, the defendant was "repeatedly committed to psychiatric hospitals" where he "would receive medication and would, with time, return to competence" before returning to Rikers "where he would *decline medication* and quickly regress to incompetence once again." *Id*. The experts who found Musaid competent noted that his competency hinged on his compliance with medication protocols. *Id*. at 97, 99. Jeffries' cognitive functioning is not so precarious and not contingent on any medication. As Dr. Paradis testified, "the fact that [Jeffries' evaluations] ha[ve] gone over three years is really helpful because we have longitud[inal] data now that does not show that he is deteriorating." (Hr'g Tr. 925:14–16.) As she explained, "the fact that he

improved from three years ago to today suggests that it's possible that he actually is more stable than I expected a year ago. I expected a year ago that he would deteriorate because, at the time I did think that he had a major neurocognitive disorder." (*Id*. 907:12–17.)

Second, as this Court has explained, other courts have found defendants competent even where an expert has provided a diagnosis of major neurocognitive disorder, Alzheimer's disease, and/or Lewy Body Dementia. *See Casteel*, 717 F.3d at 640; *Rainone*, 32 F.3d at 1207–08; *Madison*, 2020 WL 8461574, at *3, 30, 37*; Brockman*, 604 F. Supp. 3d at 613 (S.D. Tex. 2022); *Henderson*, 2025 WL 582553, at *3–6; *Salery*, 681 F. App'x at 855–57; *Chun*, 2019 WL 6683878, at *12; *Pfeiffer*, 2019 WL 2435487, at *1; *Lowe*, 2022 WL 738550, at *2; *Deruiter*, 2017 WL 9360880, at *25.

Although the defense experts in this case formed the opinion that Jeffries' cognitive issues and presentation are consistent with Lewy Body Dementia and Alzheimer's disease, Dr. Paradis opines that Jeffries likely does not present with either disease due to the lack of significant deterioration in Jeffries' condition since 2023. Dr. Pennuto shares this view. Ultimately, the Court need not resolve the question of whether Jeffries is suffering from either Lewy Body Dementia or Alzheimer's disease because, as addressed at length above, the Court has fully accounted for Jeffries' cognitive deficits and strengths as well as his functional abilities in concluding that even without any trial accommodations, he has a rational and factual understanding of the proceedings and has the present ability to consult with defense counsel with a reasonable degree of rational understanding. Moreover, Jeffries has been deemed competent to proceed precisely because his memory deficits are not so great that he does not meet either prong of the *Dusky* standard.

## CONCLUSION

For the reasons set forth above, the Court has determined that Defendant Michael Jeffries is competent to proceed in this action. The Court will address further pretrial proceedings and a motion schedule by separate order.

Dated: Central Islip, New York
August 20, 2026

*/s/ Nusrat J. Choudhury*
NUSRAT J. CHOUDHURY
United States District Judge